COURT'S RULINGS ON OBJECTIONS TO EXHIBITS AND DEPOSITIONS DURING JURY TRIAL

**Deposition of George Muirhead, November 17, 2005, Vol. 1,**
**Objections by Defense To Government Cross-Examination**

S (Deleted)

| Page(s) | Line(s) | Response |
|---|---|---|
| 245-246 | 21 of 245 - 5 of 246 | The Government withdrew this question at the time but, perhaps inadvertently, has not specifically agreed to delete it. It was never answered. |
| 246-253 | 6 of 246 - 15 of 253 | This questioning concerns high-profile litigation which the Muirheads were involved in against their banks in 1993. It is irrelevant to this case, remote in time, and beyond the scope of direct. Furthermore, it is not specific conduct of truthfulness or untruthfulness which may be inquired into on cross-examination.<br><br>At the time of this incident, Muirhead was a rancher and farmer. As he explained, interest rates on farm and commercial loans had increased to around 30%, leading to numerous foreclosures and financial distress for farmers. The Muirheads became embroiled in litigation with their bank which ultimately led to the loss of all their farms and property. To gain public support and attention<br><br>(continued on next page) |

S

FILED IN OPEN COURT THIS 2/23/06 CLERK, U.S. DISTRICT COURT, NORTHERN DIST. FLA.

| | | |
|---|---|---|
| | | for this issue they "seceded" from the regional government and declared themselves "Duke and Duchess of Marlborough." They did so as "a political statement." However, as Muirhead acknowledged, it became a "media fiasco." As he stated, "we sought to bring the attention to the government and, at the end of the day, we - we lost our farms."<br><br>Upon objection, the prosecutor stated that she would be able to show the relevance of this incident. However, upon further questioning Muirhead answered that he acquired REM in 1993 or 1994 and that it was initially used for buying and selling agricultural machinery. At that stage, REM had no investors. (pp.254 - 255.) The first time Muirhead took in investor funds was in 1995 - 1996. As the prosecutor then clarified, "So you had AAH REM for a couple of years prior to taking anyone else's money." (P.256.)<br><br>This episode, which is unrelated to this case, unfairly reflects on the Muirheads' credibility. It is remote in time as it occurred over 13 years ago. (Of course, a felony of that vintage could not be used to impeach them.) Moreover, it is not proper impeachment of their credibility. Rule 608(b) only permits impeachment by specific instances of conduct of the witness if probative of truthfulness or untruthfulness. There is no indication that this incident is of that nature. |

| | | | |
|---|---|---|---|
| S | 260-261 | 19 of 260 - 3 of 261 | Defendant objected to the characterization of "these adventures" in the question. The prosecutor rephrased the question in lines 4 - 6 and it was answered. Accordingly, the objected to question in lines 19 (p.260) - line 3(p.261) should be stricken. |
| S | 290 | 13-21 | The question concerns Muirhead's decision to establish an offshore (from Australia) entity. This is irrelevant and beyond the scope of the direct. Moreover, there was no follow-up to show that any such entity formed by Muirhead related to this case. |

**Deposition of George Muirhead , November 18, 2005, Vol. 2, Defendant's Objections To Government Cross-Examination**

| | Page(s) | Line(s) | Response |
|---|---|---|---|
| O.R. | 382-383 | 21 of 382 - 3 of 383 | The prosecutor asked the witness to produce certain documents. These had not been subpoenaed or requested before. It is improper to make such a testimonial request. |
| * | 435 - 438 | 25 of 435 - 19 of 438 | Muirhead was asked here about Government Exhibit AUS-13. He testified he did not recognize it and didn't think he had seen it before. Based on that response, further questioning about the contents of the document was improper as it was without foundation. |
| S | 468 - 469 | 7 of 468 - 9 of 469 | The prosecutor questioned Muirhead about AUS-1, a document which he said he could not remember. There is, therefore, insufficient predicate for its admission. |

* AUS.13 is in evidence now?

sustained up to P. 437 L. 13.

