IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                     CASE NO.  3:00cr48/LAC

vs.

WILLIAM SCOTT DOHAN,

       Defendant.

_____/

TRANSCRIPT OF SENTENCING

       The above-entitled matter came on to be heard before

the Honorable Lacey A. Collier, United States District Judge,

in the United States Courthouse, Pensacola, Florida, on the

25th day of July 2006.

APPEARANCES:

FOR THE GOVERNMENT:      MICHELLE M. HELDMYER, ESQUIRE
                        Assistant United States Attorney
                        21 East Garden Street, Suite 400
                        Pensacola, Florida 32502

FOR THE DEFENDANT:       LAWRENCE S. ROBBINS, ESQUIRE
                        GREGORY L. POE, ESQUIRE
                        Robbins, Russell, Englert,
                        Orseck & Untereiner
                        1801 K Street Northwest, Suite 411-L
                        Washington, D.C. 20006

                        NORMAN A. MOSCOWITZ, ESQUIRE
                        Moscowitz, Moscowitz & Magolnick
                        1111 Brickell Avenue, Suite 2050
                        Miami, Florida 33131

_____
Gwen B. Kesinger, RPR, FCRR
United States Court Reporter
One North Palafox Street
Pensacola, Florida  32502

```
 1              (Court in session.)

 2              (Defendant present.)

 3              THE COURT:  Good morning.  I do recognize

 4   Mr. Moscowitz.

 5              MR. MOSKOWITZ:  Good morning, Your Honor.

 6              THE COURT:  The other two gentlemen.

 7              MR. ROBBINS:  Good morning, Your Honor.  I'm Larry

 8   Robbins and my partner, Greg Poe, for the defendant this

 9   morning.

10              THE COURT:  Good morning, Ms. Heldmyer.

11              MS. HELDMYER:  Good morning, Your Honor.

12              THE COURT:  All right.  And, Mr. Robbins, would you be

13   the primary spokesman?

14              MR. ROBBINS:  Should I use the --

15              THE COURT:  Well, just a preliminary question.  Have

16   you reviewed the presentence report with your client?

17              MR. ROBBINS:  We have, Your Honor.

18              THE COURT:  And I noted I think you primarily cited

19   four principal objections.

20              MR. ROBBINS:  That's correct, Your Honor.

21              THE COURT:  I'd like to ask you to address those one

22   at a time so we can stay a little bit organized.  I do assure

23   you that I have read all the submissions that have come in so

24   far, if that helps with your presentation.

25              MR. ROBBINS:  That does, Your Honor.  If I may,
```

9:03AM 1    perhaps set out at the outset the order, with the Court's

2    permission, and we would propose to proceed.  I'm going to

3    present two of the issues, the criminal history issue and the

4    specific offense characteristic regarding knowledge of the

5    specified unlawful activity.  And Mr. Poe will present our

6    argument with respect to loss and role in the offense, since we

7    regard those as closely related issues and, therefore,

8    logically presented to the Court seriatim.  If I might proceed

9    on that basis, I'm just going to grab some materials and put it

10    in front of me, if that's okay.

11             THE COURT:  Yes, sir.

12             MR. ROBBINS:  Your Honor, I realize this is in some

13    sense working backwards, but I think the most discreet issue

14    and the one most easily addressed at the outset is actually the

15    criminal history category question.  The Court will note that

16    paragraph 95 of the presentence report assigned Mr. Dohan two

17    points for a criminal history because of an allegation that he

18    was arrested and convicted in 1987 and received a sentence of

19    at least 60 days of incarceration.

20             Under Section 4A1.1(b) of the guidelines, the two

21    points are indeed assigned if you received a sentence of

22    incarceration of imprisonment for at least 60 days, but

23    4A1.1(b)(2) goes on to say, Your Honor, that if part of that

24    sentence was suspended, then any part that was suspended is not

25    counted against the 60 days.  And that is what really presents

9:05AM 1  the challenge this morning, because as best we can tell from

2  all the available information that we've been able to get of

3  this approximately at this point nearly 20-year-old conviction,

4  it does not appear, and certainly the government can not bear

5  its burden of showing that it appears, that Mr. Dohan, in fact,

6  receive a 60-day incarceration sentence as required within the

7  meaning of the guidelines.

8        We have two documents that are before the Court, and

9  neither of them, I think, comes close to allowing the

10  government to sustain this burden.  The first, Your Honor, I

11  think shows almost exactly the opposite.  It is an order that

12  declared -- that reduced this sentence from a felony to a

13  misdemeanor and then dismissed it.  It was entered -- excuse

14  me, Your Honor.  It was entered in the Superior Court in the

15  State of California for the County of San Luis Opisbo on

16  December 29th, 1988.  What it did -- what this order did, Your

17  Honor, is to reduce the crime from a felony to a misdemeanor

18  and then dismiss it, and it recited or purported to recite what

19  the sentence had originally been.

20        And in the first decretal paragraph, it provided as

21  follows:  "It is ordered, adjudged and decreed that the

22  defendant, William Scott Dohan, having been heretofore on the

23  17th day of June 1983 --" and we don't dispute for present

24  purpose that it's -- 1983 was a misprint, it should have been,

25  I believe, 1987 -- "granted probation for a period of three

9:07AM  1  years and granted early termination of probation, and whereupon

2  on the motion of the probation officer and Court being fully

3  advised," and then it goes on to reduce, as I say, the offense

4  from a felony to a misdemeanor and to dismiss it.  So in the

5  first recital far from suggesting that he got 60 days for this

6  offense, all it says is that he received a period of probation.

7          Now, let me be clear.  We're not saying that that is

8  on its face entirely dispositive of the question, but it does,

9  I think, raise a significant doubt as to whether Mr. Dohan, in

10  fact, received 60 days because this ordering docket makes no

11  mention.

12          More recently, we received from the probation officer

13  a second document.  This is or purports to be a sheriff's form

14  with case summary information from the County of San Luis

15  Opisbo, and it has two recitals in it.  It says, first, "Jail

16  days, 60."  It says, second, "Status, alternative work

17  program."  Now, we're not sure precisely what that means, if it

18  means, for example, 60 days with some portion of it suspended

19  to permit an alternative work program, why then, in that event

20  it, would fall within 4A1.1(b)(2) that says, as I indicated at

21  the outset, that if a portion of the 60 days is suspended in

22  favor of some other non-incarceratory sentence, then you don't

23  count it.

24          That, I think, is quite likely what we have here, and

25  the reason I say that, Your Honor, is that if we go back to the

9:09AM 1  presentence report, it recites in paragraph -- in the back part

2  of -- in paragraph 156, this is the portion of the presentence

3  report that responds to objections that we made on this issue.

4  And the presentence report quotes Mr. Dohan as stated, that he

5  served nine weekends in jail, which would be 18, not 60 days,

6  and then reports later for the remainder of his sentence.

7  Well, "later for the remainder of his sentence" appears to

8  dovetail with the suggestion or the inference that I draw from

9  the sheriff's report that there were 60 days, but some part of

10  it suspended in favor of an alternative work program.  That's

11  consistent with what was quoted in paragraph 156.

12       But I would say, Your Honor, at the end of the day, we

13  can't be entirely certain what any of these documents means,

14  and that is where the burden of proof, of course, resolves the

15  matter for us, because, of course, the government bears his

16  burden as they do any other with respect to sentencing

17  adjustments.  And where the materials in front of us are as

18  fundamentally indeterminate, I would suggest there is no way to

19  draw a conclusion from a preponderance standard that Mr. Dohan,

20  in fact, received a sentence of incarceration within the

21  meaning of 4A1.1(b) for at least 60 days.

22       That being the case, I respectfully suggest, Your

23  Honor, that Mr. Dohan is not in category two for purposes of

24  sentencing, but rather in category one for purposes of

25  sentencing.  That is our submission with respect to the

9:11AM 1  criminal history issue.  I don't know if the Court pleases to

2  have the government counsel address issue by issue.

3          THE COURT:  Let me do that.

4          MR. ROBBINS:  I'm sorry, Your Honor?

5          THE COURT:  Let me do that.

6          MR. ROBBINS:  I'll just remove my materials from the

7  lecturn.

8          THE COURT:  Ms. Heldmyer.

9          MS. HELDMYER:  Your Honor, this was one of those kinds

10  of issues in the preparation of the PSR that the probation

11  office, of course, took the lead on and did the investigation,

12  pulled all of the documents and was able to establish the facts

13  that she has put in the presentence investigation report

14  addendum.  So any of the details of that investigation or what

15  those documents say, I know the Court has had access to them,

16  as have the parties, and I would defer in terms of details to

17  Ms. Lassiter if there are any unclear details.

18          The guidelines, however, are fairly clear that a

19  sentence of imprisonment is counted.  And in this particular

20  case, there was, in fact, one, a sentence of imprisonment.

21  4A1.2(b)(2) calls for apparently a deduction of any portion of

22  a sentence that is suspended, and that's just not the case in

23  this instance.  It seems that California apparently has some

24  fairly unique way of handling drug offenders that we don't

25  obviously practice here in Florida.  But the bottom line is

9:12AM 1  that it was a conviction and not expunged by any of the

2  definitions or rules adopted by the sentencing guidelines.

3  Therefore, the criminal history category should be two.  This

4  conviction happened within ten years of the conduct and, in

5  fact, was a period of incarceration for 60 days.  So clearly it

6  falls within the guidelines.  And through the hard work of the

7  probation office, the government has met its burden.

8       THE COURT:  Ms. Heldmyer, I guess I didn't get a

9  direct answer, though, to the suspension of part of the

10  incarcerative sentence.  Do you argue that that's not a part of

11  the guideline criteria?

12       MS. HELDMYER:  Well, I don't know, Your Honor, that

13  any portion of it was suspended.  It's a strange thing that

14  California did.  They allowed the sentence to be served, and

15  then after the fact, based upon whatever criteria they have,

16  they have a situation where a prisoner is allowed or a

17  defendant -- or a convicted felon is allowed to have the

18  charges dismissed, but it's all after the fact.  I don't

19  believe that any of those events occurred during the service of

20  a sentence or prior to the end of the case.  And under those

21  circumstances, I do not believe that one could consider that

22  portion suspended under the definition of the guidelines.  I

23  think the guidelines are taking into account sentences that are

24  of a different type than what we have here.  A suspended

25  sentence implies what it implies, that it's beforehand and the

9:14AM 1   sentence is not actually served.