S

| | | |
|---|---|---|
| 523 | 16-19 | Objection to the prosecutor's characterization of Muirhead's response to the previous question as "speculation." |

**Deposition of Stephanie Muirhead, November 18, 2005, Defendant's Responses To Objections by the Government**

| Page(s) | Line(s) | Response |
|---|---|---|
| 39 | 12-16 | In her previous answer, Mrs. Muirhead testified that she had made a $200,000 transfer of REM's funds to the Microfund account. She was asked whether these funds went into the Panther Fund investment. Mrs. Muirhead answered they did not as the minimum amount for that investment was not reached. The prosecutor objected on the basis of knowledge. However, Mrs. Muirhead was charged with keeping track of REM's investments and did so. She properly testified as to her understanding as to what was done with these monies. |
| 97 | 6-12 | Mrs. Muirhead testified, without objection, that in Fall, 1998, there were increasing delays in their receipt back from Microfund of REM's funds. She testified Gilliland repeatedly explained such delays as "the bank's fault." She was then asked whether Gilliland blamed someone else for the delay in return of funds from a particular investment which REM had been made. Mrs. Muirhead stated he blamed "George Warner." That is not hearsay, as it is not offered for the truth. She then stated that Gilliland said he was going to see George Warner, "so he must have thought he could do something to stir it up." Defendant agrees to redact this last phrase. |

D.R

D.R.

| | | | |
|---|---|---|---|
| O.R. | 100 | 2-17 | Mrs. Muirhead testified, without objection, that they were having particular difficulties in getting funds returned from Gilliland for one particular client. She then named him and stated that he had complained to her. The prosecutor objected that this was hearsay. However, Mrs. Muirhead then testified that based on those complaints she wrote to Gilliland requesting the return of the funds. The testimony is offered, therefore, to explain the action she took to get the money returned. It is relevant to explain what Mrs. Muirhead described on p.101, the subject of the Government's next objection. |
| O.R. | 101 | 9-16 | Here, Mrs. Muirhead testified that Gilliland had given her the tracing number for a particular wire transfer which he claimed must have been lost. This same investor (described above on pg. 100) told Mrs. Muirhead that Gilliland had also told him that he had sent him a wire transfer with the same tracing number. Based on this evidence of Gilliland's lie, Mrs. Muirhead testified "every alarm bell went off." This is offered to show the basis for her increasing distrust of Gilliland and the subsequent measures which she, her husband and Dohan took to protect client funds. |
| D.R. | 109 | 3-20 | Mrs. Muirhead testified that this same investor still had not gotten his funds back by Easter, 1999. She then testified that she, her husband and Dohan engaged in negotiations with Gilliland to return investor funds in Dohan's custody directly to investors. This investor's funds were among those whose return they negotiated with Gilliland. |

S

As to ~~[illegible]~~ L. 10 p 111 to L. 13 P. 114

| 111-114 | 5 of 111 - 17 of 114 | Mrs. Muirhead's testimony concerns an investment in a currency arbitrage that Dohan had arranged with Mr. Droubi. She testified that she heard Gilliland say he was withdrawing his money and, therefore, the investment could not continue. Dohan stated in conversation with her that he was very upset about that. Mr. Dohan reaction is admissible as evidence of his state of mind. The fact that he was engaging in an investment which was being frustrated by Gilliland bears on his good faith. |
|---|---|---|
| 131-132 | 11 of 131 - 2 of 132 | Mrs. Muirhead testified, without objection, that in the first quarter of 1999 clients were complaining to them that they weren't getting paid their monies by Gilliland. This "barrage" of complaints was very stressful and contributed further to their loss of confidence in Gilliland. She then testified that she was told by a client that there was only $100,000 of Australian client funds invested with Dohan. This upset her (because she had believed the amount was a lot larger) and caused her to make inquiry to determine how much in client funds were in Dohan's custody and to confirm that with him. This testimony is, therefore, not offered for the truth (on information and belief it was incorrect) but to explain the steps she took to determine how much in funds were in Dohan's custody. |
| 132-134 | 25 of 132 - 9 of 134 | Mrs. Muirhead testified that she gave this information (described above) to Dohan. She then stated that by the tone of his voice he was surprised to hear this as well. This is admissible to show Dohan's state of mind. |

S

S

O.R.

| | | |
|---|---|---|
| 135-136 | 24 of 135 - 20 of 136 | Here, Mrs. Muirhead is describing her conversation with Dohan regarding the client funds in his possession in which he stated he would return the funds directly to clients if he could get written authorization from Gilliland to do so. She then testified that "based on that (lines 12 - 22)," she undertook to approach Gilliland and Melody Rose directly about returning the funds.<br><br>Dohan's statement as to his future course of conduct is admissible under the Hillmon doctrine, supra, which provides that "when the performance of a particular act by an individual is an issue in a case, his intention (state of mind) to perform that act may be shown. From that intention, the trier of fact may draw the inference that the person carried out his intention and performed the act." United States v. Pheister, 544 F.2d 376.<br><br>Further, Mrs. Muirhead's statement of what she did (i.e., contact Gilliland and Rose directly) based on Dohan's statement is also not hearsay. |