2          In this case the sentence was served as it was

3   directed to be served, and any changes to the status of his

4   incarceration or of his convicted status happened after the

5   fact.  So I just don't believe it falls within the definition

6   under Chapter 4.

7          THE COURT:  In other words, you're just completely

8   discounting the statement of Mr. Dohan serving nine weekends

9   and performing labor or community service, I guess, for the

10  remainder?

11         MS. HELDMYER:  I don't know that that's the case, Your

12  Honor.  I'm relying strictly on the documents that the

13  probation office was able to gather.

14         THE COURT:  Well, I agree with you that the

15  expungement or set aside is not the issue.  We have that same

16  thing here in Florida.  You can expunge one, but it's still

17  active as far as criminal history goes.  The question is

18  whether -- and I gather you do agree that he must be sentenced

19  and complete a 60-day sentence before it comes under the

20  guidelines.  You don't take any issue with that?

21         MS. HELDMYER:  No, Your Honor, I do not.

22         THE COURT:  And so other than the entry, which is not

23  really the court record, that says he was sentenced to 60 days

24  in the first place, what else is there that you have that

25  suggests he served a 60-day sentence?

9:16AM 1         MS. HELDMYER:  Your Honor, all the documents that I

2    have the Court has, and they all came from the tenacious

3    investigation of the probation office.  I'm sure the Court is

4    aware of the difficulties the probation office has in trying to

5    verify the conviction.  So I have nothing in addition to what

6    the probation office was able to get.

7         THE COURT:  Well, I find that there is a lack of proof

8    as to exactly what the sentence was that was served and,

9    therefore, that objection will be sustained.  And it would

10   revert then to a category one.

11        MR. ROBBINS:  Thank you, Your Honor.  If I may turn to

12   the second issue.  The Court will note that in paragraph 84 of

13   the presentence report, a two-level increase is recommended to

14   Your Honor because the defendant is said to have known that the

15   funds that were laundered in this case were, in fact, the

16   proceeds of specified unlawful activity, and there is no

17   question that there is a guideline that, in fact, authorizes a

18   two-level increase where, in a 1957 money laundering case, the

19   defendant, in fact, knew that the proceeds came from specified

20   unlawful activity.  And that makes perfectly good sense in a

21   substantive 1957 prosecution, because under the law, it's very

22   well settled, it's right in the statute, a 1957 money

23   laundering violation, in contrast to a 1956 money laundering

24   prosecution, a substantive offense does not require the

25   government to show that the defendant, in fact, knew that the

9:18AM  1  proceeds came from specified unlawful activity.  He has to know

2  that it came from criminal activity of some sort, but not on

3  the list of specified unlawful activity.

4      So I think it makes perfectly good sense, as the

5  guidelines describe, that in a substantive 1957 case, if the

6  defendant actually knows the kind of crime that the proceeds

7  came from, that makes the crime more deserving of punishment,

8  as perfectly rational to have a two-point upward adjustment.

9  But we don't have that case here.

10      The government, for reasons that are best known to it

11  and to the grand jury, elected not to charge a substantive 1957

12  violation.  Instead, they charged a conspiracy to violate 1957.

13  Perhaps because they were not sure they could tie Mr. Dohan to

14  a particular monetary transaction, they, therefore, charged him

15  with a conspiracy.  And that, of course, in some ways makes the

16  task easier for the government, but in one respect, it makes it

17  harder, and this is the moment where it's harder, because in a

18  conspiracy, you must agree to commit the substantive offense.

19  You must form an intent to commit the individual elements of

20  the crime.

21      And our contention, Your Honor, is that a conspiracy

22  to commit 1957 cannot be accomplished without knowing that you

23  are going to commit all of the elements of 1957, including the

24  requirement that the proceeds be the result of specified

25  unlawful activity.  So that to give the upward adjustment of

9:20AM 1  two points because you knew that the proceeds came from

2  specified unlawful activity, while it makes perfectly good

3  sense in a substantive 1957 case, makes, I suggest, no sense

4  and constitutes impermissible double counting in the context of

5  a conspiracy to violate 1957.

6        And I think because of that, in a way the argument

7  that we're making here today is the same argument that the

8  guidelines indicate for 1956 cases.  In the notes to the

9  sentencing guidelines, the commentators made clear -- this

10  is -- I'm reading from the commentary to 2S1.2, they explain

11  that we don't have a similar adjustment of two points for 1956

12  money laundering because it's impossible to commit a 1956 money

13  laundering violation without knowing where the proceeds came

14  from.

15        So, too, here.  A conspiracy is simply different, and

16  it is just an impermissible double counting for an upward

17  adjustment in a case where, by its very nature, a defendant

18  would invariably know where the proceeds came from.  And for

19  that reason, we respectfully ask Your Honor not to include a

20  two-point upward adjustment under 2S1.2(b)(1)(B) for knowledge

21  that the funds came from other specified unlawful activity.

22  And we, therefore, persist in our objection to paragraph 84 of

23  the presentence report.

24        And with that, I'm happy to yield to brother counsel

25  from the government.

9:22AM 1              THE COURT:  All right.  Ms. Heldmyer.

2              MS. HELDMYER:  Your Honor, we disagree.  I agree with

3    the probation office when they stated in paragraph 150 of the

4    addendum that the background notes as to 2S1.1, state the

5    adjustment judgment implies Mr. Dohan knew that the funds were

6    not merely criminally derived, but were, in fact, the proceeds

7    of specified unlawful activity.  To adopt the defendant's

8    argument in this particular matter simply because a conspiracy

9    was charged is to put an added burden of proof on the

10   government with regard to conspiracy that just simply doesn't

11   exist.

12              A conspiracy is not -- does not require that the

13   government prove that the defendant knew of specified unlawful

14   activity.  It's just not one of the elements.  In this

15   particular case the government did, in fact, prove at trial

16   that the defendant was well aware of the specified unlawful

17   activity from the beginning of his involvement in this

18   conspiracy all the way through.  So the guideline adjustment

19   under 2S1.2(b) would apply.

20              THE COURT:  What instruction did we give?  I was

21   looking through my file, and I don't recall, and I don't seem

22   to have that particular instruction.  Do you recall?

23              MS. HELDMYER:  Your Honor, I know we had a discussion

24   about whether or not the government -- whether the jury

25   instructions needed to inform -- require the jury to find which

9:24AM 1    specified unlawful activity, because we did not charge that.

2    We had taken that out of this indictment.  Maybe Mr. Robbins

3    has something.

4              MR. ROBBINS:  Your Honor, may I assist counsel?  I do

5    have a copy of the instructions.

6              THE COURT:  Yes, sir.

7              MR. ROBBINS:  Would it be helpful, I could just direct

8    counsel's attention or answer the Court's attention?

9              THE COURT:  Either that, or you could project it up

10   here if that would help.

11             MS. HELDMYER:  All right.  Mr. Robbins does seem to

12   have the jury instruction.  It seems to be document No. 1441

13   for the record.  And if I may use Mr. Robbins' copy here, I may

14   put it on the screen, page 20 of document 1441.  Mr. Robbins

15   has marked this particular paragraph, and I'll allow the Court

16   to have time to read that.  And there was one more.  That's all

17   I have.

18             THE COURT:  Mr. Robbins.

19             MR. ROBBINS:  Yes, Your Honor.  Oh --

20             THE COURT:  It would appear that the instructions say

21   that the government didn't have to prove that at all, that that

22   wasn't part of the charge to the jury or the jury's finding.

23             MR. ROBBINS:  Well, let me answer that in two parts.

24   I actually think that -- well, first off, there is no question

25   that the last instruction that was just on the screen very much

9:27AM 1    subscribes to the point Your Honor just made.  They were indeed

2    told that they did not have to know -- that the defendant did

3    not have to know that the property involved the proceeds of

4    specified unlawful activity.  And that is without question a

5    true statement about 1957 substantive offenses.

6         But I would respectfully suggest that the part that is

7    pertinent here -- and that instruction with respect to a

8    substantive 1957 count is entirely correct and on objection,

9    but I think the pertinent instruction is the first one that was

10   on the screen, because that is the one that goes directly to

11   the conspiracy nature of this charge.  And there Your Honor

12   charged correctly in my view that to be unlawful of conspiring,

13   the defendant must have engaged in a common and unlawful plan,

14   a plan that, if carried out, would include the following, and

15   then it proceeds to say what the defendant must have planned.

16        And one of the things the instructions say the

17   defendant must have planned is that the property was derived

18   from specified unlawful activity.  That was on the first screen

19   that Ms. Heldmyer showed from page 20 of the instructions.  And

20   that instruction, I believe, Your Honor, is also correct,

21   because although the second instruction is correct as a matter

22   of substantive law, that's certainly true for 1957, but when

23   you layer conspiracy on top of it, particularly in a case where

24   the government gets all the advantages of a conspiracy trial,

25   rather than a substantive act trial, there is an additional

9:29AM 1    imposition, which is just as Your Honor charged.  There must be

2    a plan, a plan that includes all the elements of 1957,

3    including the one that you would not have to prove if you

4    charge merely a substantive offense.  And that is, I guess, the

5    one price you pay if you are a prosecutor and you elect to go

6    with a conspiracy theory rather than a substantive charge.

7         So I would respectfully suggest, Your Honor, that your

8    first charge is the one that speaks directly to my argument,

9    and I think for that reason, it would be impermissible double

10   counting to penalize Mr. Dohan for knowing something which he

11   invariably would have to know to commit the conspiracy charge

12   in the first place.  I think that's the core of our argument,

13   Your Honor.

14        THE COURT:  Anything further, Ms. Heldmyer?

15        MS. HELDMYER:  Just very quickly to add, Your Honor,

16   that all of the other defendants, it is my recollection,

17   received that two-level upward adjustment, all the

18   co-defendants in this case.  And as the Court knows, I don't

19   know if that was challenged on appeal, but obviously all the

20   sentences have been upheld.