**Deposition of Stephanie Muirhead, November 18, 2005, Objections by Defense To Government Cross-Examination Questions**

| Page(s) | Line(s) | Response |
|---|---|---|
| 201-203 | 11 of 201 - 2 of 203 | The prosecutor questioned Mrs. Muirhead about AUS-13, which Mr. Muirhead had previously failed to identify. Mrs. Muirhead also did not recognize it. Accordingly, there is no foundation for this questioning about it. |

**Defendant's Responses To Government's Objections to Defendant's Exhibits** [3]

| Defense Exhibit Number | Page[4] | Defendant's Response |
|---|---|---|
| WD - 50 (Attachment 1) | GM1,p.33 | WD-50 is a copy of a Federal Reserve Bulletin which Muirhead testified Gilliland gave him as background for the high yield investments he was promoting. Muirhead testified that this helped make Gilliland's claims credible.(pp.31 - 34.) This is an authentic United States Government publication and is, accordingly, admissible as a public record. However, it is offered to show what information Gilliland gave to Muirhead to persuade him of the legitimacy of his investment program and what Muirhead relied on in deciding to proceed to deal further with Gilliland.. |
| WD - 41 (Attachment 2) | GM1, pp. 109- 111. | This is a fax which Gilliland sent to Muirhead describing "Eurofund," an investment program he was offering. The Government objected to the first page of the fax on the ground that based on the fax tag it did not appear to be related to the following seven pages and withdrew its objection to the following seven pages. (See p.111, lines 4 - 10.) The Defendant agrees to withdraw the first page from the exhibit. |

As Agreed

[3] Copies of the exhibits are attached to this memorandum.

[4] "GM1" refers to George Muirhead's deposition transcript, vol.1 ("2," is the second day of his testimony); "SM," will refer to Stephanie Muirhead's transcript.

| | | |
|---|---|---|
| WD - 42 (Attachment 3) | GM1, pp.116 - 117. | This is a series of e-mails between Gilliland and Ron Benson, an Australian investor in Microfund with whom Muirhead was in communication. It represents an effort to determine which investors' monies are in which particular Microfund deal. The Government objected on hearsay and authenticity grounds, noting that the format was unusual. (p. 117.)<br><br>First, it is not offered for the truth, as Defendant does not claim that there were any such deals in which Gilliland had put investor funds. As to authenticity, Muirhead testified that he received this from Benson and that he recognized the format of the e-mails as characteristic of Benson's e-mails which he characterized as "quite unusual." (p.118.) |
| WD - 27 (Attachment 4) | GM1, pp. 143 - 145 | This is a fax which Dohan sent to the account executive at Cohig Securities requesting that he send to Muirhead and him the "account balance information which they requested." The Government objected that it is hearsay. However, it is not hearsay as it is a request that the account executive send them information. |
| WD - 49 (Attachment 5) | GM1, pp. 157 - 158 | This is a memorandum which Gilliland sent to Muirhead and Dohan describing "Eurofund," an investment program he was offering and his proposal for future joint activity, including setting up an office in Australia. The Government objected that it is hearsay. It is not offered for the truth. It is offered to show that these were claims which Gilliland was making regarding the programs he was offering and for the effect it had on the Defendant's intent and state of mind. See, United States v. Rubin and United States v. Schlei, supra, at p. 5. |
| WD - 20 (Attachment 6) | SM, pp.17 - 18 | This is a composite of two sheets relating to REM's account. These pages identify Fiserv Correspondent Services, which was Cohig's clearing house. The Government objected on foundation. However, Mrs. Muirhead testified that she received these pages from Cohig together with other account documents. |