21        THE COURT:  Mr. Robbins, I would disagree with you

22   there that the specified criminal activity had to be known,

23   just that it was one of the specified criminal activities,

24   which would get us back to the broader definition of criminal

25   activity.  So I think it is appropriately applied.  And the

9:31AM 1    objection is overruled there.

2              And Mr. Poe?

3              MR. POE:  Thank you, Your Honor.  Your Honor, if I

4    may, I would propose addressing the role issue first, because I

5    think a lot of the facts that bear on the discussion of that

6    issue and the Court's ultimate decision as to that issue then

7    certainly would flow into the value of the funds and the proof

8    issues that we're primarily focusing on for Your Honor.

9              At the outset, like I say, we greatly appreciate the

10   courtesy of the probation office and Ms. Lassiter in particular

11   in giving us the time we needed to prepare the objection that

12   is supplemented Mr. Moscowitz's and Mr. Mendez's, because

13   obviously we gave very detailed responses.

14             But I would like to ask just the Court to focus on the

15   calculation itself and the key issues in the offense conduct

16   descriptions that we believe are unsupported by the evidence.

17   We would ask Your Honor to accept the proposition that under no

18   circumstance does the evidence support a role adjustment of

19   four levels for Mr. Dohan, and we'd ask the Court to accept our

20   argument that no adjustment in this case, given the facts,

21   should be made.

22             The probation -- excuse me.  The probation office in

23   the response to our objections at page 36 of the final

24   presentence report indicates that Mr. Dohan's role was

25   described in detail at trial through the testimony of David

9:33AM

1    Gilliland, and that's the primary response to the objection

2    noted in the presentence report addendum.

3            Now, to give three particular examples of what we've

4    objected to, paragraph 22 says Mr. Dohan involved to be the

5    operational leader.  Paragraph 62 says Gilliland and Dohan

6    decided where the money went.  Paragraph 66 states in part

7    Gilliland says Dohan was the decision maker in the conspiracy

8    after the investigation began.  And we take issue with those,

9    Your Honor, statements and with the ultimate four-level

10   adjustment because, number one, the guidelines, we submit, are

11   quite clear.  In Eleventh Circuit law, the Glover case being

12   the one we cited, it's quite clear that an individual has to

13   actually supervise someone else in order either to be eligible

14   for a role adjustment, putting all the other considerations to

15   one side, and we respectfully submit in this case that is

16   simply not the picture painted of Mr. Dohan at trial and that

17   is not what the evidence supports.

18           The evidence at trial showed that although many people

19   called Mr. Dohan the trader in the operation, it really paints

20   a picture also of Mr. Dohan in a dotted-line relationship and

21   not part of a Bridgeport scheme.  Mr. Dohan didn't sign

22   contracts.  Mr. Dohan was not a signatory on bank accounts.

23   Mr. Segner himself, the government's accounting expert, stated

24   that the large accounts -- he conceded that Mr. Dohan was not a

25   signatory on those accounts, and that's where most of the money

9:34AM 1    went through, and the Hammersmith money being the primary funds

2    involved in this case, which I'll get to when we address the

3    next issue.

4           But the investors that he did talk with, and there

5    were just a few that the government put on at trial, they are

6    not indicative of the kind of role that others in this -- their

7    testimony is not indicative of the kind of role that others in

8    this conspiracy played.  With respect to the testimony, for

9    example, of Mr. Dyer, Mr. Dyer says that Mr. Dohan had a

10   conversation with him which then ultimately, after Mr. Dyer met

11   with others in Florida, he invested.  Well, there is a level of

12   generality of that discussion which we submit is not damaging

13   to Mr. Dohan for purposes of an analysis of what his real role

14   in the offense was.  Was he directing others?  Was he involved

15   in supervision of others?

16          And so what we have, Your Honor, is he's not a

17   recruiter.  He's not a broker.  He's not an agent.  He's not in

18   the Bridgeport operation moving money around.  He becomes a

19   trader in April of '98.  And it's interesting because up to

20   that point, the flow of funds is going to Mr. Gilliland, not to

21   Mr. Dohan.  Some money gets released to Mr. Dohan in April of

22   '98, and he becomes -- for the first time starts investing some

23   money.  And, again, when we get to the value of funds argument

24   and our mitigation arguments, that money doesn't get lost.

25          So he is a trader in the sense only that at a certain

9:36AM 1  point, he gets some money to invest, which he does ultimately

2  lose.  The government has relied on a particular e-mail that he

3  sent, and the probation office, I believe, relies on this

4  document in its role argument, in which he basically says don't

5  use people's name without my permission.  And we embrace that

6  e-mail, because in our view it simply shows Mr. Dohan saying I

7  have a reputation and I'm trying to do legitimate work out

8  here, and you're going to hurt me with these people if you

9  continue to do some of the nonsense that you've been doing.

10  It's almost like a wrist-slapping exercise.  And we dispute the

11  characterization of that as Mr. Dohan directing Mr. West,

12  Mr. Gilliland what to tell agents about the, quote, unquote,

13  programs and what the agents then would funnel down to others

14  to tell investors or to tell the investors directly themselves.

15        Your Honor, if one looks at the role issue and looks

16  at the chart -- OD-49 is a primary exhibit in the trial which

17  broke out some distribution of funds, which relates to

18  Microfund and which relates to a time when Eurofund, when by

19  David Gilliland's own testimony, was producing profits, or so

20  they believe, meaning Gilliland and Dohan.  Dohan and Gilliland

21  himself believed that those were legitimate profits at the

22  time.

23        That document in our view doesn't show Mr. Dohan --

24  he's not dealing with principal amounts.  He's not dealing with

25  in-flow of direct investor money.  There is simply not the sort

9:38AM

1    of evidence to show that he directed anybody, and,

2    particularly, there is no evidence to show that he involved in

3    any way to be an operational leader of this conspiracy.  Now,

4    Mr. Gilliland, as we've noted -- putting the credibility issues

5    to one side, we're not asking, we're not attempting, we have no

6    desire to sit here at this sentencing proceeding and try to

7    relitigate Mr. Gilliland's credibility.  The Court has seen

8    many of these proceedings over six years, and we don't need to

9    touch that issue.

10           What we do wish to address, though, is the speculative

11   quality -- the pervasively speculative quality of

12   Mr. Gilliland's testimony through trial.  We did a spreadsheet

13   in my office, and I gave selected examples in a footnote in our

14   submissions, 51 pages where language along the lines of I

15   guess, probably, it seems that, similar sort of hedging

16   statements by Mr. Gilliland which we submit simply can't tie

17   Mr. Dohan to the sort of role that Mr. Gilliland put him in by

18   the time of his trial testimony.  It was -- I understand why

19   Mr. Gilliland put him in that role at the time of his trial

20   testimony, but we would submit that the vague quality of it

21   simply can't be relied on to support the proposition that

22   Mr. Dohan was at a level with Mr. Gilliland, even if the Court

23   were to determine that they supervised others, which is the

24   threshold at issue.

25           Your Honor, I don't think it's necessary at this point

9:40AM
1    to get into any more detail about the record, the facts or some

2    of the specific nature and some of the objections, other than

3    just to say that I think based on that information alone, we

4    would submit that a four-point role adjustment is unwarranted

5    under any circumstance, and we would ask the Court to consider

6    our argument that no role adjustment at all in this case would

7    be the appropriate outcome.  And I can wait to address value of

8    funds laundered if the Court wishes.

9          THE COURT:  Yes, please.  Ms. Heldmyer.

10          MS. HELDMYER:  Yes, Your Honor.  Your Honor, Section

11    3B1.1 states that a four-level increase is appropriate if the

12    defendant was an organizer or leader of criminal activity that

13    involved five or more participants or was otherwise extensive.

14    There is no requirement -- I believe Mr. Poe said there may be

15    a requirement with regard to supervision, and there is no

16    requirement under 3B1.1(a) that any supervision take place.

17    Nevertheless, I think that this case -- a trial in this case

18    and some of the testimony from previous proceedings show that,

19    in fact, Mr. Dohan was all of those things.

20          I note the Court is very familiar with all of the

21    case.  As Mr. Poe pointed out correctly, this Court has heard

22    this case on several different occasions and the evidence.

23    There were several additions to Mr. Dohan's case that had not

24    been previously offered by the United States because of

25    Mr. Dohan's rather unique role in certain aspects of the crime.

9:41AM 1    One of those was Australia, and the Court may recall the

2    testimony of several of the Australians, including Alexander

3    Gilliland, who outlined the picture of Mr. Dohan who was in

4    charge of everything.  Mr. Dohan was the man.  Mr. Dohan was

5    the one with the control, and that's the way he wanted it.

6    That's the way he represented it himself, that he was the one

7    in control.  He was not pawning this off on anybody else.  He's

8    not saying he was answering to anyone.  He was the man in

9    Australia.

10         Frank Scott testified that in the early days, in 1986

11   and beyond, that Mr. Dohan and Mr. Gilliland were clearly 50/50

12   partners.  If he talked to one, he'd start talking to both of

13   them.  They obviously had equal power and equal share.

14         From the first trial, Your Honor, points to the

15   testimony of Ted Brinek from the 2001 trial.  Ted Brennick was

16   an early investor as well and, as a matter of fact, one of the

17   latest investors as well sending money to directly to Mark

18   Talley as the conspiracy wound down in 1999.  But Mr. Brennick

19   testified since that was a long time ago, if the Court would

20   indulge, I would like to read just a short portion of that or I

21   have that portion that I can offer as an individual exhibit

22   here for purposes of this trial, although the record, of

23   course, is all the same case, it is part of the record, but I

24   have it marked specifically as Government's Exhibit 4.

25         Mr. Brennick testified that he was introduced to

9:43AM

1    Mr. Gilliland through a gentleman in England.  He first said,

2    "Whose name I forget, but he introduced us, and then I met

3    Mr. Gilliland for the first time in London in a hotel

4    approximately 1995, '96."