5

| | | |
|---|---|---|
| WD - 62 (Attachment 7) | SM, pp. 105 - 107 | This is a fax sent from David Gilliland to Ron Benson, which Benson gave to Mrs. Muirhead. The Government objected on hearsay grounds. However, it is not offered for the truth. Indeed, it is a lulling communication from Gilliland to an investor. It is authentic as a copy of this same document was received from the Government during discovery. |
| WD - 83 (Attachment 8) | SM, pp. 85 -88. | WD-83 is a chart which Mrs. Muirhead prepared showing the distribution to REM investors of the proceeds of a $206,000 payment which was received from Microfund in early May, 1998. The indictment alleges, to the contrary, that this payment was received by Dohan.<br><br>On voir dire, Mrs. Muirhead testified that she prepared this at the defendant's request after he was indicted. (p.86.) The prosecutor asked whether she had bank information reflecting this information. She stated that while the bank statements would not show the names of the names of the payees, she had the check stubs, which did show the names, and had asked the bank to send copies of the checks. (p.88.) The prosecutor reserved an objection; however, she did not state the basis for it.<br><br>On January 18, 2006, the Government requested, for the first time, copies of the underlying bank records from which this document was prepared. The Government stated that it would withdraw its objection if these documents were provided.<br><br>On January 20, 2006, Defendant provided copies of these documents. (See Attachment 9.) |

as agreed

| | | |
|---|---|---|
| WD - 88 (Attachment 10) | SM, pp.155 - 156 | WD - 88 is an excerpt from the spreadsheet which the Government provided in discovery of financial transactions relating the Defendant. This excerpt contains the transactions which relate directly to REM. Mrs. Muirhead, who was responsible for bookkeeping, made notations during her testimony on this excerpt relating to the transactions. These notations show errors and omissions.<br><br>The Government objects to admission on the ground that this is not its final spreadsheet. However, Defendant specifically requested that it provide this document prior to the deposition so that it could inquire from the witnesses about these transactions. Clearly Defendant may show that there are errors on this spreadsheet regarding particular transactions. If the Government's "final spreadsheet" still contains these same errors (further renditions received from the Government still do), then this testimony and the underlying exhibit is the only way Defendant can reasonably respond. |

S

UNLESS →

RESPECTFULLY SUBMITTED,

Joaquin Mendez, P.A.
100 SE 2nd Street, Suite 2700
Miami, FL 33131
Telephone (305) 375-0886
Facsimile (305) 375-0884

BY: s/Joaquin Mendez
Joaquin Mendez
Florida Bar No. 0814652

Moscowitz & Moscowitz, P.A.
1111 Brickell Avenue, Suite 2050
Miami, FL 33131
Telephone (305) 379-8300
Facsimile (305) 379-4404

BY: s/Norman A. Moscowitz
Norman A. Moscowitz
Florida Bar No. 0765643

Date: February 2, 2006

**Deposition of George Muirhead, Objections by the Government**

| Page(s) | Line(s) | Defendant's Responses |
|---|---|---|
| 21-22 | 4 of 21 - 20 of 22 | The Government only objected to questions beginning at pg. 21, line 25, continuing to pg. 22, line 22. Objections to the questioning on pg. 21, lines 4 - 24 are, accordingly, waived. See Rule 15(g). Defendant concedes the objections which were preserved here are correct. |



| | | | |
|---|---|---|---|
| OR | 130-131 | 24 of 130 - 20 of 131 | The Government does not object to Muirhead's preceding testimony (lines 10 - 23) that Dohan's wife, Susan Dohan, had an employment search firm in London which placed bank executives. The objection is to Muirhead's testimony that he had discussions with Dohan about his becoming more involved in Mrs. Dohan's business and Muirhead's observation that Dohan's involvement with REM's affairs correspondingly lessened, even though "he still did have an active interest in watching over REM's affairs." This is not hearsay. Muirhead is commenting from his own observations of the change in the nature and extent of Dohan's involvement with REM's affairs. While he testifies that he had discussions with Dohan about this change in his level of involvement due to his increased involvement with his wife's business he does not testify as to the contents of those discussions.<br><br>Accordingly, this, too, is not hearsay. |
| OR | 133-134 | 1 of 133 - 10 of 134 | The Government objects to Muirhead's testimony that Dohan "felt he no longer should be involved with Microfund at the point when "there seemed to be problems associated with it."<br>While the Government objects to this testimony about Dohan "feeling" that he should no longer be involved with Microfund, it did not object earlier to testimony by Muirhead that Dohan had a role in Microfund. First, under the rule of completeness, this testimony that Dohan wanted to curtail his involvement should be heard together with testimony that he had been more actively involved. Second, this testimony is admissible as it shows Dohan's then state of mind. |
| S | 135 | 12 -18 | In the preceding lines 2 - 11 Muirhead testified that when he received REM's account statement from Cohig Securities he saw that there was a substantial loss. He became concerned and called Dohan to tell him. Only line 13 is hearsay, in which Dohan reports he called Signer, the account executive. |