5            "Did you also meet a man by the name of William

6    Dohan?"

7            "I met him at the same time, yes."

8            "What was the purpose of your meeting with

9    Mr. Gilliland and Mr. Dohan?"

10            Answer.  "They were introduced to me and said to be in

11    the investment business and professional and had some

12    interesting investment programs to discuss."

13            Question.  "Why was that of interest to you?"

14            Answer.  "I have placed client money from time to time

15    and that would be objective to learn a little more than the

16    usual bank account savings book."

17            You may recall Mr. Brennick was Austrian and had a

18    little bit of trouble with syntax in his answers.

19            Question.  "At that time in 1996 did Mr. Dohan or

20    Mr. Gilliland seem to have a specific program for you to invest

21    in?"

22            "A.  In conversation and meeting with him several

23    times that emerged that they did have or purported to have a

24    program where one could earn substantially higher monies, and

25    they tried to explain to me how it works and present the draft

9:44AM 1    contracts.  It appeared to be quite professional."

2              "When you say substantial higher returns, what kind of

3    returns are we talking about?"

4              Answer.  "I don't remember exactly what was the

5    discussion at the time, but I would think that it was sort of

6    in the neighborhood of 8 to 10 percent a month over a year."

7              "And we're still talking about the program in 1996?"

8              Answer.  "That's correct."

9              Going on to page 56 of that same transcript.

10   Question.  "Still back in 1996, maybe in 1997 time frame, did

11   you follow up on any specific program of Mr. Gilliland and

12   Mr. Dohan's?"

13             Answer.  "Yes, I did.  Contracts were drafted and

14   redrafted, and T's crossed and I's dotted with lots of detail,

15   which impressed me quite a bit.  And then I did place some

16   funds through the escrow agent that was proposed through them

17   that was the time -- at the time the United American Bank, an

18   escrow account, was opened, and I transferred funds there."

19             And then to page 60, this is the final quote that I'll

20   give the Court for now.

21             Question.  "Before you get that far, let me go back.

22   You said the Panther Fund was like a big dollar investment,

23   correct?"

24             Answer.  "Yes."

25             "Was it too big dollar for you?"

9:45AM

1           Answer.  "It was certainly too big dollar for my funds

2    and my clients."

3           Question.  "So you did not invest in Panther Fund at

4    all?"

5           Answer.  "No."

6           Question.  "Did you hear anything about the Panther

7    Fund or its demise or its unsuccessfulness or anything of that

8    nature?"

9           The Court may recall the Panther Fund occurred before

10   Microfund and never actually got off the ground.

11          Answer.  "From what I understand, it never really came

12   about."

13          Question.  "Who would have told you about that?"

14          Answer.  "Presumably Mr. Gilliland and/or Mr. Dohan.

15   There was mainly communication with Mr. Gilliland."

16          Question.  "During this period of time here, up to

17   this point, you and Mr. Gilliland and Mr. Dohan were getting

18   along fine, I assume?"

19          Answer.  "Oh, yes."  And then he says the baby of

20   Panther Fund emerged as Microfund.

21          Mr. Brennick then, therefore, testified primarily the

22   same way that Mr. Scott testified, and that was that

23   Mr. Gilliland and Mr. Dohan from the very beginning organized

24   the chain of events that eventually precipitated the loss of

25   over $60 million to the investors.  You may also recall that

9:47AM

1    there was testimony from Mr. Scott and Mr. Gilliland that when

2    the genesis of this particular investment scam occurred, it

3    started fraudulent because it started a million dollars in the

4    hole.  Mr. Scott and his clients lost over a million dollars.

5    They were given these shares in Hammersmith to roll those over

6    and to keep him in the program and to keep him active, but from

7    that point on, no one ever disclosed the fact that this

8    investment program, whatever it may have been, started a

9    million dollars in the hole.  So it started as a fraud.

10           I think that Mr. Poe has quoted quite a bit of

11    information showing that Mr. Gilliland said it wasn't -- or he

12    did not believe it to be a Ponzi scheme from the very

13    beginning.  That may or may not be true.  I think

14    Mr. Gilliland has testified on a number of occasions that he

15    tried to get it to work, but everyone agrees from the very,

16    very beginning they were telling lies to get investors to get

17    them to invest.  Whether they can classify it as a Ponzi scheme

18    at that point in time -- well, clearly it was, because they

19    took a million-dollar loss, and they Ponzied the million-dollar

20    loss from the very beginning.  He may not have called it a

21    Ponzi scheme, he may not have had an intent to form a Ponzi

22    scheme at that point, it evolved into that, but certainly from

23    the very beginning investors were lied to to get their money.

24           The Court may recall that we played a tape at the

25    trial as well.  Mr. Papagni had a conversation with Mr. Dohan

9:48AM 1   very early on, 1995, I think it was, very early on, '95 or '96,

2   where Mr. Dohan himself was selling a program and a program

3   that didn't exist, and not telling the Papagnis anything about

4   a risk.  When asked specifically about the risk, he said the

5   risk was zero, none.

6           So from the very beginning -- and that's the point of

7   a four-level increase.  From the very beginning Mr. Dohan was

8   there.  He was organizing it with the others that were -- the

9   organizers in this, including Mr. Gilliland, Mr. Sonny Poole

10  and some of the other earlier people that were involved in

11  this.  So the role -- Mr. Dohan's role cannot be distinguished

12  from Mr. Gilliland's role in terms of organizer and leader for

13  purposes of 3B1.1.

14          We believe, Your Honor, that the probation office is

15  correct, and that a four-level increase applies in this case.

16  I'm giving a copy of this to the defense.  I would just offer

17  Government's Exhibit 4 for the record so there is a record of

18  what I was reading from.

19          THE COURT:  It will be received.  And, Mr. Poe, if we

20  can go on to the matter of the money, that may help in the

21  determination of role adjustment.

22          MR. POE:  Yes, Your Honor.  Your Honor, may I make

23  just a couple of brief responses on the role issue?

24          THE COURT:  Yes, sir.

25          MR. POE:  I would just like -- of course, I have no

9:50AM 1    doubt the Court recalls that the structure of this in

2    Bridgeport was Gilliland.  West was underneath him.  Hansen,

3    Cobb and others were underneath him.  And as I recall, I think,

4    based on my review of records, Mr. West got a two-point upward

5    role adjustment, if I'm correct about that.

6         What I was referring to in terms of having actually

7    supervised someone is application note 2 of Section 3B1.1,

8    which states in part, "To qualify for adjustment under this

9    section, the defendant must have been the organizer, leader,

10    manager or supervisor of one or more other participants."  And

11    that's the Glover case that also relies on that and expounds on

12    it.

13         Now, I have not seen the Brennick testimony before

14    this morning, Your Honor, because I had a hearing, but just two

15    quick things on that.  The point I made about Mr. Gilliland's

16    testimony, page 60, "Who would have told you that?"

17         "Presumably Mr. Gilliland and/or Mr. Dohan."

18         Elsewhere at page 55.  Question.  "When you received

19    substantially higher returns, what kind of returns are we

20    talking about?"

21         Answer.  "I don't remember exactly what was that

22    discussion at that time, but I would think it was sort of in

23    the neighborhood."

24         That sort of testimony, Your Honor, we submit is

25    simply not sufficient nor reliable enough to count on for these

9:51AM 1  sorts of role adjustments with these sorts of consequences in a

2  sentencing proceeding.  The Papagni tape -- I'm sorry if I'm

3  mispronouncing the gentleman's name -- but I believe that was

4  in June of '98.  And with that, Your Honor, I'll just move on

5  to the value of laundered funds issue.

6          Now, at the outset, I think a critical issue is:  What

7  is the proper standard of proof?  And for reasons that are in

8  many ways similar to and dovetail with I think the point

9  Mr. Robbins tried to make with respect to the specific offense

10  characteristic.  In a conspiracy, the guideline is quite clear

11  that the adjustments under the substantive guideline may only

12  be applied if the intended offense conduct can be determined

13  with reasonable certainty.  That displaces the ordinary

14  relevant conduct principle of reasonably foreseeable conduct in

15  furtherance of undertaking criminal activity.

16          Now, I know the probation office's response to this,

17  and presumably Ms. Heldmyer shares this position, is that that

18  only applies to conduct that did not actually occur because of

19  an application note.  But if one looks at the application note,

20  I think it's quite evident that because something actually

21  occurred or not doesn't bear on whether the proof standard of

22  reasonable certainty has to apply because it's a conspiracy

23  after all.  So the example that's been given in the application

24  note is somebody getting hurt after a bank robbery that was

25  planned by some conspirators who had nothing to do with the

9:53AM 1    bank robbery.  Well, that's speculative.  And even if that

2    actually occurred, it's speculative and can't be applied to the

3    conspirator.

4          Similarly here, when one looks at the value of the

5    funds laundered, as Mr. Moscowitz put it in his April 18th

6    objection letter -- or I should say this is even before the

7    probation office had issued the initial report, there is simply

8    not evidence to show that Mr. Dohan was aware of the vast scope

9    of the scheme, the massive conspiracy that Mr. Gilliland was

10   perpetrating, was clearly the leader of, the Eleventh Circuit

11   said in the McCrimmon case, he was the mastermind, he was the

12   ringleader.  And until this proceeding, I know that the

13   government said at Mr. Gilliland's sentencing here before the

14   Court, that Mr. Gilliland -- there were others above

15   Mr. Gilliland, but I don't think that -- the Eleventh Circuit

16   didn't appear to see it that way in the McCrimmon case.

17         Now, with respect to the scope of the value of the

18   funds, if one stakes the reasonable certainty standard, but, if

19   I may add, even under ordinary relevant conduct principles,

20   it's not a strict liability concept.  And I think our position

21   is, as presented in the presentence report, it is as if it's a

22   strict liability concept.  And let me note, Your Honor, the

23   response on the issue at page 35 was, "The jury rejected these

24   same arguments --" this is of the presentence report submitted

25   to the Court.  "The jury rejected these same arguments and

9:54AM

1    found the defendant guilty."