S

| 136 - 137 | 15 of 136 - 4 of 137 | This is continued testimony about Dohan and Muirhead's joint discovery that there had been a substantial loss in REM's trading account at the Cohig Securities firm. The question asked was whether Dohan stated what he intended to do about this discovery. The answer was "to track the account closer."<br>This statement of an intended future course of conduct is within the exception for state of mind and evidence of intent. As the Advisory Committee Notes state, "The rule of <u>Mutual Life Ins. Co. v. Hillmon</u>, 145 U.S. 285 (1892) allowing evidence of intention as tending to prove the doing of the act intended, is , of course, left undisturbed." |
|---|---|---|
| 178 -179 | 11 of 178 - 19 of 179 | Muirhead testified that he was interested in investing REM's funds in a new investment activity (a currency arbitrage) which Dohan was involved in.. Asked how he learned about this, he replied that Dohan had told him. In lines 15 - 19, pg. 179, he states specifically what Dohan told him. Muirhead then described his own understanding of the nature of the investment. Dohan's statements about the investment are, here, not offered for the truth but to explain the basis for Muirhead's interest in making that investment. |

OR

S AFTER L. 22

S AFTER L-24

| | | |
|---|---|---|
| 189 - 190 | 21 of 189 - 15 of 190 | Prior to this objected to testimony, Muirhead testified that he was beginning to become concerned about the safety of his investment with Gilliland due to delays in repayment and an increasing number of excuses from him.(p.189, lines 2 - 19.) He was then asked whether he shared these concerns with Dohan and he stated he did. He was asked what Dohan's response was and he said "we should get our money back." That, however, is not hearsay, but a direction from Dohan as to a proposed course of action Muirhead should take. Muirhead then testified that Dohan expressed that he shared his same feelings about Gilliland, i.e., he "started to get very concerned." That is a statement of Dohan's then state of mind and, therefore, admissible. Moreover, it is the basis for Muirhead's explanation of the joint course of action he and Dohan then took. "We elected to seek to get all [of our] funds back." Testimony that they shared the concern and agreed on how to proceed is admissible under the Hillmon doctrine and necessary to explain what they then jointly did, which was place funds under Dohan's custody. |
| 191 - 193 | 22 of 191 - 14 of 193 | Here, Muirhead was asked what course of action he decided to take once the investor funds were under Dohan's control. He responded that Gilliland wanted to remove funds from Dohan's currency arbitrage. This is not hearsay as it described a proposed future course of action of Gilliland. Moreover, Muirhead explained that Gilliland's doing that was the trigger for his and Dohan's further action in seeking to remove their funds from Gilliland's control. As he states, "we, in fact, all elected then, including Mr. Dohan, once Gilliland had effected the termination of it, to- to recall all of our funds." Accordingly, that testimony is not offered for the truth but to explain what course Muirhead and Dohan then took regarding the funds in their control. |

| | | |
|---|---|---|
| 200 -202 | 11 of 200 - 13 of 202 | Muirhead is describing his discussions with Dohan in which they reached agreement that Dohan would return directly to investors funds he was holding pursuant to custodial agreements with Microfund. He testified that a limitation on Dohan's doing so was the fact that they were being held by Dohan pursuant to these custodial agreements and that Gilliland wanted them to be returned to his control. Dohan raised the possibility of turning them over to the courts as alternative. Both his "non-agreement" and suggestion of another alternative are not hearsay statements. Muirhead's statement that he wanted the funds to be turned over by Dohan directly to the investors is also not hearsay. Finally, his testimony that Dohan agreed to return the funds directly to the clients once he had worked out a release with Gilliland is not hearsay. It is an agreement, which is not a hearsay statement, and also bears on Dohan's intent. His further statement that Dohan was in favor of returning the funds to the clients is a statement of a future course of conduct which shows Dohan's state of mind. |
| 202 | 17-22 | Muirhead is asked what position Melody Rose was taking on the return of the funds. He testified that it was Gilliland's responsibility and "she couldn't do anything without him signing off." This is not offered for the truth, i.e., that Rose couldn't release the funds. It is offered as evidence that she was refusing to facilitate the return of the funds. It is the equivalent of her saying "no," which is not hearsay. |
| 204-205 | 9 of 204 - 14 of 205 | Here, Muirhead is testifying about his conversations with Mr. Dyer, an investor, who was having difficulty getting his money back from Gilliland. This is offered to explain the action which Muirhead then took, which was asking Gilliland about returning Dyer's money to him. |