2           Well, but for one justice, that would have -- there is

3    simply no basis in the trial record, we submit, to hold

4    Mr. Dohan accountable for everything, and there is certainly --

5    and we would venture a guess that the jury would not have seen

6    Mr. Dohan as responsible for every piece of the Hammersmith

7    scheme, because when one looks at the scheme, it started off

8    Gilliland, Dohan has AAH REM and Muirhead, invests money, and

9    the flow of funds into Gilliland.  They also have a separate

10   Cohig bank account, the Hammersmith Cohig account, I should say

11   investment account in Denver.  Gilliland has a separate one.

12          Now, the fact that Hammersmith is somehow an entity

13   that was originally created with some involvement from

14   Mr. Dohan is almost a red herring in our view, because what

15   happens then is it evolves to the point where Mr. Gilliland

16   takes it offshore, money goes through accounts that Mr. Dohan

17   has, as I said earlier, no signatory control over.  There is no

18   evidence that he knows of the scope of where these funds are.

19   The only evidence that can even be pointed to is David

20   Gilliland's testimony that he would give information orally to

21   Mr. Dohan, then Mr. Dohan would put it on spreadsheets, and so

22   forth.

23          Well, what spreadsheets did the government produce at

24   trial?  It's a Microfund spreadsheet created at the time when

25   Gilliland himself thought that Eurofund is producing a

9:56AM  1    legitimate profit, and it's not a spreadsheet which shows
2    principal moving around or principal coming in from investors.
3    It shows distribution of what they thought were legitimate
4    profits.  So if you take one step beyond that, Your Honor, and
5    you say, what does Gilliland's testimony show about what Dohan
6    knew?  Pervaded by speculation over and over and over.  And the
7    Court would show no disrespect to the jury verdict whatsoever
8    by saying this is simply not sufficient under any standard of
9    proof, but particularly the reasonable certainty standard of
10   proof, to tag a man like Mr. Dohan with 50-odd million dollars
11   in Hammersmith funds.

12          Now, we're not standing here, Your Honor, and asking
13   the Court to suggest that nothing should apply to Mr. Dohan as
14   a value of funds laundered, and it's almost as if an insider
15   trading case when one can't determine what the loss is when
16   using the gain to determine the number.  We would submit that
17   the only logical number to use would be the money that actually
18   went into Mr. Dohan's accounts, albeit money that he returned
19   to the investors later on, but the money that went into his
20   accounts, which is a number under $10 million.  We would submit
21   that that is the appropriate number, given the way the evidence
22   came in in this case, to use.

23          Now, there is a second argument.  If the Court were
24   inclined to attribute all of the $58 million in funds, which I
25   believe it's MHS-1, if my recollection is correct, to

9:58AM
1    Mr. Dohan, which, again, we submit there is not a sufficient

2    factual basis for, that leaves the issue of the additional

3    money that the government has argued in this case and presented

4    to the probation office and is included in the report, which is

5    some money from Australian investors and money from Mizrahi

6    that the government claims was invested in Microfund and should

7    be added to the amount.  Now, Mr. Moscowitz made abundantly

8    clear, we would submit, in his April 18th letter why that

9    Mizrahi money is not properly includable in the calculations.

10          Now, the Australian investor money, Your Honor, the

11   Court doesn't have to reach those issues, because the amounts,

12   I believe, are in the neighborhood of somewhere -- if the Court

13   were to agree with our conclusion about the Mizrahi money, it

14   would take him under $60 million.  So I'm just going to focus

15   on Mizrahi and not waste the Court's time with any discussion

16   of the Australian investors.

17          Now, Mizrahi testified that he made a multimillion

18   dollar investment in Microfund through Fidelity, but there is

19   no contract -- there is no Microfund contract with Mizrahi or a

20   Dominion Fidelity-related entity for that money.  And that was

21   the norm that the government relied on throughout the trial for

22   Microfund investments, the regularity of that recordkeeping and

23   the contracts that each investor would use once they signed up

24   with Microfund.

25          Now, the government points to two letters from David

9:59AM 1    Bishara -- I'm sorry, to David Bishara from Ralph Mizrahi

2    stating that he was authorizing a movement of money in the

3    Microfund accounts.  Well, the fact that those letters exist

4    doesn't help with the government's point in our view, because

5    there is no record in the Microfund accounts that those -- in

6    the bank accounts that those monies actually were invested as

7    these letters apparently authorize.  Now, there is no

8    indication in Microfund records that were seized either as far

9    as we can tell.

10    Now, the other thing, Your Honor, is the amounts that

11    are in the letters in Mr. Mizrahi's testimony are utterly

12    inconsistent with what the government says are in the records.

13    And so that leaves Mizrahi's testimony itself.  Now, the

14    government said in its response on July 18th to Mr. Moscowitz's

15    April 18th letter, the points he made in that letter, "in light

16    of various factors, Mr. Mizrahi's testimony controls."  Well,

17    there's still the standard of proof, and Mr. Mizrahi's

18    testimony has to be looked at in light of the other

19    uncertainties, the lack of things like the existence of a

20    contract, the movement of monies, where otherwise the

21    government relied on exactly that.

22    Now, the government backs away from Mr. Quilling --

23    who I haven't met, but I understand is present in the court

24    here today -- the government backs away from Mr. Quilling's

25    information in this context when at trial the government

10:01AM
1   essentially said, you know, Mr. Quilling was a reliable and

2   dogged pursuer of funds on behalf of investors.  So we would

3   just respectfully submit that that would be having it both

4   ways, and we would ask the Court not to accept that argument.

5           Now, the final point I want to make about Mizrahi --

6   Dominion, by the way, did not submit a claim to Mr. Quilling,

7   as I recall from reviewing information.  The final point I want

8   to make about Mr. Mizrahi is his relationship to Mr. Gilliland

9   is very odd, as Mr. Moscowitz put in his April 18th letter.

10  Number one, he loaned Mr. Gilliland money at a very late date

11  when the assets had been frozen, I believe, and I think he

12  would have reason to suspect, if not actually suspect, that

13  Mr. Gilliland had been up to no good, number one.  Number two,

14  as Mr. Moscowitz attached to his submission of April 18th,

15  Dominion Fidelity was acting as a vehicle for high yield

16  investment opportunities.  Mizrahi and Dohan apparently working

17  together.  And if one looks at a memo that Mr. Gilliland sent

18  to Mizrahi four days before that letter that Mr. Mizrahi sent

19  on Dominion Fidelity letterhead to somebody named, I believe,

20  Larry Krasny, the text is almost identical.  It's almost like

21  it was transplanted, slightly rewritten and put in Mr.

22  Mizrahi's letter.  So there was something going with that

23  relationship which was never fully disclosed at trial, but we

24  submit should create enough doubt at this point in the

25  sentencing stage that Mr. Mizrahi's testimony by itself at the

10:03AM
1    trial is insufficient basis to enhance that offense level --

2    the offense calculation by an additional level should the Court

3    agree with the government on the Hammersmith calculation, which

4    we would disagree with for the reasons already stated.

5              With that, Your Honor, I don't have anything

6    additional to add at this point.

7              THE COURT:  Ms. Heldmyer.

8              MS. HELDMYER:  Your Honor, the United States agrees

9    with the calculations as performed by the probation office.  If

10   I may ask counsel for a little clarification at this point,

11   because we are prepared to present evidence today and shore up

12   the exact figures, because I don't know that the whole picture

13   came into evidence at trial, and it probably needs to be done

14   with regard to the $58 million and then the addition of the

15   Mizrahi funds, et cetera.  May I ask counsel if he's objecting

16   to the base number of that $58 million as the loss figure, at

17   least as it pertained to the first trial and as it may pertain

18   to this trial if, in fact, the Court decides Mr. Dohan is

19   responsible for the full amount?  Because if not, I can present

20   evidence, but it would be time consuming.

21             MR. POE:  I guess I don't quite follow the point, Your

22   Honor, if I may speak from here.

23             THE COURT:  Well, let me see if I understand it, that

24   you're objecting to the 58 million because you say it shouldn't

25   be counted.  Are you objecting to the actual amount of 58 or

10:04AM 1    simply saying that it should not be attributed to Mr. Dohan?

2         MR. POE:  If I may have one moment, Your Honor.

3         THE COURT:  Yes, sir.

4         MR. POE:  Your Honor, let me say this:  We have -- and

5    Mr. Moscowitz presented these earlier, we had some specific

6    objections to particular amounts, double counting, but in our

7    view, it wouldn't ultimately be material.  Our view is that the

8    calculation of $58 million in itself is not something that we

9    feel we need to dispute today.  It is the attribution of that

10   amount under the relevant proof standards for Mr. Dohan, which

11   is the basis for our objection that the 12-level sentence

12   increase is unwarranted.

13        MS. HELDMYER:  The only further question I would have

14   on that issue, Your Honor, is restitution.  Obviously those

15   numbers and the Australian figures become crucial when the

16   Court determines how much restitution to order in this

17   particular case, if any.  So if they want to dispute individual

18   amounts, is that something the Court wants to do here today

19   with regard to restitution, if not for loss?

20        THE COURT:  I'm not sure if we have a controversy.  Do

21   we?

22        MR. POE:  We have the same position on that issue,

23   Your Honor.

24        MS. HELDMYER:  All right.  I just wanted to make sure

25   that that's not something I need to establish.  So apparently,

10:06AM

1    we're going to be concentrating on the Mizrahi money, which

2    does increase the guidelines level one slot on the chart.

3    Mr. Poe has argued that only $8 million should be attributable

4    to Mr. Dohan because that is the amount of money that Mr. Dohan

5    took possession of during the course of the conspiracy.  That

6    is certainly not the standard by which this Court has to

7    determine how much loss to attribute to any defendant,

8    including Mr. Dohan.  The case law -- and the law is very

9    clear, the sentencing guidelines are very clear, that we make

10   adjustments for intended conduct that can be established

11   relative to reasonable certainty, irrelevant conduct type of

12   evaluation of the case.  It's not the amount of money -- as was

13   argued by a number of other defendants in this case

14   unsuccessfully, it's not the amount of money that they were

15   handed or they personally took possession of, but what was

16   foreseeable certainly to Mr. Dohan at the time and at the time

17   that he was involved in the conspiracy.