S Xcept L 8-14

S

S After L-14

S AFTER L-24

| 205-206 | 18 of 205 - 7 of 206 | Muirhead then explained that he then spoke to Gilliland about Dyer's funds and testified "he made the same promises to me that he did to Mr. Dyer that those funds were earmarked here and there to send back to make up that number." Gilliland's statements are not hearsay as they are not offered for the truth. Indeed, they were false as the monies were never returned by Gilliland to Dyer. |
|---|---|---|
| 207 | 17-25 | Muirhead was asked whether Dohan ever said he wanted to keep the investors' money. He answered, "Never, never. It'd be the last thing on his mind." His statement that Dohan never made that statement to him is, not hearsay. However, defendant agrees to redact the second sentence ("It'd be the last thing on his mind.") |
| 496 | 4-11 | Mr. Muirhead testified that Gilliland told him that Dohan had been making derogatory remarks about clients. Muirhead testified that he never heard Dohan make such remarks. He asked Dohan about it. The objected to question was what effect Dohan's response had on Muirhead's view of Gilliland. Muirhead then explained that Dohan's response "put [Gilliland] and me slightly at odds." The testimony is offered, therefore, to explain the change in Muirhead's opinion of Gilliland. |

OR, AS AGREED

O.R.

S AFTER "US," ON L-25

| 496-497 | 19 of 496 -13 of 497 | Muirhead was then asked whether he observed a pattern developing of Gilliland's seeking to put him and Dohan at odds by saying derogatory things to each about the other. He said it was. He testified that he "confirmed" this with Dohan. His and Dohan's agreement was not hearsay. Muirhead also testified that Gilliland was good at keeping people "compartmentalized." That is a lay opinion which describes what Muirhead observed about Gilliland's behavior towards him. |
|---|---|---|

| | | | |
|---|---|---|---|
| S | 497 | 22-25 | Muirhead was asked whether Dohan expressed agreement about this view of Gilliland's conduct. He answered "yes." Dohan's expression of agreement is not hearsay as it is the statement itself which is the evidence offered. In addition, it is evidence of Dohan's then state of mind. |
| S AFTER "contemplate" 2-19 | 499 | 17-23 | Muirhead was asked his view of Gilliland's proposal that complaining investors be paid off first. He said he discussed that with Dohan. That fact is not hearsay. He further testified that it was his and Dohan's mutual view that should never be done. Certainly his statement that he would not agree to do so is admissible. Dohan's expression of assent to that view is also admissible as evidence of Dohan's intent. |
| S | 501-502 | 25 of 501 - 7 of 502 | Muirhead further testified that Gilliland proposed that clients should be paid in advance of "profits" coming in. This is not hearsay as it is a proposal for a course of conduct, specifically, that Muirhead should agree to engage in "ponzi-like" distributions. Muirhead then testified that he and Dohan discussed Gilliland's view and that he and Dohan were "adamant" that they would not do that. Their agreement on how they would handle distributions to clients is not hearsay. It is an agreement as to a future course of conduct and it is also evidence of Dohan's intent. |
| O.R. | 511 | 6-15 | Muirhead testified here what he was told about the Government's search. The objection was that he did not specify who told him about this. However, he testified on p.510 (lines 17 - 18) that he thought it was Ken Cobb. |
| O.R. | 515 | 14-18 | He was asked whether Melody Rose told him whether there was a court order requiring return of the funds. He answered she never said that. Her non-response is not hearsay. |

United States v. William Scott Dohan Case No. 3::00cr/LAC

S

| | | |
|---|---|---|
| 516 | 5-16 | Muirhead was asked, without objection, whether he was willing to trust Gilliland to return the funds to investors. He testified "no.' He was then asked whether he trusted that if they went through Dohan's account they would get back to the investors. He said "yes." This expression of Muirhead state of mind explains the course of conduct he undertook in seeking to have investors' funds placed in Dohan's custody. |