18        Because Mr. Dohan was involved from the very beginning

19   in organizing of the structures of this organization that

20   the -- the testimony was very clear that he was actively

21   involved, actively communicating with not only Mr. Gilliland,

22   but very actively communicating with the Bridgeport office when

23   it was opened in January of 1998 and actively selling the

24   programs to a number of individuals, particularly the

25   Australians, the Hammersmith and the Microfund programs, all of

10:08AM 1    the amount of money is reasonably foreseeable to Mr. Dohan.  At

2    no point in time, Your Honor, could Mr. Dohan have believed

3    that any legitimate money was being made simply because, at the

4    very least, the program was illegitimate from the very

5    beginning.  As we said, any profit that he thought he was

6    legitimately, quote, unquote, making was money that was already

7    owed to other investors, including Mr. Scott's group.  So

8    anything that he may have considered to be legitimate was not

9    something that he was entitled to keep in any event.  But

10   certainly given the amount of money -- amount of profit that

11   they were promising and the amount of risk, the lack of risk

12   that they were representing to individuals is per se

13   unreasonable and fraudulent, as the McCrimmon court actually

14   stated in their opinion.

15           And Mr. Poe has quoted the McCrimmon opinion as

16   calling Mr. Gilliland the mastermind and the person that was

17   behind all of this.  Well, there was a reason for this, and

18   that is because when the Eleventh Circuit was considering the

19   McCrimmon case, they did not know about Mr. Dohan.  There had

20   been no evidence admitted in court -- very little evidence

21   admitted in court at that point that Mr. Dohan existed, that he

22   had a significant role in this.  That was information that came

23   out primarily at Mr. Dohan's trial.  I believe that had the

24   Eleventh Circuit had that information, as they will soon, they

25   will take a different view of whether or not Mr. Gilliland was,

10:10AM 1  in fact, the only mastermind involved in this.  Certainly there

2  is enough room at the top for more than one individual, and

3  this is one of those kinds of cases where it would have been

4  very difficult for one person to pull it off anyway.

5      The fact that Mr. -- certainly if he was involved from

6  the very beginning and then got out and withdrew, did something

7  to cut his ties to this conspiracy, then we'd also be talking

8  about a limited amount of exposure in the total scheme of

9  things.  The Court has considered that amongst co-defendants,

10  that there were some that got in early and left early.  There

11  were some that got in late and left quickly.  And those

12  individuals had their reasonable foreseeability amounts and,

13  thus, their loss amounts that were scored against them reduced

14  from the total amount, the roughly 58 million the Court found

15  in the first case.

16      With regard to Mr. Mizrahi's testimony, Mr. Mizrahi

17  testified at this trial unequivocally on a number of occasions

18  that he and his group invested $2,250,000.  There was no doubt

19  in his mind, there was no equivocation in his testimony.  As a

20  matter of fact, I think he said it three times during the

21  course of his testimony, but that's how much he and his group

22  invested.  There is nothing suspicious about the fact that

23  Mr. Mizrahi doesn't have a contract.  It is very common for

24  people who got involved as early as Mr. Mizrahi did not to have

25  a contract.  Mr. Poe has indicated that we've relied heavily on

10:11AM 1    the contracts in this case.  While he may not know this, having

2    not been involved, but there were a number of people testifying

3    and not testifying that didn't have copies of their contracts.

4    We have what we have.  And there are a lot of cases where we

5    were unable to get a copy of or produce the actual contract,

6    yet their testimony was found to be reliable.  And the numbers

7    in those particular cases and in this case are undisputed.

8            Now, Mr. Mizrahi's money -- the problem with

9    Mr. Mizrahi's money and adding it up and the different numbers

10   that we've come up with Mr. Mizrahi, the difficulty in that is

11   that Mr. Mizrahi, a lot of his money came in after there were

12   offshore bank accounts that were opened.  This Court may recall

13   that once David Bishara became extremely active in this, and

14   Mr. Bishara and Mr. Dohan teamed up to open bank accounts

15   offshore within AmPac Bank and other banks, that there were a

16   number of bank records that we simply never got.  We don't have

17   access to a lot of bank accounts, including one very important

18   bank account that was apparently a Dominion Fidelity account in

19   Nevis.  We didn't get any records from Nevis.  That more than

20   likely is the hold that is causing the problem in terms of just

21   adding up the numbers.

22           It is undisputed that Mr. Mizrahi put money into this

23   program, and I don't think it's disputed that he lost money,

24   the fact that just didn't get that much money back.  Mr. Poe

25   can argue about his role, if he wants to, and then certainly he

10:13AM 1  does, but I don't see any reason -- any evidence to support the

2  theory that Mr. Mizrahi was, in fact, a co-conspirator in any

3  of this.  In fact, he lost a lot of money and his group lost a

4  lot of money, and there is no evidence at all that Mr. Mizrahi

5  was part of a conspiracy and that he had any kind of a special

6  illicit relationship with Mr. Gilliland.

7        The letter to Mr. Krasny was not uncommon.  As this

8  Court may recall, there were a lot of people, very innocent

9  people who were drawn in and asked to write those kinds of

10  letters and, in fact, did write those kinds of letters to other

11  investors or other people.  That was part of the fraud, to get

12  people in, to get their money and to get them to help them

13  perpetuate the fraud by bringing other people in.  That was

14  very, very common.  The letter to Mr. Krasny was one of several

15  that we found that were written by innocent victims in this

16  case who were trying -- or were promised that if they brought

17  in other people, that they would get a portion of the profit

18  that was made off their investment, et cetera, et cetera, et

19  cetera.  It was all built into the program.  There is nothing

20  particularly suspicious about the Krasny letter that was

21  brought up in trial.

22        And I would also point out that Mr. Mizrahi did not

23  lend any money to Mr. Gilliland.  The testimony was that

24  Mr. Mizrahi merely took Mr. Gilliland over to Mr. Loavenburg

25  who had the money.  Mr. Mizrahi was an accountant and didn't

10:14AM

1  have the kind of money that Mr. Gilliland was looking for.

2  Mr. Loavenburg was the one with the money, and all he did was

3  walk Mr. Gilliland to Mr. Loavenburg's office, and

4  Mr. Loavenburg independently chose to loan money to

5  Mr. Gilliland at the end when Mr. Gilliland was in need of the

6  money.  And, also, that event happened before Mr. Gilliland was

7  ever charged with a crime.  So the suspicion may or may not

8  have been there at that point in time.

9         But in any event, there is no evidence to dispute

10  Mr. Mizrahi's direct testimony and evidence that he invested

11  and he had lost $2,250,000.  He put it in.  He got some back.

12  He put more in, he and his group.  And it was all gone.  That's

13  what he testified to, and there is no reason for us to doubt

14  that, and there is no reason for us to change that figure.  The

15  bank records are what they are.  They are portions of records.

16  So we don't know if there is double counting.  We don't know if

17  that's new money or old money coming in some of these bank

18  accounts, particularly AmPac.  The fact that there were some

19  transfers, interbank transfers within AmPac, and that there was

20  no record of interbank transfers is certainly also not unusual

21  in this case.  As the Court may recall, AmPac, number one, was

22  not a bank, but, number two, they did a lot of what they were

23  calling book entries, which was just a piece of paper sitting

24  in front of Mr. Bishara where he jotted down a million dollars

25  is moved from this subaccount to that subaccount, and because

10:16AM 1    there is really no movement of any money, there was no record

2    of it.  There is no bank records showing that.  So there is no

3    way for us to know about those kinds of transfers.

4        The bottom line for Mr. Mizrahi is he lost over

5    $2 million, and that money should be counted.  It was not

6    counted in the first trial, because Mr. Mizrahi did not testify

7    in the first trial.  And when we got down to sentencing, it was

8    a matter of whether or not we were going to put the Court and

9    everyone through trying to find Mr. Mizrahi and putting on a

10    little mini trial with just Mr. Mizrahi because they were

11    challenging that money, and we decided not to do that.  We

12    decided not to pursue that particular money for that particular

13    trial.  In this case it matters, because Mr. Mizrahi was

14    directly victimized by Mr. Dohan, and that's why this money

15    should be included.

16        And I guess we're not disputing the Australian money

17    for purposes of loss calculation.  So I won't argue about that.

18        We do have -- we have the AmPac Bank records, Your

19    Honor.  I don't know at this point in time, given the nature of

20    the argument, whether it would be important for us to introduce

21    those or not.  I'm suspecting that probably at this point in

22    time, that's not necessary.  We also have some documentation

23    backing up the Australian investors, which I'm assuming is not

24    important at this point in time.

25        Also, Your Honor, in terms of loss, this was not

10:17AM

1  brought up by Mr. Poe, but in fairness, we need to put on the

2  record that the receivership has given back -- for restitution

3  purposes, the receivership has given back some money.  We do

4  need to put that on the record as well.  Mr. Quilling is here

5  to testify about that or any other money issues that need to be

6  supported by the record when that time comes, but that would

7  only be for restitution purposes and calculations.

8          THE COURT:  All right.  Mr. Poe, anything further on

9  role adjustment or amounts?

10         MR. POE:  I don't believe so, Your Honor.  May I

11  confer with Ms. Heldmyer for a moment?

12         THE COURT:  Yes, sir.

13         MS. HELDMYER:  Thank you, Your Honor.  I think we've

14  been able to accomplish something to save some time.  I'm going

15  to offer into evidence what I've marked as Government's

16  Exhibit 1, which is called "PSR Investors," and that is the

17  document that we relied upon in the sentencing in 2001 to show

18  the $58,998,113.13 figure and the return of 33,480,446.67.  For

19  the record, also, there are some figures in this particular

20  document on page 15 of this document that involve Mr. Mizrahi,

21  monies that were -- the first million dollars -- I believe that

22  was the first million dollars in from the Mizrahi group, the

23  USWTL group, and some returns being made.  And for the record,

24  when we calculated how much additional money should be added to

25  the Mizrahi figures, we did not double count that money.  That

10:20AM 1    the money that we have asked to be added to the calculation is

2    above and beyond the dollars that were included in Government's

3    Exhibit 1.  And so I would offer that at this time.

4           THE COURT:  That will be received.

5           MS. HELDMYER:  Also, Your Honor, the figures that we

6    have used, therefore, the victims have netted out on an

7    individual basis, rather than on a gross basis.  And what I

8    mean by that is we took investor by investor, and we figured

9    out what they invested, we figured out what they got back, and

10   if they got back equal or more than what they invested, we took

11   them out of the equation.  I think technically the case law

12   would allow a different kind of calculation in this case, but

13   we have not been doing this all along, so we wanted to be

14   consistent.  I think the guidelines calculations allow the

15   monies -- the total figure to be used rather than netting out

16   on an individual basis.  So I think that the number is

17   conservative, the number that we were providing to the Court,

18   but we are staying with the same types of calculations that we

19   made in the first case.

20          So we offer No. 1.  Government's Exhibit No. 1 has

21   those original calculations, the $58 million and the $33

22   million, and the additional monies on top of that are the

23   Australian monies and Mr. Mizrahi's money.

24          THE COURT:  Anything further?

25          MR. POE:  We do not either on value of funds nor role,

10:21AM 1    Your Honor.

2        THE COURT:  All right.  I do find that Mr. Dohan's

3    participation in this matter was early and actually grew

4    through the process to the actual ending, the crash of it all.

5    And as far as the money goes, with great admiration for the

6    work that Mr. Quilling has done, I think this is an inexact

7    science in determining the money in this case, and I would like

8    to deal with certainty in my mind.  And, therefore, I am going

9    to adjust the money to below 60 million, but I'm absolutely

10   confident without any question that the evidence establishes

11   somewhere between that 35 and 60 million.  So my understanding

12   that would reduce by one point --

13       THE PROBATION OFFICER:  That's correct, Your Honor.

14       THE COURT:  -- in that regard.

15       And with regard to the role, this again has been very

16   difficult in these cases to determine exactly what role,

17   because there seem to be somewhat of a loose organizational

18   structure, not a king and queen all the way down, but people

19   participating for their own purposes at their own level and

20   taking the entire scheme into effect, I did not feel that a

21   four-level increase is appropriate, but I do think it reaches

22   the level for a three-level increase.  I'm not absolutely

23   confident that you must have control over some other person in

24   making that determination, but I would find that at least at

25   the end that he was, in fact, giving Mr. Gilliland orders, that

10:23AM
1  was as it began to become unraveled.  So at least at that

2  period of time there was someone else that he was controlling.

3  But I would reduce that to a three-level enhancement or role

4  considering the overall scheme rather than isolating a

5  particular role at a particular time in the case.

6          So with those adjustments, Ms. Lassiter, if you could

7  help us with the mathematics -- or should I ask, are there any

8  other matters to be discussed?  Those I know are the four

9  principal ones that you brought forth.

10         MR. ROBBINS:  Those are, Your Honor, the four

11  principal objections we wanted to raise today.  If I could just

12  mention one or two other things we would like to present before

13  sentence is passed, though, today.

14         THE COURT:  Well, let me -- I want to get down to the

15  mathematics first before we do that.  If you could just hold

16  your position there.  Does the government have any specific

17  objections?  I didn't note any.

18         MS. HELDMYER:  We do not, Your Honor.  We just need to

19  put on the record if at some point in time Mr. Quilling might

20  just be able to take the podium and inform the Court of the

21  status of the receivership.

22         THE COURT:  Ms. Lassiter.

23         THE PROBATION OFFICER:  Judge, the defendant would

24  have a total offense level of 33, criminal history category of

25  Roman numeral I, resulting in a guideline sentencing range of

10:25AM 1    135 to 168 months.

2        THE COURT:  Given the Court's rulings, any objection

3    do that mathematics?

4        MS. HELDMYER:  No, Your Honor.

5        THE COURT:  All right.  Then, Mr. Robbins.

6        MR. POE:  Your Honor, we don't quibble with those

7    calculations.  Of course, we stand by the comments we

8    previously made and the position that we've taken.

9        THE COURT:  That's why I preface it by saying given

10    the Court's ruling.  You're not waiving any objection.

11        MR. POE:  I'm sorry, Your Honor.

12        THE COURT:  All right Mr. Robbins.

13        MR. ROBBINS:  Your Honor, apart from the four major

14    objections bearing on adjustments made upwards, we have

15    presented to the Court a range of factors that we would ask the

16    Court to consider by way of mitigation.  I don't know if the

17    Court feels it wishes to hear further argument.  I've submitted

18    sentencing memorandum calling a range of considerations that

19    are available to the Court for purposes of exercising

20    discretion downward.  What we've argued up to now are reasons

21    why we object to upward adjustments.  We have provided to the

22    Court for its discretion a range of factors that in the

23    post-Booker world, the Court has the authority to consider to

24    go in the downward direction in the service of what we

25    believe -- respectfully believe to be not only fair, but a

10:27AM 1 merciful sentence.

2          In that connection, Your Honor, we would ask before we

3   sum up on the defendant's behalf, for the Court to hear

4   statements -- if the Court wish, brief statements from

5   Mrs. Dohan, who has traveled from England, accompanied by

6   several families, her and William's friends.  She wishes to

7   address the Court briefly.  My client, Mr. Dohan, wishes to

8   address the Court briefly.  Both of those statements, I

9   believe, will support the range of factors that we have

10  identified for the Court as bearing on its discretion to go

11  down, not simply up, which is the direction that we addressed

12  up until now.  So with the Court's indulgence, I would ask

13  Mrs. Dohan to come forward and speak to the Court.

14          THE COURT:  If you would just join Mr. Robbins.

15          MRS. DOHAN:  Thank you, Your Honor, for the

16  opportunity to speak to you.  Your Honor, I couldn't live with

17  a bad man for one day.  I married William Scott Dohan because

18  he's a good and decent man.  And I ask you, Your Honor, to

19  please show him mercy.

20          MR. ROBBINS:  Your Honor, I believe Mr. Dohan would

21  like to address the Court.

22          THE DEFENDANT:  Good morning, Your Honor.  As nervous

23  as I am, I appreciate this opportunity to speak.  And to begin

24  with, Your Honor, I cannot adequately express the many regrets

25  that I have, deep regrets.  I've suffered so many people in

10:29AM 1    this case.  If I could undo it at all, I would.  I have learned

2    very difficult lessons from my experience here which will stay

3    with me the rest of my life.  It pains me deeply, Your Honor,

4    for my wife, Susan, to have suffered so much.  993 days that

5    we've been apart since I've been incarcerated are very

6    difficult physically and psychologically.  I love my wife, Your

7    Honor, more than my life itself.  Susan has been very brave,

8    compassionate, special and truly needs and deserves her

9    husband's care, which I have avowed and so desperately wish I

10    was able to give her now.

11            Your Honor, I've always had faith, and I still do.

12    And I understand that Your Honor has the power to see past the

13    portrait of me that was conveyed in this case to the real

14    person I am, as so many people wrote to you and described to

15    you.  I ask you, Your Honor, please exercise justice and mercy.

16    Thank you.

17            THE COURT:  Mr. Robbins.

18            MR. ROBBINS:  Ms. Heldmyer made a point earlier and

19    it's hard to argue with, Your Honor.  We are new to the case.

20    We were not here for the trial, and we certainly don't have the

21    perspective that Your Honor has having presided over a series

22    of these cases going back several years.  All we have, Your

23    Honor, is the snapshot that a two-week trial transcript and

24    several hundred thousands of documents provided.  To call it a

25    snapshot scarcely captures it.  We have only the smallest

10:32AM

1    window into where this man is.  But in a way, that has enabled

2    us to learn something that goes beyond the transcript, and

3    we've tried to communicate some of that in our sentencing

4    memorandum and the attachments and the letters to try and give

5    the Court bigger flavor than what can be discerned from a

6    two-week transcript and a record of the trial.  The picture you

7    get, I think, is materially at odds with a portrait that you

8    might otherwise take of this case.

9         I think prisoners who have submitted letters to you,

10   which I don't know whether this accords with Your Honor's

11   experience, but I've been practicing criminal law for 30 years,

12   and I don't think I've ever seen letters from fellow inmates

13   talking about the work that this man has done to make their

14   lives better.  Family members, several of whom have been --

15   friends who have come extraordinary distances to support

16   William and his wife, tell you, I think, of a very different

17   man.  I know Your Honor has been sentencing defendants for a

18   long time, and I scarcely need to tell this Court that an act

19   of sentencing is an act of faith.  It's an act that goes beyond

20   the case and tries to figure out what is right for the man.

21        I don't mean to suggest that the facts of the case are

22   not germane.  Of course, they are.  I do mean to suggest,

23   however, that when you exercise post-Booker discretion, you

24   have the power to take like cases into effect to figure out how

25   this man fits not only on the spectrum of other participants

10:34AM

1    who have come before you and gotten a range of sentences, will

2    also take into account what you've learned beyond the confines

3    of this case.  And we'd ask Your Honor to respectfully consider

4    the discretion of which the Court is now vested and to depart

5    materially downward from the range of numbers that you heard

6    Ms. Lassiter present to you just moments ago.  In doing so, we

7    think is not only consistent with fairness, it's consistent

8    more fundamentally with the mercy that both Mr. Dohan and his

9    wife have asked you to exercise, in which you manifestly now

10   have the power to do.  We think that's the right thing.  And

11   with that, Your Honor, we're prepared to receive sentence.

12              THE COURT:  All right.  Ms. Heldmyer.

13              MS. HELDMYER:  Your Honor, Mr. Robbins is absolutely

14   correct.  This Court has heard this case and knows this case

15   and has heard from a small portion -- a very small portion of

16   people who have been victimized and traumatized, who have been

17   wiped out by the activities of this defendant and his

18   co-defendants.  We would ask the Court not forget those

19   individuals when fashioning an appropriate sentence in this

20   case.  We believe that the guidelines fairly and adequately

21   address the seriousness of this crime, and a guideline range

22   sentence would be fair in this matter.  Thank you.  Would the

23   Court like to hear from Mr. Quilling now?

24              THE COURT:  Yes, ma'am.

25              MR. QUILLING:  Good morning, Your Honor.  I've been

10:36AM 1    asked to inform the Court as to what amounts I distributed to

2    investors as a result of my efforts.  As the Court is aware, I

3    was appointed in Dallas in 1998, and my duties concluded, I

4    believe, in 2004.  During that period of time, I turned over

5    every rock I could find and tried to pursue assets literally to

6    the end of the earth.  As a result of my efforts, when

7    everything was said and done and attorney's fees and accounting

8    fees, which were substantial, were netted out, I was able to

9    return $1,625,000 to investors.

10            THE COURT:  If I might interrupt only to the point

11    that since this is going to be matters that I will rely upon, I

12    would like to have the witness sworn.

13            MS. HELDMYER:  Certainly, Your Honor.

14            THE CLERK:  Do you solemnly swear that the testimony

15    that you shall give will be the truth, the whole truth and

16    nothing but the truth so help you God?

17            MR. QUILLING:  I do.

18            THE CLERK:  State your full name and spell your last

19    name.

20            MR. QUILLING:  Michael J. Quilling, Q-u-i-l-l-i-n-g.

21            THE COURT:  All right.  You don't need to restate the

22    prior, just proceed on.

23            MR. QUILLING:  Thank you, Your Honor.  Of the

24    $1,625,000 that constitutes approximately 5.7 percent returned

25    to the investors of the amount of their individual claims, so

10:37AM 1    out of a loss of $100, they got back 57 cents -- yeah, 57

2    cents.  That's all I have.

3           THE COURT:  Ms. Heldmyer, anything further?

4           MS. HELDMYER:  I think that covers that issue, Your

5    Honor, and we have documents to cover the rest.

6           MR. ROBBINS:  I may have misheard, Mr. Quilling, but I

7    thought he said 5.7 percent, in which case it would be $5.70.

8           MR. QUILLING:  My math is not so good without a Big

9    Bird calculator, but it's 5.7 percent of their loss, is what I

10   have.

11          THE COURT:  Anything else, Ms. Heldmyer?

12          MS. HELDMYER:  No, Your Honor.

13          THE COURT:  If you want to come forward for

14   sentencing.

15          All right.  I do determine the presentence report to

16   be accurate as we have modified it here today, and it will be

17   considered in its advisory status in the imposition of

18   sentence.

19          It's the judgement of the Court that you be committed

20   to the custody of the Bureau of Prisons to be imprisoned for a

21   term of 60 months as to Count 1 and 96 months as to Count 2.

22   And these terms do run consecutive, one with the other.

23          This sentence is at the midpoint of the guidelines

24   range, having found no aggravating or mitigating circumstances

25   that have not already been considered under the guidelines.

10:39AM 1   And I do find -- after considering all other matters in Title

2   18, 3553(a), that the Court is required to consider in

3   imposition of sentence, I do find this sentence to be

4   sufficient, and a greater sentence is not necessary, and this

5   sentence is reasonable.  I would point out that this would be

6   the Court's sentence regardless of the Court's rulings and

7   findings on the matters that pertain to the guidelines that we

8   have discussed here today.

9          And in imposing this sentence, I am impressed by the

10  letters that I have read in your behalf, but also am impressed

11  by the letters to the claims that have been made by the victims

12  in this case, who have suffered greatly because of this scheme.

13  Their children will suffer, their grandchildren will suffer,

14  and their entire descendents will suffer as a result.  And I

15  have taken that into consideration in the imposition of

16  sentence, finding that there must be a deterrence for anyone

17  else who might consider similar criminal conduct of this

18  magnitude.  I do find that it meets the general goals of

19  punishment and, as I say, hopefully will deter anyone else who

20  might consider similar criminal conduct.

21         I do find limited assets.  And then in the light of

22  the mandatory restitution, I am going to waive any imposition

23  of fine in this case, but you will be required to make

24  restitution in the amount of $29,152,257.  And if any

25  additional defendants are named and sentenced under this docket

10:41AM

1  number or any other related case, then it's determined that

2  these defendants are responsible for restitution to the same

3  victim for the same loss amounts, that you'll be jointly and

4  severally liable with those defendants for the common

5  restitution which may be offered.  And there will be no

6  requirement for interest in that restitution.  And restitution

7  payments will be made to the clerk of this court in Tallahassee

8  at the address in the presentence report and will be disbursed

9  by the clerk's office to the victims.  And there is a special

10  monetary assessment of $100 required by law, which is ordered

11  on each count, for a total of $200.

12         Upon release from incarceration, you will be placed on

13  a period of supervised release for a term of three years as to

14  Counts 1 and 2 with each, again, to run consecutive, one with

15  the other, under the standard conditions adopted by the Court

16  with the added provision that any unpaid balance of restitution

17  be paid during that period at a rate of not less than $500 per

18  month.  Payments to commence within three months of release

19  from imprisonment.  You will provide the probation officer with

20  access to any financial information in this case, and you'll

21  report the source and the amount of personal income or business

22  income and any financial assets to the supervising probation

23  officer.  You'll not incur any new credit charges or open any

24  additional lines of credit without the consultation and

25  approval of the probation officer unless the restitution

10:43AM

1    obligation has already been met.  You will not transfer or

2    dispose of any asset or any interest in any asset without the

3    prior consultation and approval of the probation officer

4    unless, again, the restitution amount has been already

5    satisfied.

6         You'll be precluded from working in any employment

7    field, including self-employment, which involves the collection

8    or solicitation of funds for investment purposes.

9         And I would ask, Mr. Robbins, any objections to the

10   ultimate findings of fact or conclusions of law relating to the

11   judgment or sentence, other than those that we've already

12   discussed here today?

13        MR. ROBBINS:  I don't think we have any objection,

14   Your Honor, to the findings of fact other than the ones we've

15   already preserved by way of objections submitted in the

16   presentence report earlier and discussed in open court.

17        There are two sentencing-related issues, however, that

18   we would ask leave to raise before the Court closes its

19   business today.  The first is with respect to the period of

20   supervised release.  At the conclusion of the sentence, after

21   Mr. Dohan has served so much of the sentence remains open, he

22   has lived obviously for the better part of ten years abroad,

23   and I guess the question is if he wanted to go back home where

24   his wife lives, I'm not entirely sure how one does that while

25   being subject to supervised release.  And I would think,

10:45AM

1    although I haven't encountered the issue before, I would think

2    that supervised release could be something that could be --

3    that would yield in the face of someone who lives overseas.  My

4    recollection of the factors that go into the imposition of

5    supervised release suggest that perhaps it isn't warranted for

6    persons not present in the United States for purposes of

7    supervision.  And I'm not -- I guess I'm not altogether sure

8    whether supervised release is warranted in a case of someone

9    who will not be a United States resident at the end of the

10   period of incarceration.

11         THE COURT:  That matter will have to wait until that

12   point when some sort of plan for residence and such as that,

13   which has always worked out right at the end.  Circumstances

14   may change drastically in that time.  Taken this day and time,

15   one never knows from one day to the next what the international

16   situation might be.  So that will simply have to wait until

17   that moment in time.

18         MR. ROBBINS:  Then the only remaining issue, Your

19   Honor, is we would ask the Court to make a recommendation of a

20   camp facility for the -- for Mr. Dohan.  My understanding is

21   that at least one other defendant, who is roughly similarly

22   situated, is currently housed in a camp facility.  I believe

23   there is one we have in mind in particular.  I recognize this

24   is a BOP question, not one of which the Court can make a

25   definitive ruling, but at least in my experience

10:47AM 1    recommendations by District Court judges have some impact on

2    the ultimate disposition by the Bureau of Prisons, and I

3    thought we had a particular facility in mind.

4            MR. POE:  Your Honor, Saufley Field, of course, is

5    most proximate, and if the Court saw fit to make a

6    recommendation to the Bureau of Prisons for placement there, we

7    would request that.

8            THE COURT:  Well, everyone seems to have a little

9    different experience with the Bureau, but mine has been that

10   all my recommendation does is generate a letter telling me they

11   have or have not complied.  I've not seen where it has any

12   influence whatsoever, because they have their own security

13   issues and bed space and such as that.  So I hesitate to do

14   anything more than go on record that I have no objections to

15   placement in the camp.  And certainly this is Pensacola and

16   this is Saufley.  So that does play a role in their assignment.

17           MR. POE:  Your Honor, if I may just ask a follow-up

18   question.  Would the Court have any problem with putting

19   anything in the judgment and commitment order to that effect,

20   or does the Court just wish that to be on the record here at

21   the hearing?

22           THE COURT:  Just on the record here.

23           Anything further, Ms. Heldmyer?

24           MS. HELDMYER:  Your Honor, I have no objections to the

25   sentence, and I would just like to state for the record that we

10:48AM

1    have to the best of our ability notified victims of today's

2    hearing, and that no additional victim notified us that they

3    wanted to make any statement on the record here in this

4    proceeding.

5            THE COURT:  All right.  And, Mr. Dohan, you have ten

6    days in which to appeal this sentence.  You have a right to be

7    represented by an attorney on that appeal.  If you could not

8    afford one, one would be appointed for that purpose upon your

9    petition to the Court.  And on that circumstance, an appeal

10   would be taken without cost to you.  And you will be remanded

11   to the marshal for the carrying out of the Court's sentence.

12   The Court is in recess.

13            (Proceedings concluded.)

14

15                    ---------------------

16        I certify that the foregoing is a correct
            transcript from the record of proceedings
17              in the above-entitled matter.

18

19    /s/ Gwen B. Kesinger                        9-3-06

20    _____        _____

21    Gwen B. Kesinger, RPR, FCRR            Date
       Official Court Reporter

22

23

24

25

*Gwen B. Kesinger, RPR, FCRR*
*United States Court Reporter*