**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**                                    **Case No. 3:00cr48/LC/CJK**
                                         **3:09cv192/LC/CJK**

**WILLIAM SCOTT DOHAN,**
     **Defendant**.

---

## REPORT AND RECOMMENDATION

This matter is before the court upon defendant's motion to vacate, set aside, or correct sentence (doc. 1722), filed pursuant to 28 U.S.C. § 2255.  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636, and NORTHERN DISTRICT OF FLORIDA LOCAL RULE 72.2(B). Having conducted a careful review of the record and the arguments presented, the undersigned concludes that the motion should be denied as to all grounds.

## BACKGROUND AND PROCEDURAL HISTORY[1]

On June 19, 2002, the defendant, William Scott Dohan ("Dohan"), and four coconspirators were charged by a fifth superseding indictment with conspiracy to commit wire fraud and securities fraud (count I), in violation of 18 U.S.C. § 371, and conspiracy to engage in or attempt to engage in money laundering (count II), in

---

[1] References to the pre-sentence investigation report will be by "PSR" followed by the paragraph number.  References to government exhibits will be by "GE" followed by the exhibit number.

violation of 18 U.S.C. §§ 1956(h) and 1957.[2] (Doc. 966, pp. 4, 13). Prior to trial, defendant filed a motion to dismiss the charges leveled in count II of the indictment, which this court denied. (Docs. 1422, 1457). After a ten-day trial, a jury convicted defendant as charged (docs. 1439, 1442), and the court sentenced him to a term of sixty months' imprisonment on count I, and a consecutive term of ninety-six months' imprisonment on count II. (Doc. 1506). The court also ordered defendant to pay restitution in the amount of $29,152,257.01. (Doc. 1506, p. 6). Defendant appealed the judgment to the U.S. Court of Appeals for the Eleventh Circuit ("Eleventh Circuit"), which affirmed his convictions and sentences. *See United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007) (per curiam). The Supreme Court entered an order denying defendant's petition for writ of certiorari on May 12, 2008, *see Dohan v. United States*, 553 U.S. 1034 (2008), on which date the judgment of conviction became final.

Defendant's convictions stem from his apparent involvement in a number of complex high-yield trading schemes. In April or May 1996, defendant began working with a firm known as DivCap. Headquartered in Memphis, Tennessee, DivCap offered high-yield investment programs to investors. (Doc. 1558, pp. 172-73). Through DivCap, defendant developed business associations with Benjamin David Gilliland ("Gilliland" or "David Gilliland") and William Harry West ("West"), two of the coconspirators named in the original indictment. (Doc. 1558, pp. 167-75). At the direction of Gilliland and the defendant, DivCap invested–and lost–more than

---

[2] The original indictment charged defendant and ten coconspirators, seven of whom had been convicted or pleaded guilty, prior to Dohan's trial, to charges of conspiracy to commit wire and securities fraud, conspiracy to commit money laundering, and various substantive counts of money laundering. (PSR ¶¶ 2-3).

$1,000,000 in capital, including an investment in excess of $900,000 from Frank Scott ("Scott"), a broker. (Docs. 1528, pp. 56, 60, 94; 1558, pp. 175-77). Upon DivCap's dissolution, defendant joined Gilliland in creating a new company, Hammersmith Trust, LLC ("Hammersmith"), which adopted DivCap's debt (approximately $900,000). To make up for the losses sustained from the DivCap investment transactions, Hammersmith gave Scott a contract under the newly-formed venture. (Doc. 1528, pp. 84-88; GE FS-01, 02).

Gilliland, who held himself out as the "funds manager," was the primary source of information concerning the investment programs and the main contact for investors. (Docs. 1560, pp. 85-86; 1529, p. 165; 1528, p. 143). Defendant, on the other hand, represented himself as the Europe-based trader who assisted Gilliland in investing the money. (Doc. 1563, p. 145; 1558, pp. 60-61; 1528, pp. 60-65, 90, 131-32, 147-56). Over time, defendant's role evolved to such a degree that he was, in effect, functioning as did Gilliland, in an operational role. (Doc. 1528, pp. 84-93, 131-32, 147-56; 1558, p. 46; 1580, pp. 162, 168, 170-75). At trial, the government introduced into evidence correspondence dated December 6, 1998, wherein defendant chastised Gilliland for divulging information without his authorization. (Doc. 1559, pp. 145-50; GE BDG-23).

To facilitate the program, defendant maintained near daily contact with Bridgeport Alliance ("Bridgeport"), an investment company through which Dohan and his coconspirators offered trading programs like Hammersmith and Microfund, the latter of which operated out of Denver, Colorado. (Doc. 1558, pp. 50, 67-72; 1580, pp. 132-42). Telephone and FedEx records offered further documentation of defendant's involvement with Bridgeport. In 1998, Bridgeport's Bluewater Bay,

Florida, branch placed no fewer than 124 calls to defendant's telephone and fax numbers. During the same period, Bridgeport forwarded at least twenty-two packages from its Bluewater Bay office to Dohan's address in London, United Kingdom. (Doc. 1560, pp. 242-57). Defendant also maintained a comprehensive access database, which he developed and used for the explicit purpose of tracking all client monies and investments. (Doc. 1580, pp. 134-35). Further, defendant instructed Gilliland and West in their sales pitches to prospective investors. This information was then transmitted down the organizational hierarchy, to agents selling the programs to investors. (Doc. 1559, pp. 150-58).

At the same time, defendant was personally involved in marketing the program to investors. In a recorded telephone conversation, for example, Dohan assured John Papagni ("Papagni"), a Hammersmith investor, that, assuming the solvency of Barclays Bank, there was no risk to investment. (Doc. 1560, pp. 149-52; GE Tape-01). Alexander Gilliland, an Australian investor, recalled no fewer than three presentations defendant made, as the principal for the Microfund program, to prospective investors in Australia. Defendant not only explained the mechanics of the program, but advised these potential investors that the capital would be guaranteed. (Doc. 1558, pp. 52-63). Further, defendant misled Hammersmith clients to believe that their investments would enjoy as much as a 100% rate of return per week. (Doc. 1528, pp. 85-86).

In addition to serving as Hammersmith's registered corporate secretary, defendant served as a director for the Microfund program. (Doc. 1558, pp. 232, 251-52). To the extent that it promised absolute safety to its investors, Microfund was devised similarly to Hammersmith. (Doc. 1558, pp. 55-57). Ralph Mizrahi

("Mizrahi"), an investor, traveled with Gilliland in February 1999 to London, where they met with defendant at his townhouse in Eaton Square to discuss the Microfund program. Defendant told Mizrahi that the program was making substantial money through a currency trading program based in Cyprus. Touting his access to the currency program, defendant ventured that the return on Mizrahi's investments could be significant. (Doc. 1528, pp. 150-56). Mizrahi ultimately invested, and lost, more than $3,000,000 in Microfund, including capital belonging to an international non-profit organization dedicated to raising educational awareness about the Holocaust. (Doc. 1528, pp. 131-38, 161-62).

In March 1998, Peter Dyer ("Dyer"), an Australian national and Microfund investor, also traveled overseas to confer with defendant at his central London apartment. Dohan explained to Dyer the investment mechanisms of the Microfund program, which he promoted as generating high returns, and also discussed how U.S. Treasury bills were involved. (Doc. 1558, pp. 108-11). Subsequent to his meeting with defendant, Dyer invested $1,500,000 in the Microfund trading scheme, which never returned the money. (Doc. 1558, pp. 117-20).

In preparation for receivership and trial, Michael Quilling ("Quilling"), the receiver appointed by the U.S. Securities and Exchange Commission ("SEC") for prior litigation against Hammersmith Trust and related entities, retained the services of Milo Segner ("Segner"), a certified public accountant. Segner and his accounting firm expended 2800 hours–the equivalent of approximately 17.5 months–analyzing documents generated in connection with this case, including more than 60,000 banking transactions. (PSR ¶ 60). Segner provided evidence tracing the money invested in the aforementioned trading entities. (Doc. 1529, p. 5). Through his

analysis, the government established that $62,652,314.03 was invested in the various fraudulent trading programs maintained as part of the overall conspiracy. Of that sum total, the coconspirators returned $33,500,057.02 to investors, diverting $29,152,257.01 as profits. (Docs. 1506, p. 6; 1533, p. 57; GE 1).

<u>DEFENDANT'S CLAIMS</u>

Pursuant to 28 U.S.C. § 2255, defendant timely filed the instant motion to vacate, set aside, or correct sentence (doc. 1722), asserting two omnibus asserting claims that he is being held in violation of the Constitution, laws, or treaties of the United States. In ground one, defendant contends he is entitled to relief in light of the Supreme Court's recent ruling in *United States v. Santos*, 553 U.S. 507 (2008). (Doc. 1722, pp. 4-5). Defendant argues in ground two that defense counsel rendered ineffective assistance by failing to (a) call as a witness Jack Higgins ("Higgins"), who was Gilliland's personal assistant; (b) introduce into evidence defendant's May 1997 email, addressed to Gilliland; (c) move for a mistrial after the prosecution allegedly transgressed the court's ruling concerning the admissibility of testimony regarding defendant's chateau; (d) introduce into evidence defendant's passport; (e) file a motion to dismiss the indictment, based on an alleged violation of defendant's Sixth Amendment right to speedy trial; (f) object to the prosecutor's closing argument, wherein she alleged, *inter alia*, that no investors received their money back from defendant's control; (g) expose the lack of evidence offered to support the overt acts charged in the indictment; (h) introduce into evidence the government's plea agreement with Gilliland and object when the government failed to disclose its discretion to revoke the agreement; (i) enter a timely objection to the prosecution's alleged attempt to enhance Gilliland's credibility by eliciting information concerning

his religious beliefs; (j) require the government to provide Jencks Act material regarding Gilliland's grand jury testimony and depositions given on behalf of the receivership; (k) enunciate a clear objection to, or move for a mistrial or continuance because of, the government's allegedly untimely provision of financial materials; (l) object to the admission in evidence of a chart relied upon by Roger Allen Cox ("Cox"), an investment advisor and expert in debt markets, who testified at trial; (m) file a timely motion to dismiss the indictment based upon alleged prosecutorial misconduct before the grand jury; (n) impeach the credibility of Michael Quilling, who testified for the government in grand jury proceedings and at defendant's detention hearing; (o) impeach the credibility of Milo Segner, who rendered allegedly false testimony at prior proceedings; (p) expose the alleged falsity of testimony indicating, *inter alia*, that the conspirators formed Hammersmith at Cliffhouse to assume the debt burden of DivCap; (q) impeach the credibility of Ralph Mizrahi, whose testimony the government allegedly misrepresented to imply that Mizrahi invested in Microfund only as a result of meeting defendant; (r) cross-examine Gilliland so as to expose the alleged falsity of his testimony that Dohan had lied to John Papagni; (s) offer allegedly exculpatory evidence to refute Gilliland's testimony that defendant had insisted on paying Australian investors before American investors; (t) cross-examine Gilliland regarding government exhibit OD-49, a June 1998 memorandum authored by defendant, to establish that it was Gilliland who determined how and to whom funds would be distributed; (u) present allegedly exculpatory evidence tending to refute Gilliland's testimony that defendant continued to perpetrate fraud even after federal authorities searched the Bridgeport Alliance premises; (v) offer allegedly exculpatory evidence to refute the government's

portrayal of defendant as the individual running the investment programs and making the trades; and (w) enter objections during closing argument, when the prosecution allegedly made statements concerning evidence not adduced at trial.[3] (Doc. 1722, pp. 5-21, 22). Finally, in ground two (x), defendant argues that the cumulative effect of counsel's alleged errors rendered the representation so ineffective and deficient as to undermine the proper functioning of the adversarial process. (Doc. 1722, pp. 21-22).

## ANALYSIS

As a preliminary matter, the court notes certain general rules applicable in § 2255 proceedings following direct appeals, as well as the distinction between review under § 2255 and direct appeal. "Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a § 2255 proceeding." *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994). "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." *Id.* "A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal." *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001). "Further, a § 2255

---

[3] Defendant also alleged in ground two (w) that appellate counsel rendered ineffective assistance by failing to raise on direct appeal the same alleged instances of prosecutorial misconduct. (Doc. 1722, pp. 20-21). In his reply memorandum on ground two, however, defendant voluntarily dismissed the claim articulated against appellate counsel in ground two (w). (Doc. 1768, pp. 85-86). In ground two (y), defendant alleged that counsel rendered ineffective assistance by failing to object at his sentencing hearing to the imposition of restitution amounts based on losses that allegedly did not occur. (Doc. 1722, pp. 22-23). In his reply memorandum on ground one, however, defendant voluntarily dismissed the claim articulated in ground two (y). (Doc. 1739, p. 2 n.1). This is the appropriate result. *See Mamone v. United States*, 559 F.3d 1209, 1211 (11th Cir. 2009) (concluding that federal prisoner cannot utilize motion under § 2255 to challenge his restitution order, even if cognizable claims seeking release from custody are also raised).

movant cannot argue as the causal basis for his failure to advance an argument on direct appeal that the argument only became known to the movant due to subsequent developments in the law." *Castro v. United States*, 248 F. Supp. 2d 1170, 1174 (S.D. Fla. 2003) (*citing McCoy*, 266 F.3d at 1258).

Regarding the important difference between a § 2255 collateral challenge and direct appellate review, "[i]t has long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *See United States v. Addonizio*, 442 U.S. 178, 184 (1979). Relief sought pursuant to § 2255 should be granted only if the challenged sentence resulted from "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *See Hill v. United States*, 368 U.S. 424, 428 (1962); *see also Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988) ("Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice.'" (*quoting United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981))).[4]

*Ground One: United States v. Santos*

In an effort to resolve defendant's claims in a coherent manner, the court will address related or similar claims in tandem. By way of ground one, defendant raises five claims relating to the *Santos* decision, wherein the Supreme Court, confronted

---

[4] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit Court of Appeals issued before October 1, 1981.

with an underlying prosecution involving a stand-alone illegal gambling operation, considered "whether the term 'proceeds' in the federal money-laundering statute, 18 U.S.C. § 1956(a)(1), means 'receipts' or 'profits.'"[5] *See United States v. Santos*, 553 U.S. 507, 509 (2008). Affirming the interpretation of the U.S. Court of Appeals for the Seventh Circuit ("Seventh Circuit"), a plurality of four justices held that "proceeds" always refers to "profits," rather than "receipts." *See id.* at 513-14. Justice Stevens concurred in the judgment, thereby providing the necessary fifth vote, but determined that "proceeds" only necessarily means "profits" in the context of an illegal gambling enterprise. *See id.* at 528 (Stevens, J., concurring in the judgment) ("The revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the meaning of the money laundering statute."). In concluding that the meaning of "proceeds" is conditional upon the context of the statute's application, Justice Stevens challenged the plurality's holding that "proceeds" invariably means "profits." *See id.* at 528 n.7 (Stevens, J., concurring in the judgment) (expressing the view that "'proceeds' need

---

[5] The federal money-laundering statute criminalizes a number of activities involving criminal "proceeds," including transactions to promote criminal activity:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(A)(i). Pursuant to 18 U.S.C. § 1956(h), "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

not be given the same definition when applied to each of the numerous specified unlawful activities that produce unclean money").

With the principle articulated by the *Santos* plurality in mind, Dohan maintains that his conviction on count II, charging him with conspiracy to engage in or attempt to engage in money laundering, in violation of §§ 1956(h) and 1957, should be vacated for one or more of five reasons: (a) the evidence on which the government relied was insufficient, (b) defendant is "actually innocent" of the charge, (c) the indictment failed to set forth an essential element of the enumerated offense, (d) the trial court did not impart to the jury the meaning of the term "proceeds" when giving its instructions, and the jury was required to find that defendant engaged in an additional conspiracy, independent of the wire fraud conspiracy, and (e) the sentencing court, in reliance on the "gross receipts" of the specified unlawful activity, rather than the amount of profits transferred therefrom, increased the guideline range and resulting sentence in error. (Doc. 1722, pp. 4-5).

Defendant simply misreads the holding of *Santos*, which is especially restrictive in scope. "The narrow holding in *Santos*, at most, was that the gross receipts of an unlicensed gambling operation were not 'proceeds' under section 1956 . . . ." *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009); *see Santos*, 553 U.S. at 509 (discussing the significance of Justice Stevens's concurring opinion, which constituted the decisive vote in a plurality decision and held that "proceeds" means "profits" when there is no legislative history to the contrary, thus limiting the *Santos* holding accordingly). Similarly, in *King v. Keller*, the Eleventh Circuit held that *Santos* did not apply where the defendant's "money laundering convictions were based on his participation in 'a cash rental 'ponzi scheme' and a related treasury bill

leasing program.'" *See* 372 F. App'x 70, 73 (11th Cir. 2010). One finds no paucity of additional cases that have rejected the application of the *Santos* profits test to money laundering offenses stemming from crimes other than gambling. *See*, *e.g.*, *United States v. Jennings*, 599 F.3d 1241, 1252 (11th Cir. 2010) (rejecting defendant's claim that, because the government failed to prove money at issue was *profits* of illegal activity, he could not be convicted of money laundering in connection with fraud and conspiracy convictions arising from scheme to sell fraudulent workers' compensation insurance); *Mignott v. United States*, Nos. 09-60805-CIV, 04-60186-CR-UNGARO, 2010 WL 2035105, at *8 (S.D. Fla. May 3, 2010) (denying relief "because the limited holding in *Santos* does not apply to Mignott's conviction for conspiring to launder money which is the proceeds of Medicare fraud"); *United States v. Morris*, No. 6:09-16-S-DCR, 2010 WL 1049936 (E.D. Ky. Mar. 19, 2010) (holding *Santos* inapplicable where the predicate offenses were bribery and extortion); *United States v. Poulin*, 690 F. Supp. 2d 415 (E.D. Va. 2010) (holding that *Santos* does not apply to health care fraud offenses); *Arnaiz v. Hickey*, No. CV208-97, 2009 WL 2971638, at *3 (S.D. Ga. Sept. 16, 2009) (limiting *Santos* to gambling cases and declining to apply profits test where the offense involves laundering of receipts of Medicare fraud); *United States v. Prince*, 627 F. Supp. 2d 863, 868-72 (W.D. Tenn. 2008) (limiting *Santos* to gambling cases and declining to apply profits test where the offense involves laundering of receipts of health care fraud). Because defendant is not accused of laundering gross receipts derived from an unlicensed gambling operation, *Santos* is unavailing in this instance. *See Demarest*, 570 F.3d at 1242.

Recognizing the barrier in his path, and relying upon *Moreland v. United States*, 555 U.S. 1134 (2009), defendant responds that the *Santos* "profits" interpretation does in fact apply to his money laundering conviction. (Doc. 1723, p. 7). In *Moreland*, the defendant was convicted of mail fraud, wire fraud, money laundering, and conspiracy to commit the same, in connection with his participation in a fraudulent pyramid scheme. *See United States v. Moreland*, 509 F.3d 1201, 1206 (9th Cir. 2007). After the court of appeals affirmed Moreland's money laundering convictions, *see id.* at 1216-19, the Supreme Court granted the defendant's petition for writ of certiorari, ultimately vacating the judgment and remanding the case to the appellate court for further consideration in light of *Santos*. *See Moreland*, 555 U.S. at 1134.

The Court, in handing down the two-sentence *Moreland* order approximately seven months after it decided *Santos*, did not, however, speak to the applicability of that decision's narrow holding, thus failing to establish any new precedent. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999) (*quoting Webster v. Fall*, 266 U.S. 507, 511 (1925) (noting that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents")); *Yossifon v. City of Cocoa Beach, FL*, No. 6:02-CV-06-ORL-28KRS, 2006 WL 2130909, at *7 n.7 (M.D. Fla. July 28, 2006) ("A court decision that does not consider an argument that may be lurking in the record cannot be considered to have decided the question that was not presented."). Nor did the court of appeals, in its initial review of Moreland's convictions, consider any such argument, statutory interpretation, or theory of law as was raised and treated comprehensively in *Santos*. Defendant, nevertheless, would

have the court infer, from this decidedly limited discussion, a principle of law running counter to that announced with clarity and regularity in cases like *Demarest* and its progeny. Given the considerable weight, consistency, and geographical diversity of the authority cited above, and the absence of any controlling case law to the contrary, defendant's preferred inference is not a persuasive one.

Defendant also argues that the "profits" test must be applied in accordance with the principles of statutory application announced in *Clark v. Martinez*, 543 U.S. 371 (2005). In *Martinez*, the court held that "the meaning of words in a statute cannot change with the statute's application." *See Santos*, 553 U.S. at 522 (*citing Martinez*, 543 U.S. at 378). Applying this general tenet to the question presented in *Santos*, the principal dissent admonished that "[t]he meaning of the term 'proceeds' cannot vary from one money laundering case to the next, and the plurality opinion and Justice Stevens inappropriately allow the interpretation of that term to be controlled by a problem that may arise in only a subset of cases." *See id.* at 548 (Alito, J., dissenting).

Defendant reasons that *Martinez* dictates the extension to all money laundering cases of the *Santos* court's interpretation of "proceeds" as "profits" in the illegal gambling context. (Doc. 1739, pp. 28-29). Whatever the abstract value of this reasoning, the Eleventh Circuit, as demonstrated above, and in more recent decisions, has rejected it uniformly and in the clearest of terms, in favor of viewing Justice Stevens' *Santos* concurrence as controlling. *See United States v. Tobin*, 676 F.3d 1264, 1289 (11th Cir. 2012) ("Given that the plurality opinion in *Santos* is not binding, and that this case involves the distribution of controlled substances rather than an illegal gambling business, the District Court did not err in refusing to define

the term 'proceeds' as 'profits.'"); *United States v. Sarcona*, 457 F. App'x 806, 815 (11th Cir. 2012) ("In *non-gambling contexts*, we remain bound by a definition of proceeds that 'includes receipts as well as profits.'" (*quoting Jennings*, 599 F.3d at 1252)); *United States v. Hill*, 643 F.3d 807, 856 (11th Cir. 2011) (declining to apply *Santos* plurality holding to convictions for money laundering in connection with mortgage fraud); *United States v. Molina*, 413 F. App'x 210 (11th Cir. 2011) ("[I]n contexts other than an unlicensed gambling operation, we have continued to apply our previous definition of 'proceeds' to include 'receipts as well as profits.'" (*quoting Jennings*, 599 F.3d at 1252)); *United States v. Hein*, 395 F. App'x 652, 658 (11th Cir. 2010) (limiting application of *Santos* "solely to the 'gross receipts of an illegal gambling operation'" (*quoting Demarest*, 570 F.3d at 1242)); *United States v. Puerto*, 392 F. App'x 692, 697 n.3 (11th Cir. 2010) ("Because Hector was not convicted of operating an unlicensed gambling operation, *Santos* does not apply."). This court need not speculate as to the wisdom of this approach, but would note that the theories espoused in the *Santos* plurality and dissents are not, as a matter of law, binding on any tribunal. *See Demarest*, 570 F.3d at 1242 (recognizing that *Santos* decision was fragmented and that, as a result, its precedential value lies only in the narrow conclusion announced in Justice Stevens's concurrence). Defendant offers only cases decided beyond the bounds of the Eleventh Circuit to support his position that the central holding of *Santos* should be extended to specified unlawful activity other than gambling. Moreover, the reading of *Santos* adopted by our court of appeals in cases like *Demarest* does not, as defendant intimates, disable the *Martinez* dictate that the meaning of words in a statute cannot change with the statute's application. Instead, the Eleventh Circuit has, in effect, simply interpreted and applied *Santos* in such a

manner as to carve out a specific exception to the rule enunciated in *Martinez*, with the result that "proceeds" refers to "profits," rather than "receipts," when the underlying specified conduct is an unlawful gambling operation.[6]

The foregoing analysis demonstrates that *Santos* is not applicable to defendant's conduct and thus offers no substantive legal basis for relief. In any event, each of defendant's five *Santos* claims is barred, because defendant did not raise the claims on direct appellate review. *See United States v. Nyhuis*, 211 F.3d 1340, 1343-44 (11th Cir. 2000) (requiring defendant seeking to raise issue on motion for collateral relief to show "cause excusing his failure to raise the issue previously and actual prejudice resulting from the alleged error"); *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994) ("Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a § 2255 proceeding."); *Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir. 1989) (requiring that "a defendant . . . assert an available challenge to a sentence on direct appeal or be barred from raising the challenge in a section 2255 proceeding"); *Castro v. United States*, 248 F. Supp. 2d 1170, 1174 (S.D. Fla. 2003) ("[A] § 2255 movant cannot argue as the causal basis for his failure to advance an argument on direct appeal that the argument only became known to the movant due to subsequent developments in the law." (*citing McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001))).

---

[6] Defendant makes various iterations of this statutory interpretation argument throughout his pleadings. The court will not address every strand of argument nor every case citation defendant puts forward. The foregoing analysis is sufficient to address the entirety of defendant's arguments concerning statutory interpretation.

"Courts have long and consistently affirmed that a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal." *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004). "Because collateral review is not a substitute for a direct appeal, the general rules have developed that: (1) a defendant must assert all available claims on direct appeal, and (2) [r]elief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Id.* (citations and quotation marks omitted). "Accordingly, a non-constitutional error that may justify reversal on direct appeal does not generally support a collateral attack on a final judgment, unless the error (1) could not have been raised on direct appeal and (2) would, if condoned, result in a complete miscarriage of justice." *Id.* at 1232-33 (citation omitted). The "fundamental miscarriage of justice" exception is satisfied where "a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ." *See Murray v. Carrier*, 477 U.S. 478, 496 (1986). "[I]n this regard . . . 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). In the alternative, a defendant who fails to raise a claim on direct appeal can evade the procedural bar on a motion for collateral relief by showing "cause excusing his failure to raise the issue previously and actual prejudice resulting from the alleged error." *See United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000).

Defendant contends that he can demonstrate cause excusing his failure to raise the *Santos* claims on direct appeal. Citing *Reed v. Ross*, 468 U.S. 1 (1984) (holding that "where a constitutional claim is so novel that its legal basis is not reasonably

available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures"), defendant submits that the "profits" interpretation adopted in *Santos* was sufficiently novel at the time of his appeal so as to excuse the procedural default. (Doc. 1739, pp. 4-8).

The operative question, however, "is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all." *See Smith v. Murray*, 477 U.S. 527, 537 (1986); *see also Waldrop v. Jones*, 77 F.3d 1308, 1315 (11th Cir. 1996) ("[A] rule is 'novel,' and therefore cause for a procedural default, only if the petitioner did not have the legal tools to construct the claim before the rule was issued."). "[P]erceived futility does not constitute cause to excuse a procedural default." *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001) (*citing Bousley v. United States*, 523 U.S. 614, 623 (1998) ("As we clearly stated in *Engle v. Isaac*, 456 U.S. 107, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982), futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time.")). Where the claim had been "percolating" in other courts, "the mere fact that counsel failed to recognize the factual or legal basis for [the] claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *See Carrier*, 477 U.S. at 486.

Although the *Santos* decision was handed down after defendant's direct appeal, the argument that "proceeds," as that term appears in the money laundering statute, should be interpreted to mean "profits," was available to defendant before each stage of his prosecution. In fact, at the time of defendant's appeal, "several other courts had decided the precise issue regarding the meaning of 'proceeds' under § 1956 that the Supreme Court ultimately would decide in *Santos*." *See Gotti v. United States*,

622 F. Supp. 2d 87, 94 (S.D.N.Y. 2009); *see also United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (declining to credit argument of appellant convicted under money laundering statute that "he could not be forced to forfeit all of the crop-sales proceeds that were funneled through the individuals' accounts because the payments made . . . were for expenses he actually did incur in producing the crops"); *United States v. Grasso*, 381 F.3d 160, 167 (3d Cir. 2004) (entertaining appellant's theory that "he was improperly convicted of and sentenced for money laundering because the Government failed to establish that the money allegedly laundered derived from the net profits of his illegal activity"), *vacated and remanded on other grounds*, 544 U.S. 945 (2005); *United States v. Iacaboni*, 363 F.3d 1, 5-6 (1st Cir. 2004) (rejecting appellant's favored interpretation of § 1956(a)(1) that the term "'proceeds' refers to net income of the illegal gambling operation, not payouts"); *United States v. Scialabba*, 282 F.3d 475, 478 (7th Cir. 2002) (vacating appellants' money laundering convictions and holding that "the word 'proceeds' in § 1956(a)(1) denotes net rather than gross income of an unlawful venture"); *Johal v. United States*, Nos. C08-1075-RSL-BAT, CR05-334-RSL, 2009 WL 210709, at *8-9 (W.D. Wash. Jan. 28, 2009) (discussing pre-*Santos* cases addressing definition of the word "proceeds" under § 1956(a)(1), and noting that the Seventh Circuit reaffirmed its 2002 holding in *Scialabba* when it decided *Santos v. United States*, 461 F.3d 886, 894 (7th Cir. 2006), in August 2006). In short, the argument that the term "proceeds" as used in § 1956(a)(1) means "profits," not "gross receipts," was neither unfamiliar to the federal courts nor unavailable to defendant at the time of his direct appeal. Accordingly, defendant cannot show cause excusing his failure to raise the claim in a prior proceeding and is procedurally barred from raising the *Santos* issues now.

In the alternative, defendant argues that he can establish actual innocence to excuse the procedural default. (Doc. 1739, pp. 8-10; 1723, pp. 8-9). Defendant asserts that "there is no evidence in the record that there were any profits made, or any profits laundered, or that any conspiracy to launder profits of the wire fraud conspiracy ever existed." (Doc. 1739, p. 9). Whatever the force of this argument, it is diminished completely by defendant's reliance on the *Santos* holding–defendant concedes that "[t]he transfers of the 'gross receipts' of the wire fraud conspiracy, which were essential to the operation of the Ponzi scheme, do not constitute money laundering *when* 'proceeds' is interpreted to mean 'profits.'" (Doc. 1739, pp. 9-10) (emphasis added). Because this interpretation of the federal money laundering statute, as articulated in *Santos*, is, according to Eleventh Circuit precedent, plainly inapplicable under the circumstances, defendant's attempt to demonstrate actual innocence cannot succeed. The argument is, in essence, a circular one, where defendant invites the court to accept an argument barred by precedent, and then urges that if the court would only accept the barred argument, it could then reach a conclusion of actual innocence, at least as to the money laundering charge. Having shown neither actual innocence, nor cause and prejudice, sufficient to excuse his failure to raise the *Santos* issues on direct appeal, defendant's *Santos* claims are procedurally defaulted, and no relief is available on ground one. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000).

*Ground Two: Ineffective Assistance of Counsel*

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Strickland*

*v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient[,]" which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense[,]" which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In applying *Strickland*, the court may dispose of an ineffective assistance of counsel claim if the defendant fails to carry his burden on either of the two prongs. *See* 466 U.S. at 697 ("A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.").

*Jack Higgins*

Defendant argues in ground two (a) that counsel rendered ineffective assistance by failing to call Jack Higgins as a witness for the defense. Higgins, according to defendant, was employed as a personal assistant to Gilliland, with whom he worked hand-in-glove during the period in which the conspiracy operated. (Doc. 1723, pp. 16-17). As part of his trial preparation, defense counsel arranged for Higgins to be interviewed by an investigator, who reported back to counsel on Higgins's responses. (Doc. 1723-14). According to the investigator, Higgins stated, *inter alia*, that Gilliland and West were partners who established and managed the scheme; nothing led him to believe that Dohan was in control of the operation or played an active role in the decision-making process; and Dohan was not part of the fraud. (Doc. 1723-

14).  Defendant reasons that Higgins's "testimony would have been valuable evidence of the [defendant's] innocence," but alleges that his lead attorney, Norman A. Moscowitz ("Moscowitz"), failed to maintain contact with the prospective witness, could not locate him to be served with a subpoena, and thus did not call Higgins to testify at trial.[7]  (Doc. 1723, pp. 17-18).

In a sworn declaration submitted in connection with the government's response to the instant post-conviction motion, Moscowitz stated that following the interview, Higgins "moved and did his best to avoid contact" with the defense.  (Doc. 1747, p. 67).  Moscowitz recalled the decision to forego Higgins's testimony, explaining that the defense team grew concerned that Higgins, once subject to cross-examination, could provide answers harmful to defendant's prospects at trial:

> We determined that the risks of putting Mr. Higgins on the stand outweighed the possible benefits and we decided not to call him.  While Mr. Higgins appeared friendly to Mr. Dohan and expressed a good opinion of him, it was our judgment that he was very pliable and that on cross-examination by the Government could have led [sic] him into providing damaging testimony.

(Doc. 1747, p. 67).  "Ineffective assistance claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because all allegations of what a witness would have testified are largely speculative.'"  *Chaney v. Sec'y, Fla. Dep't of Corr.*, No. 10–13039, 2011 WL 5555846, at *2 (11th Cir. Nov. 15, 2011) (*quoting Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978))).  "'Which witnesses, if any, to call, and when to call

---

[7] Defendant was represented at trial by Moscowitz and Joaquin Mendez ("Mendez"), two accomplished and seasoned practitioners.

them, is the epitome of a strategic decision' that seldom, if ever, serves as grounds to find counsel's assistance ineffective." *Id.* (*quoting Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004)). Based upon his familiarity with the prospective witness, Moscowitz made an informed, strategic determination not to expose Higgins to impeachment on cross-examination, and his client to the potentially incriminating fruit of such questioning. Although defendant takes issue with this strategy in hindsight, he has not carried his burden to show that the calculation was so plainly unreasonable that no competent attorney would have made it. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."); *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983) ("Even if in retrospect the strategy appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it."). As a result, defendant has not established deficient performance on this ground.

Defendant submits that Moscowitz, rather than making a reasoned strategic decision not to call a witness, simply lost track of Higgins. (Doc. 1723, p. 18). Although the record offers reason to doubt this proposition,[8] defendant also fails to

---

[8] On the third day of Dohan's trial, Moscowitz told the court that he had been "unable to locate Mr. Higgins." (Doc. 1558, p. 75). The February 2006 trial, however, took place approximately eight months after Higgins provided his cell phone number and address to Moscowitz's investigator. (Doc. 1723-14, p. 2). It is not implausible that a prospective witness

provide a compelling articulation of the significance of Higgins's speculated testimony in the context of the trial. The evidence of defendant's knowing involvement in the frauds of the conspiracy was ample and, as a general rule, self-reinforcing. Had the government failed to present before the jury first-hand evidence documenting Dohan's immersion in the Ponzi schemes, Higgins's testimony may have held greater exculpatory value. But, in addition to Gilliland, several investors and brokers testified as to Dohan's role in marketing, operating, and tracking the fraudulent investment programs like Hammersmith and Microfund. Given the united front established by the government's numerous witnesses, Higgins's putative testimony (as characterized by Dohan) absolving defendant of any active role in the conspiracy would have been persuasive, let alone conclusive, of little. "Failing to call a particular witness constitutes ineffective assistance of counsel only when the absence of the witness's testimony amounts to the abandonment of a viable, outcome-changing defense." *Jordan v. McDonough*, No. 6:06-cv-1446-Orl-19KRS, 2008 WL 89848, at *5 (M.D. Fla. Jan. 7, 2008). "In all other cases, the failure to call a witness is either an objectively-reasonable strategic decision or a non-prejudicial error." *Id.* In declining to call upon Higgins for testimony, counsel here did not

---

could relocate and become resistant to sworn testimony in the span of eight months, and such a development would not speak to counsel's vigilance in keeping track of him. More importantly, when Moscowitz explained before the trial judge that he could not locate Higgins, the judge directed the prosecution to furnish to the defense Higgins's current address. (Doc. 1558, p. 77). The defense did not rest until nine days later, meaning Moscowitz had sufficient time, in theory, to have Higgins subpoenaed for testimony–that defense counsel did not do so reinforces his assertion that he made a strategic judgment to shield his client from the undue prejudice that may have flowed from the government's cross-examination of a witness Moscowitz described as "pliable" and "incorrect on important facts." (Doc. 1747, p. 67).

abandon a "viable, outcome-changing defense." Insofar as defendant has not demonstrated prejudice, this claim of ineffective assistance must fail.

*An "Inadvertent" Ponzi Scheme*

In ground two (b), defendant contends that counsel rendered ineffective assistance by failing to introduce into evidence a May 1997 email, in which Dohan advised Gilliland that modifications to program documents should be made to assure that none of the principal invested would be disbursed inadvertently to clients or agents as if it were dividends. (Doc. 1723, pp. 19-20). Defendant insists the email is dispositive of the question of his intent, or lack thereof, to participate in the Ponzi scheme. In his sworn declaration, Moscowitz asserted that neither he nor Mendez thought the email to be significant:

> The "inadvertent" Ponzi [scheme] Mr. Dohan refers to was not central to the fraud alleged by the Government. The Government's theory of prosecution was that the insiders, such as Mr. Dohan, knew that there were no investments despite the representations being made and were diverting the investors' funds to their own use. The essence of our defense was that Mr. Dohan was, in good faith, seeking to find bona fide investments and that he properly safeguarded the funds entrusted to him. . . . We were able to present that defense through an accounting of the monies given to Mr. Dohan and returned by him, through the deposition testimony of the Muirheads and, in part, through David Gilliland's admissions on cross-examination that Mr. Dohan was seeking to find high yield investments . . . .

(Doc. 1747, pp. 67-68).

Constitutionally effective counsel "is not required to present every nonfrivolous defense . . . ." *See Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000) (en banc). "[N]or is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been

incompatible with counsel's strategy." *Id.* Rather, in certain instances "[g]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Id.* (*quoting Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir. 1994)). Here, counsel reasoned that this particular document, undoubtedly one among a great many Dohan's legal team could have emphasized, would not, given their trial strategy, advance the cause of the defense in any substantial manner. Even when defendant's favored interpretation of the email is applied to the evidentiary record as a whole, Dohan has not established that his attorneys' decision to rely on alternative evidence in crafting a defense strategy was an unreasonable one. *See Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("[T]he decision [of counsel] will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" (*quoting Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983))). Consequently, defendant has not demonstrated that counsel's performance was constitutionally deficient.

*The "Chateau"*

Defendant asserts in ground two (c) that counsel rendered ineffective assistance by failing to move for a mistrial when the prosecution, in contravention of the court's admissibility ruling, elicited testimony at trial regarding a "chateau" belonging to defendant and his wife. (Doc. 1723, p. 21). During defendant's detention hearing, the court heard evidence concerning Dohan's October 2001 purchase and subsequent renovation of a chateau in France. (Doc. 1342, pp. 159-61, 164-66). In February 2006, defense counsel filed a motion *in limine* to prohibit the government from introducing evidence of the chateau at trial, arguing that such evidence was irrelevant and would create unfair class prejudice to the detriment of defendant. (Doc. 1409,

pp. 4-5). The trial court granted the motion to exclude evidence of the chateau, except for defendant's statements concerning the residence. (Doc. 1434).

At trial, the prosecution questioned Ralph Mizrahi as to whether defendant had mentioned anything about the acquisition of a new home. Mizrahi recalled that defendant had said "he owned a home in France, somewhere north of the Riviera, . . . and that he was in the process of remodeling it." (Doc. 1528, p. 159). In contravention of the court's bench conference ruling, which sanctioned questioning only up to the point of Dohan's acquisition of the property, the prosecution then inquired as to what, if anything, defendant had said regarding the remodeling. (Doc. 1528, pp. 156-59). Mizrahi testified that defendant had spent $60,000 on the kitchen cabinets. (Doc. 1528, p. 159). The prosecution returned to the remodeling issue shortly thereafter, at which point defense counsel objected, "Asked and answered." The court overruled the objection, and Mizrahi replied that the residence was "a French foreign house or - - or chateau . . . ." (Doc. 1528, p. 160). Defense counsel entered a second objection, which the court sustained. The prosecution rephrased the question, but Mizrahi testified again that defendant "called it a chateau." (Doc. 1528, pp. 160-61). Counsel for defendant objected, prompting the court to give a curative instruction: "The objection is sustained. The jury is directed to disregard. There is no evidence of any chateau whatsoever. You are to disregard the comment of the witness." (Doc. 1528, pp. 160-61).

According to defendant, his attorneys should have moved for a mistrial upon the prosecution's transgression of the court's ruling to exclude reference to the chateau, evidence of which, defendant theorizes, created class prejudice. Further, defendant maintains, the court's curative instruction served only to compound the

unfair prejudice he suffered in the wake of Mizrahi's testimony. (Doc. 1723, pp. 24-25). In support of this contention, defendant reasons that the court, by instructing the jurors that the chateau did not even exist, led the jury to believe that defendant had lied to Mizrahi, and other investors, about purchasing a stately residence, or castle, in France.[9] Defendant submits that the court's curative instruction thus "guaranteed" his conviction. (Doc. 1723, pp. 25-26).

Defendant, however, places undue importance on the court's instruction and the testimony occasioning that instruction. Moscowitz concluded that any additional focus on the issue would not redound to defendant's benefit: "It was our judgment that further efforts to cure any prejudice would have only emphasized [Mizrahi's] testimony which we believed would recede in significance." (Doc. 1747, p. 68). This interpretation of the "chateau" affair, and subsequent decision to forego a motion for mistrial, were not professionally unreasonable, particularly given the prosecution's focus at trial. The government sought to establish that defendant made intentional misrepresentations to prospective investors in order to separate them from their money. (Doc. 1563, pp. 175-76). The factual background set forth above is comprised of extensive evidence tending to substantiate such accusations. Whether defendant owned a nice home in France was a tangential and decidedly isolated issue that did not implicate defendant's guilt of the offenses charged. Stated another way, defendant has not shown that a motion for mistrial would have been granted. *See Strickland*, 466 U.S. at 693 (observing of the prejudice prong that "[i]t is not enough

---

[9] In fact, defendant had, by the time of trial, purchased two homes in France: one, located in the southeast of the country, outside of Nice, was a more modest, four-bedroom residence, whereas the other, sitting in northwest France, was an actual chateau. (Doc. 1723, pp. 24-25).

for the defendant to show that the [alleged] errors had some conceivable effect on the outcome of the proceeding"). Defendant, unable to show either deficient performance or prejudice, cannot prevail on this claim of ineffective assistance.

*The Passport*

In ground two (d), defendant asserts that counsel rendered ineffective assistance by failing to introduce his passport into evidence. (Doc. 1723, p. 26). Defendant contends that the content of the passport would have revealed factual inaccuracies in the testimony of Scott, Gilliland, Steven Signer, and Alexander Gilliland, thereby impeaching the credibility of those witnesses and, by extension, the government's case. (Doc. 1723, pp. 27-33). In support of this theory, defendant cites the testimony of Frank Scott, who stated at trial that he had been in contact with defendant, from England, during "most of [1996] and [the] early part of [1997]." (Doc. 1528, p. 62). Defendant, referring to the pages of his passport, argues that he was not in the United Kingdom between November 7, 1996, when he arrived in Hong Kong, and April 6, 1997, the day after which he returned to England. (Doc. 1723, p. 27). These passport entries, however, do not undermine Scott's testimony to such a degree as defendant claims. Testifying at a distance of nearly ten years, Scott may have been chronologically imprecise, but such imprecision does little to remove the sting of testimony relating to the nature of his relationship with defendant.

Next, defendant urges the court to consider the potentially damaging effects his passport would have had on Gilliland's credibility. (Doc. 1723, pp. 28, 33). Gilliland, as Dohan notes, testified that defendant visited Bluewater Bay, Florida, on no fewer than two occasions, the first coming in Summer 1998, when Dohan allegedly stayed for a couple of weeks at Gilliland's condominium. (Doc. 1559, p.

121).    Further, Gilliland averred that defendant, while there, worked out of Bridgeport's offices.  (Doc. 1559, p. 124).  Despite his protestations, defendant concedes that he was indeed in the United States in August 1998, albeit "only for a few days." (Doc. 1723, p. 33).  Accordingly, the passport is not wholly inconsistent with Gilliland's testimony regarding defendant's travels.   Morever, the precise amount of time Dohan spent in Bluewater Bay was simply not a question of overriding import.  To the extent defendant believes the passport would have been useful to impeach Gilliland's credibility generally, it is apparent that defense counsel did not need the passport in evidence to remove the cloak of plausibility from Gilliland's testimony.  During an unflagging cross-examination, Moscowitz so eroded Gilliland's credibility that the prosecution had little recourse but to invite the jury during closing argument to "disregard completely" the witness's testimony.  (Doc. 1563, pp. 173-74); *see United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (observing that "the government . . . in its closing argument . . . even invited the jury to disregard Gilliland's entire testimony if it wished, and convict on other evidence"). Gilliland was forced to admit on cross-examination that he had spoken falsely on multiple occasions.  (Doc. 1559, pp. 206-17, 226-27, 232-33, 240; 1560, pp. 29-30, 58, 61, 70).  Defendant's counsel, even without the benefit of the passport, thus ably stripped from Gilliland's testimony whatever veneer of credibility he had enjoyed theretofore.  Insofar as Moscowitz exposed Gilliland's numerous prevarications, thereby diminishing in significant degree his value as a witness, no prejudice is apparent in counsel's decision to keep the passport out of evidence.  Moreover, one is left to wonder how counsel, by exposing Dohan as a prodigious globehopper, could

have saved him, when, at the same time, any mention of a home in France seemingly doomed him.

Defendant also submits that Alexander Gilliland, an Australian national and investor, "had his dates confused" when testifying for the government, which confusion could have been "eliminated" had defense counsel introduced the passport into evidence. (Doc. 1723, p. 31). Alexander Gilliland testified that he met with defendant on two occasions prior to the August 1998 opening of Bridgeport Alliance Australia ("Bridgeport Australia"), and that defendant spoke specifically at the second meeting about the Microfund program. (Doc. 1558, pp. 56-57). At the opening of Bridgeport Australia, Alexander Gilliland conferred with defendant a third time. According to Alexander Gilliland, all present at the opening were "extolling the virtues and the outcomes of the program . . . ." (Doc. 1558, p. 63).

In turn, defendant points out a number of temporal inconsistencies in the testimony of Alexander Gilliland. For instance, defendant emphasizes that Microfund had yet to be created at the time of his second meeting with Alexander Gilliland, determining that they could not possibly have discussed the program at that point in time. Referencing another passport entry, defendant asserts that he was not in Australia at any time between January 13, 1997, and August 14, 1998, the day after which he arrived for the Bridgeport Australia opening. Defendant concludes from this entry that his in-person meeting with Alexander Gilliland regarding Microfund actually occurred in August 1998, by which time the program had paid approximately $350,000 in what defendant believed to be legitimate profits to AAH Rem, an Australian investment firm controlled by Dohan and his partner, George Muirhead ("Muirhead"). (Doc. 1528, p. 220; 1723, pp. 31-32).

Nonetheless, defendant's speculation as to the evidentiary centrality of the passport is not persuasive. Despite defendant's insistence that the passport would have become a silver bullet as an impeachment tool, the significance of these alleged discrepancies, to the extent they are discrepancies at all, is not apparent in the context of the entire body of evidence. Defendant simply fails to demonstrate that counsel's failure to offer the passport into evidence altered the outcome of the proceeding, let alone that the trial was rendered unfair and the verdict suspect. *See Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (establishing that an analysis of prejudice under *Strickland* "focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective"); *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." ).

For his last excursion into the passport ground, defendant argues that the introduction of the passport into evidence would have exposed the errancy of Steven Signer's testimony. (Doc. 1723, pp. 28-30). Steven Signer ("Signer"), a trader in U.S. Treasury bonds, testified that defendant, in the company of Gilliland and Francis Josiah ("Josiah"), an individual leveraging Treasury bills out of Canary Wharf,[10] visited the Denver, Colorado, offices of Cohig & Associates ("Cohig"), a retail brokerage firm, on December 16, 1996. Signer, who was working for Cohig at the time, explained that Dohan participated in various conversations and the opening of

---

[10] Canary Wharf is one of London's main financial centers.

the AAH Rem and Hammersmith accounts, in which investors were told their Treasury securities would be held. (Doc. 1528, pp. 200-03, 205). Signer asserted that he personally assisted Dohan and the others in establishing the accounts. (Doc. 1528, p. 200). Defendant submits that the passport entries would have shown that he was not in the United States, let alone Denver, on the date attested to by Signer, and, therefore, that he did not participate in Hammersmith's formation. (Doc. 1723, pp. 28-30).

On cross-examination, Signer conceded his uncertainty regarding Dohan's presence at Cohig when Gilliland established the Hammersmith and AAH Rem accounts: "I do not recall. I - - I do believe they came in together." (Doc. 1528, pp. 269-70). Defendant now maintains that his passport, had counsel introduced it into evidence, would have shown that Dohan did not visit Cohig with Gilliland and Josiah in December 1996. (Doc. 1723, p. 29). Rather, defendant asserts, the passport would substantiate his presence in Australia at the relevant time. (Doc. 1723, p. 29). Regarding the possibility of deficient performance, Moscowitz assessed that the passport would be of limited evidentiary value, particularly given the other evidence adduced at trial:

> There was no dispute that Mr. Dohan was in Europe during most of the period of the conspiracy and visited the offices in Bluewater Bay on very few occasions. That was a fact which we emphasized. The one allegation which I recall the passport would have refuted was that Mr. Dohan was in Colorado in December, 1996, when the [Hammersmith and AAH Rem] accounts at Cohig were opened. This didn't matter, however, as there was no question . . . that [Dohan] was involved in the management of the [AAH Rem] account which he and Mr. Muirhead opened at Cohig on behalf of their investors. Indeed, we believed that it was helpful to show that [Dohan] exercised independent control over

that account [AAH Rem] from the other account [Hammersmith] controlled by Gilliland.

(Doc. 1747, pp. 68-69). Given the degree of culpability attributable to Gilliland for the criminal schemes at issue, defense counsel's determination to separate Dohan from the mastermind in the eyes of the jury was not an unreasonable one. By extension, defendant has not demonstrated that counsel's assessment as to the evidentiary value of the passport was constitutionally deficient. *See Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) ("When reviewing whether counsel's performance was deficient, courts must, in a highly deferential manner, examine 'whether counsel's assistance was reasonable considering all the circumstances.'" (*quoting Strickland v. Washington*, 466 U.S. 668, 688 (1984))).

As the government responds, moreover, "[t]here is no reasonable probability that the introduction of the passport, showing Signer's belief to be in error, would have changed the outcome of the trial." (Doc. 1747, p. 29). Assuming *arguendo* that defendant did not physically visit Cohig's premises to establish the Hammersmith and AAH Rem accounts, the government, as Moscowitz recognized, still adduced evidence at trial tending to implicate defendant in the operational management and marketing of the various trading programs. For this reason, defendant has not made the requisite showing of prejudice under *Strickland*, and no relief is available on this ground. *See Strickland*, 466 U.S. at 693, 694 (subjecting defendant claiming ineffective assistance to "a general requirement that [he] affirmatively prove prejudice," or "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different").

*The Right to Speedy Trial*

Defendant argues in ground two (e) that defense counsel rendered ineffective assistance by failing to move for dismissal of the indictment on the grounds that the government violated his Sixth Amendment right to a speedy trial. As set forth by the defendant, the chronology of relevant events begins in August 1999, when Higgins apprised Dohan of the government's pre-indictment investigation. (Doc. 1723, p. 34). Dohan, who was then splitting his time between England and France, retained a solicitor, Gerald Cooke ("Cooke"), and initiated contact with the government. Upon learning of his indictment in July 2000,[11] Dohan secured the services of a second solicitor, Monte Raphael ("Raphael"), who assisted him in locating and retaining appropriate legal representation in the United States. (Doc. 1723, p. 34). By the end of July 2000, defendant had retained the services of Gary Naftalis ("Naftalis"), who directed another attorney in his New York firm, Henry Mazurek ("Mazurek"), to contact the prosecutor to discuss bond arrangements for Dohan's immediate surrender. The prosecutor informed Mazurek that the trial date had already been set for five weeks hence, the trial judge had ruled against any further continuances, and the government would commence extradition proceedings if defendant did not surrender promptly. (Doc. 1723, pp. 34-35). Unable to represent defendant on such a schedule, Naftalis withdrew his representation. Dohan remained in Europe. Although prospective replacement counsel declined to represent defendant based upon the scheduling exigencies, several attorneys indicated they would consider representing defendant upon his extradition to the United States. (Doc. 1723, p. 35).

---

[11] The grand jury also indicted ten of Dohan's coconspirators, including David Gilliland. (Doc. 1, p. 1).

The trial of Dohan's coconspirators, which garnered six convictions, proceeded with defendant still in Europe.

Pursuant to U.S. Ambassadorial Letter, French National Police converged on Dohan's chateau to arrest him and his wife on November 5, 2003. (Docs. 1723, p. 36; 1723-35). The Dohans were brought before a French magistrate, who lodged formal money laundering charges against each of them, confiscated their passports, and released them on their own recognizance. In accordance with the Ambassadorial Letter's request for temporary arrest, however, defendant was immediately rearrested and detained pending extradition to the United States. (Doc. 1723, p. 37). According to defendant's French attorney, Philippe Goupille ("Goupille"), Dohan requested that he be extradited immediately. Despite this request, Goupille advised defendant to remain in France, lest he be convicted *in absentia* for charges of aggravated money laundering. (Doc. 1723-21, p. 3). So as to remain on French territory for the pendency of his case, defendant challenged the extradition decree.

Upon conclusion of the judicial investigation, the money laundering charges were dismissed by French authorities on April 21, 2004, and the Dohans were fully exonerated. (Docs. 1723-20; 1723-21, pp. 3-4). Nevertheless, Goupille advised defendant to persist in the extradition challenge, because he believed it to be meritorious. (Doc. 1723-21, p. 4). Notwithstanding delays in the bureaucratic process, defendant was finally extradited on August 31, 2005. Upon his arrival in the United States, defendant was arraigned on September 13, 2005, and held without bond at the Escambia County Jail pending trial. To secure the video depositions of Muirhead and his wife, who were residing in Australia, defendant twice moved for

a continuance of trial, which the court granted on each occasion. (Docs. 1337, 1377). Defendant's trial commenced on February 9, 2006. (Doc. 1528, p. 1).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." U.S. CONST. amend. VI. Constitutional speedy trial challenges are subject to a four-factor balancing test. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972) (applying four-factor test to habeas corpus petition raising speedy trial grounds). The four factors are "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* "The length of the delay is to some extent a triggering mechanism." *Id.* "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* "Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (applying *Barker* criteria to defendant's claim on appeal).

Here, the government indicted defendant in June 2000 (doc. 1), but did not make diplomatic overtures to the French Foreign Ministry to arrange for his arrest until November 2003. Defendant, having satisfied the first of the speedy trial considerations articulated by the Supreme Court, "retains the burden of proving the remaining factors under *Barker*." *See United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996) (reviewing government's appeal of district court's dismissal of federal indictment returned against defendant). The second *Barker* factor requires the court to examine the government's reason for the delay. *See* 407 U.S. at 530. Between the time of defendant's original indictment and the government's first

attempts at extradition, the government appears to have focused upon objectives other than Dohan, opting to prosecute charges leveled against coconspirators involved in the scheme. The undersigned agrees with the government, however, that the prosecution was not the sole, or even primary, source of delay in this case. True, defendant, upon learning of the indictment in July 2000, tried initially to negotiate a surrender with the government. (Doc. 1342, p. 197). But Dohan ultimately reversed course, resisting surrender to avoid pretrial incarceration.[12] (Doc. 1342, p. 197). Defendant also contested his extradition from France, initially so as to be present on French soil to face charges of aggravated money laundering, and, after the charges had been dismissed, because his attorney believed the challenge to have merit. (Doc. 1723-21, p. 4). Moreover, defendant does not adequately explain his failure to surrender in the closing days of July 2000–that Naftalis withdrew his representation is not a persuasive explanation, particularly where, as defendant admits, "several" replacement counsel offered to represent him upon extradition. (Doc. 1723, p. 35). At no point in time did defendant waive extradition to the United States. In other words, the delay in defendant's trial cannot be attributed to prosecutorial negligence or bad faith alone.

The third factor of the *Barker* balancing test weighs the defendant's assertion of the right to speedy trial. *See* 407 U.S. at 530. Here, defendant did not assert the right at all, opting instead, as his litigation strategy, to resist immediate surrender (to

---

[12] At defendant's arraignment and detention hearing, held on September 13, 2005, U.S. Magistrate Judge Miles Davis recounted the events provoking Dohan's course reversal. In negotiating Dohan's prospective surrender, the government refused to stipulate to a bond, meaning the court, upon defendant's arrival in the United States, would have determined whether to grant pretrial release. (Doc. 1342, p. 197). "Rather than . . . risk . . . being incarcerated prior to trial," the court concluded, "[Dohan] decided not to surrender [at] all." (Doc. 1342, p. 197).

avoid incarceration prior to trial) and challenge extradition, even after a supposed extenuating circumstance of colorable legitimacy, potential prosecution in France, had passed.[13]  Once in custody in the United States, defendant moved on two occasions to continue the trial to allow for the preparation of the Muirheads' video depositions.  (Docs. 1337, 1377).  Mr. Dohan not only refrained from asserting any right to speedy trial, but affirmatively waived the right and subsequently delayed prosecution further by his own motions to continue trial.  Though the government did not oppose the second  motion for continuance, the government may not be charged with such delay.  *See United States v. Ingram*, 446 F.3d 1332, 1337 (11th Cir. 2006) ("[A] defendant who intentionally evades the Government's efforts to bring him to trial is culpable in causing the delay."); *United States v. Hill*, 622 F.2d 900, 909 (5th Cir. 1980) ("Any prolongation attributable to conduct by the accused is excused.").

Relying on case law from the U.S. Court of Appeals for the Sixth Circuit, Dohan contends that "any act by [a] defendant or attorney notifying the government of the defendant's attempt to secure speedy disposition" qualifies as an assertion of the right.  *See United States v. Brown*, 169 F.3d 344, 350 (6th Cir. 1999) (*citing Strunk v. United States*, 412 U.S. 434, 436 (1973)); (Doc. 1831, pp. 1-2).  In so arguing, defendant, in essence, urges the court to credit his announced desire to surrender, but ignore his incompatible corresponding actions, which, if not negating the earlier act, cast serious doubt on the legitimacy of any implicit speedy trial

---

[13] Contrary to his present contention that he tried to surrender in July 2000, and thereby asserted his speedy trial rights, ultimately defendant did not offer himself into government custody. Rather, defendant halted that process after weighing the risk of pretrial incarceration and after Naftalis withdrew as his attorney, despite offers of legal representation conditioned only upon his arrival in the United States.  (Docs. 1342, p. 197; 1723, p. 35).

demand.  At the arraignment and detention hearing, the magistrate judge considered the fact issue of whether defendant had been motivated by a genuine desire to confront the charges against him:

> Mr. Dohan learned that he had been indicted in July of 2000. . . . [H]e very soon thereafter retained counsel and tried to negotiate a surrender indicating that he was willing to surrender, but that was unsuccessful. . . . [I]t appears . . . that the Government was not willing to talk about a bond and that he would have to be brought here and the Court would have to decide whether a bond would be granted.  Rather than come here and . . . take the risk of being incarcerated prior to trial, he decided not to surrender [at] all.  More than three years later in November 2003, he was arrested.  The Government says that he was hiding, he says that he was not.  I have a hard time faulting the Government for not finding him even though . . . they had something that had his address on it.  This is not a negligence case against the Government in which they should have found him or . . . ought to have known where he was.  The question is, in Mr. Dohan's mind was he willing to come to the United States and address these charges against him as he had initially indicated, [and] the answer to that clearly was no.

(Doc. 1342, pp. 197-98).  Defendant cannot reconcile what he would *now* like to characterize as a request for trial in due course with *contemporaneous* conduct making speedy disposition impossible.  The undersigned agrees that "Dohan [had] no intention whatsoever of coming back to the United States and answering [the] charges" (doc. 1342, p. 200), and therefore declines to credit defendant's professed assertion of the right to speedy trial.

The final *Barker* factor examines prejudice to the defendant.  *See* 407 U.S. at 530.  Unless the preceding three factors *all* weigh heavily against the government–and here they do not–defendant must demonstrate actual prejudice.  *See United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir. 1985) ("The trial court

correctly concluded that because only two of the first three *Barker* factors weighed heavily against the government, the defendants were required to show actual prejudice."); *United States v. Dennard*, 722 F.2d 1510, 1513 (11th Cir. 1984) ("It is well settled that when the first three *Barker* factors weigh heavily against the government, the defendant need not demonstrate actual prejudice.").  Prejudice can be established in three ways: (1) oppressive pretrial incarceration; (2) anxiety and concern caused to the accused; and (3) the possibility that the accused's defense will be impaired.  *See United States v. Clark*, 83 F.3d 1350, 1354 (11th Cir. 1996).

Defendant claims that each form of prejudice is implicated here, beginning with his allegation that the pretrial incarceration was oppressive.  Defendant asserts that he was detained in pretrial incarceration for a total of twenty-seven months, spending six months in a French jail on charges of aggravated money laundering, another fifteen months' incarceration in France during the pendency of the extradition process, and five months at the Escambia County Jail, in Pensacola, Florida, awaiting trial.  (Doc. 1723, p. 57).  The claim of prejudice, as it results from defendant's pretrial incarceration, is not persuasive.  Defendant spent the majority of his pretrial incarceration–fifteen months–while maintaining his challenge to extradition, notwithstanding the fact that French authorities had dismissed the money laundering charges allegedly occasioning his failure to surrender in the first place.  Similarly, the government is not, contrary to defendant's assertions, culpable for the initial six months defendant spent incarcerated in France.  Though showing that the French charges were dismissed, defendant offers no authority to support his suggestion that the government should be, in effect, penalized for warning another nation as to possible crimes committed within its borders, or for the criminal charges resulting

from such an apprisal.  Further, the five months spent at the Escambia County Jail were no more than could reasonably be expected, or at least anticipated, for the parties to prepare for a complex trial, complete discovery, and litigate pretrial motions, including the two motions for continuance filed by defendant.  In other words, this final period of detention was not the result of unconstitutional prosecutorial delay, but a normal consequence of the operation of the justice system.  Likewise, the "anxiety and concern" defendant claims attended the years following the initial indictment cannot be attributed to any untoward conduct on the part of the government.  Any uncertainty that might have plagued defendant in the interim between his indictment and trial could have been alleviated in large part had defendant simply surrendered in July 2000 or ceased his subsequent extradition challenge.

Defendant also alleges prejudice of the third type, arguing that the delay in prosecution impaired his "ability to conduct [a] defense . . . ." (Doc. 1723, p. 57). Defendant offers several theories to construct his conclusion that the defense was impaired:  (1) as a result of not being not tried at the first trial, he did not have the benefit of the other defendants' cross-examination of Gilliland; (2) having missed the first trial, defendant's conduct was not evaluated in the context of the entire conspiracy; (3) defendant's pretrial incarceration prevented his participation in the preparation and presentation of a defense; and (4) the witness' memory lapses deprived defendant of an accurate record of his conduct.  The first three sources of alleged prejudice are utterly unconvincing.  Defendant had an unimpeded opportunity to cross-examine Gilliland, and his attorneys did so thoroughly.  Defendant does not identify with particularity exactly what the cross-examinations of his coconspirators

revealed that would have redounded to his benefit in a material way. Similarly, by its examination of several of the key players, the prosecution effectively placed defendant's conduct in the context of the larger conspiracy. Defendant does not state specifically how the "context" of the first trial would have made a significant difference in the outcome of his prosecution. Moreover, defendant does not explain what his defense team lacked that he could have provided had he not been incarcerated prior to trial. From all appearances, counsel prepared a lucid theory of defense and was able to present that theory in a coherent manner, defendant's initial absence notwithstanding.

Though acknowledging the most serious prejudice is the third form, the possibility that the accused's defense will be impaired, *see Hill*, 622 F.2d at 910, the courts of this circuit have "consistently held that conclusory allegations of prejudice, including unsubstantiated allegations of witness's faded memories, are insufficient to constitute proof of actual prejudice." *See, e.g.*, *United States v. Hayes*, 40 F.3d 362, 366 (11th Cir. 1994). Here, defendant contends that the faulty memories of various coconspirators prejudiced his defense. Specifically, defendant alleges Signer testified inaccurately that Dohan was in Denver in December 1996. (Doc. 1723, pp. 57-58). In reviewing the transcript of defendant's trial, however, the undersigned notes that some witnesses, including Signer, simply conceded to having less-than-perfect memory regarding some of the events underlying the Ponzi scheme for which defendant was on trial. When, for example, Signer could not say with certainty whether defendant had been present at Cohig with Gilliland in December 1996, defense counsel asked, "[D]id they really come in together, or now ten years later,

you are assuming [Dohan and Gilliland] came in together?"  Signer responded, "I do not recall.  I - - I do believe they came in together."  (Doc. 1528, p. 270).

To the extent defendant identifies the testimonial accounts he believes were infected by faulty recollection–those of Signer and Scott–the transcript reveals that neither witness testified to an impaired memory regarding a material fact in issue. Scott, for instance, testified that he had spoken with Dohan around the end of 1996 and beginning of 1997, asserting that Gilliland and Dohan were residing in the English countryside during this period.  (Doc. 1528, pp. 62, 88, 90-91).  Conversely, defendant submits that his passport would have established that he was not in the United Kingdom, as Scott recalled.  (Doc. 1723, p. 58).  The witnesses' powers of recall notwithstanding, the relation between defendant's allegations of impaired memory and the material facts in issue is too tenuous to be credited as a source of prejudice.  *See United States v. Dennard*, 722 F.2d 1510, 1513-14 (11th Cir. 1984) ("[W]here . . . appellants allege no more than the general inability to recall a transaction with desired specificity that occurs in any trial regardless of delay, and where such faded memories do not appear substantially to relate to any material fact in issue, no actual impairment of their defense for purposes of a speedy trial challenge is shown." (*quoting United States v. Avalos*, 541 F.2d 1100, 1116 (5th Cir. 1976))). The very purpose of cross-examination, part and parcel of an effective defense, being to expose the fallibility of memory, defendant must show more than the sort of ordinary forgetfulness that would have attended his trial had he been prosecuted in some sort of idealized accordance with the hastiest of speedy trial procedures.  *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316 (1974) (observing that cross-examination serves to reveal a witness's perceptions and memory); *United States v. Williams*, 592

F.2d 1277, 1281 (11th Cir. 1979) (stressing "the importance of the right of cross-examination to delve into a witness' story, to test the witness' perceptions and memory and also to impeach the witness").

Further, Mr. Moscowitz averred in his sworn declaration that the delay in prosecution did not impair the preparation of a defense in any meaningful way:

> We prepared the speedy trial motion and gave serious consideration to filing it. A shortcoming, however, was that a substantial period of the delay was a consequence of Mr. Dohan's decision to challenge extradition, and there was no appreciable prejudice from the delay in loss of evidence, either of witnesses or documents. We did not think there would be any benefit to filing a motion which we judged had little chance of success.

(Doc. 1747, p. 69).

Defendant's motion and supporting memoranda consist primarily of conclusory allegations of prejudice, which, as explained above, do not establish actual prejudice from the pretrial delay in prosecution. *See Hayes*, 40 F.3d at 366. As no one *Barker* factor predominates, the factors must be balanced against one another in the context of surrounding circumstances. *See Dennard*, 722 F.2d at 1512-13 ("We regard none of the four factors . . . as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial."). Finding no assertion of the right to speedy trial nor any prejudice resulting from the delay, the undersigned cannot rationally find that defense counsel could have successfully established a violation of defendant's right to speedy trial. Counsel does not render ineffective assistance for failing to argue a meritless claim. *See Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (holding that "[c]ounsel was not ineffective for failing to raise these issues because they clearly lack merit"); *Meeks v. Moore*, 216 F.3d 951, 968 (11th

Cir. 2000) (affirming district court's assertion that counsel has no duty to bring forth non-meritorious motions); *Jackson v. Herring*, 42 F.3d 1350, 1359 (11th Cir. 1995) ("[C]ounsel need not pursue constitutional claims which he reasonably believes to be of questionable merit."); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (applying *Strickland* and holding that "a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client"); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (crediting as professionally reasonable counsel's decision not to file what he believed to be a meritless motion); *Ladd v. Jones*, 864 F.2d 108, 110 (11th Cir. 1989) ("[S]ince these claims were meritless, it was clearly not ineffective for counsel not to pursue them."). Because the claim was meritless, counsel did not render ineffective assistance for failing to move for dismissal of the indictment on the basis of a violation of the right to speedy trial. *See Strickland*, 466 U.S. at 687 (conditioning successful ineffective assistance of counsel claim on showing that counsel's performance was deficient).

*Closing Argument*

In ground two (f), defendant argues that counsel rendered ineffective assistance by failing to object to the prosecution's closing argument, which, according to Dohan, contained misrepresentations of fact and advanced facts not in evidence. (Doc. 1723, p. 60). Additionally, defendant contends that appellate counsel, G. Richard Strafer ("Strafer"), rendered ineffective assistance by failing to raise the same instances of claimed prosecutorial misconduct on direct appeal. (Doc. 1723, p. 65). Specifically, defendant takes issue with the argument of Assistant United States Attorney Michelle M. Heldmyer ("Heldmyer"), who commented on defendant's actions during the receivership and the return of money accumulated in the course of the scheme:

[Alexander] Gilliland lost all of his money. Mr. Gilliland reinvested, too. You recall, he was the one that was told we're going to give you your money back during the receivership and during this period of time when . . . Mr. Dohan was supposed to be working so hard for the Australian investors, we'll give it back, but we're going to take it right back from you. . . . They didn't give him his money back. It touched his account for a day, and they took it back and stole it, and he lost everything. That's not giving the money back. That's giving the money back on paper, so that he can come in to you and tell you that he gave everybody's money back. So he can go to Mr. Quilling's office and tell Mr. Quilling that he gave all the money back. And so he can go in my office and tell me he gave all the money back. He did not.

(Doc. 1563, pp. 141-42). Defendant also characterizes as prejudicial the content of the prosecution's rebuttal closing, in which Ms. Heldmyer further addressed the fate of Alexander Gilliland's investment:

> And Mr. Moscowitz is dead wrong when he told you that [Alexander] Gilliland made money. He did not make money. He got back his principal. It touched his account . . . and bounced right back to Mr. Dohan, because he was the hero of the day. He was the one Mr. Muirhead was touting as the savior of all, because the Australian money came back. Well, remember, ladies and gentlemen, you saw plenty of evidence to show that not all the Australian money came back. . . . [N]obody else's money came back that went into Mr. Dohan's control. None of [it] did.

(Doc. 1563, p. 178). Dohan maintains defense counsel should have entered objections to the foregoing statements, which, he asserts, are contradicted by evidence that he "had indeed sent back all of the money that was placed in his custody . . . ." (Doc. 1723, p. 61).

As the government notes, "[a] criminal trial does not unfold like a play with actors following a script . . . ." *See Geders v. United States*, 425 U.S. 80, 86 (1976).

"It should come as no surprise that 'in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused.'" *United States v. Young*, 470 U.S. 1, 10 (1985) (*quoting Dunlop v. United States*, 165 U.S. 486, 498 (1897)). "The test for determining whether a prosecutor's comments warrant the granting of a new trial is (1) whether the remarks were improper and (2) whether they prejudicially affected substantive rights of the defendants." *United States v. Vera*, 701 F.2d 1349, 1361 (11th Cir. 1983). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

As a threshold matter, not all of the remarks defendant relies on were improper. For example, defendant deems unwarranted Ms. Heldmyer's assertion that Dohan returned certain funds temporarily so he could "go to" the offices of the receivership and the United States Attorney and represent that he had returned monies obtained by fraudulent means. Defendant maintains that he was not in the United States at the time in question, and thus could not possibly have visited either office to make such a representation. Perhaps defendant interprets the commentary at issue too literally. Given the context of her remarks, Heldmyer was simply trying to convey that Dohan returned some funds on a temporary basis, allowing the monies to "touch" the pertinent accounts, so he could attempt to rehabilitate his image before the receivership, the prosecution, and, ultimately, the jury. That defendant did not physically visit these sites does not make the prosecution's implications improper.

Similarly, defendant fails to demonstrate the impropriety of Ms. Heldmyer's contention that Alexander Gilliland "bounced" money back to him. Alexander

Gilliland testified that, after learning David Gilliland had misappropriated investments made with Microfund, Dohan and Muirhead explained that they would return his invested capital, less withdrawals. (Doc. 1558, pp. 70-71). But Alexander Gilliland also stated that both Dohan and Muirhead instructed him to "bounce" the returned funds back to an offshore account (at AMPAC Bank), which, unbeknownst to him, was controlled by members of the conspiracy. (Doc. 1558, pp. 70-71). When asked on direct examination whether he ever got that money back, Alexander Gilliland responded that he did not. (Doc. 1558, p. 71). Ms. Heldmyer then asked Alexander Gilliland, "And it was your understanding . . . that Mr. Dohan controlled your money?" Alexander Gilliland responded in the affirmative. (Doc. 1558, pp. 71-72). The foregoing exchange provides the evidentiary basis necessary to sustain Ms. Heldmyer's assertions that Alexander Gilliland lost his investments and that capital returned to him on a temporary basis eventually "bounced" back into the hands of Dohan and his associates.

Nor can defendant establish the impropriety of particular comments merely by asserting that the comments are contradicted by the facts in evidence, without identifying those facts with specificity. Thus, for instance, when defendant submits that "the bank records" prove the purported "bounce back" of Alexander Gilliland's funds occurred prior to the receivership period, Dohan does not satisfy his burden to come forth with a factual basis to support the allegations of professionally unreasonable representation. *See Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) ("Conclusory allegations of ineffective assistance are insufficient." (*quoting United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991))).

Dohan does identify some evidence with particularity in support of his allegations of prosecutorial misconduct. Defendant, for example, relies on exhibit WD-183 (doc. 1529, pp. 233-37), a letter faxed from Dohan to Gilliland, and the testimony of accountant Milo Segner (doc. 1529, pp. 68-69), in support of his contention that Heldmyer spoke falsely and in contravention of the evidence when she stated that Dohan used the "bounce back" mechanism to negate the return of investor funds and did not return money to any of the investors. (Doc. 1723, pp. 62-63). To the extent these comments were inconsonant with the evidence, defendant has not carried his burden to prove that counsel, having failed to object during closing argument, compromised the fairness of the trial or the reliability of the verdict. *See Fretwell*, 506 U.S. at 369 (requiring defendant waging claim of ineffective assistance of counsel to show that "the result of the proceeding was fundamentally unfair or unreliable"). The remarks, even if improper, cannot be viewed in isolation, and defendant simply cannot overcome the considerable evidence of guilt borne out by the record. *See United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006) ("When the record contains sufficient independent evidence of guilt, any error is harmless."); *United States v. Adams*, 74 F.3d 1093, 1097-98 (11th Cir. 1996) (determining that improper prosecutorial references did not raise a reasonable probability that, but for the remarks, the outcome would be different, "because the record contain[ed] sufficient independent evidence establishing guilt"); *United States v. Harmas*, 974 F.2d 1262, 1269 (11th Cir. 1992) ("A prosecutor's comments [in closing argument] must be viewed in the context of the record as a whole, and will be the basis for reversal only if they result in prejudice affecting the substantial rights of the defendant." ). Because the record contains sufficient independent evidence of

his guilt, defendant has not shown a reasonable probability that counsel's failure to object to the remarks at issue deprived defendant of a trial whose result is fair and reliable. *See Fretwell*, 506 U.S. at 369.

The claim of ineffective appellate assistance is equally deficient. In a sworn affidavit appended to the government's response to the motion to vacate, Strafer noted the limitations and considerable burden confronting Dohan on direct appeal:

> Since nearly all of these issues were being raised for the first time on appeal under the "plain error" doctrine codified in Fed. R. Crim. P. 52(b), I discussed with Dohan the need to keep our eye on the ball and to not risk [losing] credibility (not to mention the Court's attention) by trying to nit pick every factual dispute where [Dohan] thought "misconduct" had occurred. I conveyed my views to Dohan and specifically informed him that I did not "think that every 'mis-statement of the evidence' [was] sufficient to allege misconduct in closing argument," especially since we had to meet the "plain error" standard . . . . I also informed Dohan of the word limits (14,000 words for an Initial Brief) and font requirements (14-point) in the Federal Rules of Appellate Procedure and Eleventh Circuit's corresponding Local Rules which would require us to be focused in the length and number of issues we could effectively raise.

(Doc. 1747, pp. 79-80) (footnotes omitted). Given the word constraints inherent to appellate practice before the Eleventh Circuit (which defendant does not contest), Dohan does not identify which of those issues Strafer raised on appeal he would have had the attorney jettison in favor of the claims emphasized on collateral review. Defendant thus fails to dispel the presumption that counsel, constrained by procedural rule in addressing the appellate tribunal, acted reasonably by presenting only the most meritorious of potential claims. *See Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) ("There is a strong presumption that counsel's conduct falls within

the 'wide range of reasonable professional assistance.'" (*quoting Waters v. Thomas*, 46 F.3d 1506, 1511-12 (11th Cir. 1995) (en banc))); *Williams v. Head*, 185 F.3d 1223, 1227-28 (11th Cir. 1999) (noting that "'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment'" (*quoting Strickland v. Washington*, 466 U.S. 668, 690 (1984))); *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990) ("[R]eviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance.").

In this instance, moreover, the plain error doctrine, which governs the noticing of forfeited error in federal appellate court, precludes a showing of prejudice. As Strafer alluded, the plain error doctrine, which applies where, as here, no objection is lodged in the district court, imposes on appellants an all but unsustainable burden, establishing what the Eleventh Circuit has referred to as "a daunting obstacle." *See United States v. Pielago*, 135 F.3d 703, 708 (11th Cir. 1998). To demonstrate plain error, an appellant must establish "'(1) error, (2) that is plain, and (3) that affects substantial rights.'" *See United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005) (*quoting United States v. Cotton*, 535 U.S. 625, 631 (2002) (quotations and internal marks omitted)). Generally speaking, an error affects substantial rights when it "affected the outcome of the district court proceedings." *See United States v. Olano*, 507 U.S. 725, 734 (1993). Provided the appellant satisfies this heavy burden of persuasion, the appellate court may, in its discretion, "'notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *See id.* (*quoting Cotton*, 535 U.S. at 631 (quotations and internal marks omitted)).

As analyzed above, here defendant fails in most respects by way of his claims of prosecutorial misconduct to identify even a cognizable error, and certainly none so plain or obvious that it seriously affected the outcome of the trial, or the fairness, integrity, or public reputation of the proceedings. No more than trial counsel must an appellate advocate pursue issues of improbable merit. *See Owen v. Sec'y, Fla. Dep't of Corr.*, 568 F.3d 894, 915 (11th Cir. 2009) (holding "any deficiencies of [appellate] counsel in failing to raise or adequately pursue [substantive issues lacking merit] cannot constitute ineffective assistance"); *Shere v. Secy, Fla. Dep't of Corr.*, 537 F.3d 1304, 1311 (11th Cir. 2008) (agreeing that "appellate counsel is not ineffective for failing to raise a meritless issue on appeal"). Because Dohan does not establish that the foregoing claims are viable when subjected to the crucible of plain error review, he cannot demonstrate prejudice from Strafer's failure to raise them on appeal. As defendant shows neither deficient performance nor prejudice, no relief is available on this claim of ineffective appellate assistance.

*Overt Acts*

Defendant alleges in ground two (g) that counsel rendered ineffective assistance by "failing to expose that both of the overt acts charged against [him] in the indictment were categorically untrue . . . ." (Doc. 1723, p. 66). Defendant theorizes that exposure of these alleged falsities "would have raised serious doubts about the [g]overnment's investigation . . . and thus reasonable doubt about his guilt . . . ." (Doc. 1723, p. 68). The fifth superseding indictment alleged in overt act one that Dohan and Gilliland, on or about December 16, 1996, "opened or caused to be opened a securities account at Cohig and Associates in the name of Hammersmith Trust, L.L.C." (Doc. 966, p. 7). As he does at various junctures of the motion to

vacate, defendant maintains that he was not in the United States, let alone Denver, Colorado (the location of the Cohig offices), at the time the Hammersmith account was established. Further, defendant argues that the testimony of Steven Signer and the pertinent documentary evidence confirm that he was not a signatory to the Hammersmith account. (Doc. 1723, pp. 66-67). This argument is misplaced, as the indictment does not allege either that Dohan was physically present at Cohig when the account was created, or that Dohan was a signatory thereto. As discussed above, defendant's presence in Denver on December 16, 1996, was not material to the case and was not required to prove overt act one as alleged in the indictment.

The fifth superseding indictment alleged in overt act nine that $206,000 was disbursed to Dohan "through his Australian company, AAH Rem . . . ." (Doc. 966, p. 10). Contrary to defendant's present position, however, defense counsel did elicit evidence to disprove that this transfer of funds ever occurred. As Moscowitz stated in his declaration, he made substantive efforts at trial to contradict this allegation:

> As to the second fact, the $206,000, that was presented to the jury through the deposition testimony of George Muirhead and Stephanie Muirhead. The account documents showing that Mr. Dohan was not a signatory on the [Rem] account were in evidence. Our forensic accountant's summary showed that these monies were not fairly attributable to Mr. Dohan.

(Doc. 1747, p. 69). In his supporting memorandum, defendant affirms Moscowitz's declaration: "The Muirheads' testimony and the AAH Rem bank records indisputably prove that [Dohan] never received a penny of this $206,000, it was all distributed by the Muirheads to Rem's investors, and [Dohan] was not a signatory on the Rem account." (Doc. 1723, pp. 67-68). Defendant thus concedes that counsel adduced evidence at trial to refute the government's allegation, and it is not clear what more

defendant would have asked of his attorney.  In effect, then, defendant complains about the jury's interpretation of the facts presented at trial, but it is not the province of the post-conviction court to reweigh the evidence.  Defendant, in short, has not demonstrated that his trial attorneys performed deficiently in their confrontation of these overt acts.

*Gilliland's Plea Agreement*

In ground two (h), defendant contends that counsel rendered ineffective assistance by failing to (1) object when the government did not disclose its discretion to revoke Gilliland's plea agreement if he did not testify, (2) introduce the plea agreement or cross-examine Gilliland in such a manner as to elicit that information, and (3) object to the prosecution's alleged misrepresentation in closing argument that Gilliland was not obligated to testify.  (Doc. 1723, p. 69).  As defendant points out, Gilliland entered into a plea agreement with the government on August 21, 2000, promising to plead guilty to counts one (conspiracy to commit wire and securities fraud) and two (conspiracy to commit money laundering), and "cooperate fully" by, *inter alia*, providing "complete and truthful . . . testimony at grand jury [proceedings], trial, or as otherwise requested involving any matters under investigation."  (Doc. 131, pp. 2-3).  In return, the government agreed to dismiss thirty-four counts leveled against Gilliland in the indictment, refrain from bringing additional charges or using any of his statements against him, and, in its sole discretion, file a motion for substantial assistance under FEDERAL RULE OF CRIMINAL PROCEDURE 35, Gilliland's compliance provided.  (Doc. 131, pp. 3-6).  The government was permitted to revoke the plea agreement upon Gilliland's "failure to comply with any of [its] terms . . . ."  (Doc. 131, p. 5).

At Dohan's trial, by which time Gilliland, having been the beneficiary of two sentence reductions, was on supervised release, the prosecution questioned the Ponzi scheme front-man as to his motivation for testifying against the defendant:

Q. And at this point in time, what could you or are you expecting in return for your testimony here today?

A. Nothing.

Q. Why is that?

A. Well, there is nothing else that the government really would have to offer for me as far as that side is concerned and I'm really just here more on my own volition in the sense of the way that I feel about [what] transpired in the decisions that I made.

(Doc. 1558, p. 164). Dohan argues that defense counsel was constitutionally obliged to enter an objection to this exchange, and either introduce the plea agreement into evidence, or cross-examine Gilliland in such a manner as to confront him with his obligations under that agreement. (Doc. 1723, p. 73).

As a prefatory matter, the alleged misconduct of which defendant complains–solicitation of false testimony–presupposes the falsity of Gilliland's testimony viz-a-viz the plea agreement. The Eleventh Circuit considered exactly this issue on Dohan's direct appeal, where he argued that "the government improperly solicited, failed to correct, and exploited false testimony from Gilliland to the effect that, having completed his term of imprisonment, he was testifying of his own volition." *See United States v. Dohan*, 508 F.3d 989, 992 (11th Cir. 2007). "[T]he prosecution's questions went to the more relevant credibility issue of Gilliland's *beliefs* regarding his obligations under the plea agreement," the appellate tribunal

explained, "and thus his motivation to appear and testify truthfully." *Id.* Concluding that "Gilliland's testimony was not patently false," *id.*, the Eleventh Circuit thus declined even to credit the premise of Dohan's claim of misconduct. Notwithstanding any technical obligations under the plea agreement, this is the correct result. Having completed his term of imprisonment, Gilliland evidently internalized a subjective belief that he was no longer bound by the plea agreement, and was thus testifying of his own volition. Accordingly, the subject testimony was not materially false and did not necessitate objection.

Assuming *arguendo* that defendant could establish the falsity of Gilliland's testimony, Dohan has not shown that counsel performed deficiently in confronting this evidence. Defendant's argument in support of this allegation is perhaps incomplete, if not misleading, as he has skirted counsel's extensive questioning of Dohan regarding the plea agreement and his motive to lie. The defense was in possession of the plea agreement long before trial, and Moscowitz engaged Gilliland in a lengthy cross-examination on various provisions of the agreement. Notably, Moscowitz garnered Gilliland's concession as to the existence of the agreement and his obligation thereunder to plead guilty to two counts, conspiracy to commit wire and securities fraud and conspiracy to commit money laundering, in exchange for dismissal of the thirty-four remaining charges. (Doc. 1559, pp. 218-23). Under additional questioning by Moscowitz, Gilliland conceded that his sentence would have been determined solely by the district judge's requisite application of the U.S. SENTENCING GUIDELINES, but for a provision in the plea agreement allowing the government, in its absolute discretion, to file a substantial assistance motion upon his full and truthful cooperation involving any matters under investigation. (Doc. 1559,

pp. 223-26). Agreeing that he had offered to provide "extreme, beyond and above substantial assistance," Gilliland allowed that the government had, in fact, filed two such motions, each of which was granted by the district court to reduce his sentence below the range provided for in the sentencing guidelines. (Doc. 1559, pp. 226-30).

Having garnered these concessions, Mr. Moscowitz pushed further in this inquest, inquiring of Gilliland about the nature of the assistance he had provided in debriefings, depositions, and testimony as it related specifically to William Dohan:

Q. Now, you understand that if you lie in court today, that would be perjury . . . ?

A. Yes.

Q. Just as you previously perjured yourself against Mr. Dohan, correct?
A. I'm sorry?

Q. The last time you perjured yourself about Mr. Dohan, it was to say that he was involved in a way which was not true, correct?

A. As related to how much money he had, yes, sir.

Q. You lied about Mr. Dohan, correct?

A. Yes, I did.

Q. You lied about the extent and nature of his involvement, correct?

A. Yes, I did.

. . . .

Q. Now, . . . at the time you made this [plea] agreement with the government, this cooperation agreement, which required that you

provide truthful and full cooperation and testimony, this was a year or so after you had committed perjury against Mr. Dohan in federal court, correct?

A.  That sounds about the right time.

Q.  And at the time the government made this agreement with you, the government collectively, and Mr. Quilling, were aware that you [had] already perjured yourself against Mr. Dohan; is that correct?

A.  Yes.

Q.  And even so, the decision was made to enter this agreement with you, correct?

> . . . .

A.  They signed the agreements.  So, yes.

Q.  So the government was making an agreement with a known perjurer, correct, which was you?

A.  Yes, sir.

(Doc. 1559, pp. 232-33).  In this exchange alone, then, Gilliland admitted on no fewer than six occasions that he had lied, at times under oath, about the nature and extent of Dohan's involvement in the fraud, and that each such deception was made *before* he entered the plea agreement.  In other words, defense counsel exposed that Gilliland's inclination to prevaricate existed independently of his obligations under the plea bargain.

The very purpose of cross-examination being to test a witness's credibility, *see Davis*, 415 U.S. at 316 (observing that cross-examination serves principally to test the

"believability of a witness and the truth of his testimony"), *Williams*, 592 F.2d at 1281 (stressing "the importance of the right of cross-examination to . . . impeach the witness"), defendant must show more than the mere omission of a decidedly particularized strategy to establish that his attorney acted unreasonably in confronting the veracity of a witness's testimony. This notion is perhaps best encapsulated by the idiom establishing the many ways to skin a cat. Having revealed that the government entered the plea bargain with a known perjurer and exposed not only Gilliland's general inclination to lie, but the multiple instances in which he did lie under oath about Dohan's role in the conspiracy, defense counsel did not exhibit unreasonable professional judgment in cross-examining Gilliland on the motivations for his testimony, or declining to object to the witness's assertion that he was "really just [testifying] more on [his] own volition . . . ." (Doc. 1558, p. 164).

Assuming *arguendo* defendant could demonstrate that his attorney performed deficiently in his response to this testimony, he has not made the corresponding showing of prejudice on which successful claims of ineffective assistance of counsel depend. Defendant theorizes that it was absolutely imperative for counsel to confront Gilliland on the continuing operation of the plea agreement and his duty to cooperate thereunder, because Gilliland was the only witness who testified as to his knowledge of the fraud being perpetrated against Hammersmith and Microfund investors. (Doc. 1723, p. 74). This theory is unpersuasive for two reasons. First, defendant maintains not only that he did not participate in furtherance of the Ponzi schemes of the conspiracy, but that he worked actively to prevent those frauds from occurring. Citing documentary evidence of different sorts (none of which is materially exculpatory, let alone conclusive of innocence), defendant relies on this

argument–that he acted diligently to preempt and undermine the Ponzi schemes of David Gilliland–at numerous junctures of the memoranda filed in support of the motion to vacate. (Docs. 1723, pp. 20, 177; 1768, pp. 11, 74, 76-77, 90). Contrary to defendant's repeated suggestions, Ponzi schemes, by definition, do not occur "inadvertently." Defendant thus concedes the logical inference that he knew of the unmistakably intentional frauds being perpetrated under the guise of legitimate investment programs.

Second, and more importantly, Gilliland's testimony regarding Dohan's intent was not indispensable to the judgment of conviction. Criminal convictions, and particularly convictions for conspiracy and fraud offenses, rest routinely on circumstantial evidence of intent, which has no less intrinsic value than direct evidence. *See Glasser v. United States*, 315 U.S. 60, 62 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" (*quoting United States v. Manton*, 107 F.2d 834, 839 (2d Cir. 1939))); *United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011) ("Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud."); *United States v. Maxwell*, 579 F.3d 1282, 1299, 1301 (11th Cir. 2009) (holding that jury may infer intent to defraud, as required to support mail fraud and wire fraud convictions, from defendant's conduct, and thus that "circumstantial evidence can supply proof of knowledge of the scheme"); *United States v. Clarke*, 331 F. App'x 670, 671 (11th Cir. 2009) ("[A] conspiracy may be established by circumstantial evidence alone."); *United States v. Cochrane*, 274 F. App'x 746, 747 (11th Cir. 2008) ("The existence of an agreement or scheme 'may be

proven by circumstantial evidence, including inferences from the conduct of the alleged participants.'" (*quoting United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005) (citations and internal quotations omitted))); *United States v. Robertson*, 493 F.3d 1322, 1331 (11th Cir. 2007) (observing that "wire fraud, like mail fraud, can be proved by circumstantial evidence"); *United States v. Forcada*, 206 F. App'x 969, 971 (11th Cir. 2006) ("[I]ntent may be established through circumstantial evidence, so long as there is enough evidence from which a jury could reasonably infer that the defendant acted with the specific intent to defraud."); *United States v. Lockhart*, 167 F. App'x 111, 112 (11th Cir. 2006) ("Specific intent to defraud can be difficult to prove, and in some cases 'circumstantial evidence must be introduced to allow the jury to infer intent.'" (*quoting United States. v. Ethridge*, 948 F.2d 1215, 1217 (11th Cir. 1991))); *United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998) ("Because the essential nature of conspiracy is secrecy, a conspiracy conviction may be based upon circumstantial evidence."); *United States v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998); *United States v. Hawkins*, 905 F.2d 1489, 1496 (11th Cir. 1990) ("The Government need not produce direct proof of scienter in a fraud case, however; circumstantial evidence of criminal intent can suffice."); *United States v. Hurley*, 755 F.2d 788, 790 (11th Cir. 1985) ("Because it is difficult to prove intent by direct evidence, it normally must be inferred from circumstantial evidence."); *United States v. Gold*, 743 F.2d 800, 824 (11th Cir. 1984) ("Direct proof of a formal agreement is not necessary to establish the existence of a conspiracy, since '[t]he very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'" (*quoting United States v. Ayala*, 643 F.2d 244, 248 (5th Cir.

Unit A 1981))); *United States v. Tolliver*, 665 F.2d 1005, 1007 n.1 (11th Cir. 1982) ("[C]riminal conspiracy may adequately be established on circumstantial evidence."); *United States v. Foshee*, 578 F.2d 629, 633 & n.8 (5th Cir. 1978) (noting the "'badges'" of fraud and explaining that "'proof that some one was actually victimized by the fraud is good evidence of the schemer's intent'" (*quoting United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970))).

In this case, the circumstantial evidence adduced against Dohan, standing alone, was sufficient to support his convictions. Contrary to defendant's intimations, Gilliland was not the sole allocator of blame in the government's case. The jury, which had the opportunity to assess the credibility of several investors, the receiver, and a forensic accountant, and consider all of the evidence in context, could reasonably have found substantial independent evidence of intent, and that this evidence proved beyond a reasonable doubt that Dohan knew of the Ponzi schemes and acted intentionally to further them. Through the foregoing witnesses, the government put on circumstantial proof that the fraud was so plain, encompassing, and pervasive as to establish the guilt of the accused to the exclusion of every reasonable hypothesis of innocence. Accordingly, defendant has not shown a reasonable probability that counsel's failure to impeach Gilliland on his continuing obligations under the plea agreement, or object to his assertion that he was testifying of his own volition, compromised unreasonably the fairness of the proceeding or reliability of the result.

Similarly, defendant alleges in ground two (h)(3) that counsel rendered ineffective assistance by failing to object to the prosecution's alleged misrepresentation in closing argument that Gilliland was not obligated to testify.

During closing argument, Ms. Heldmyer suggested that the plea agreement was no longer in force:

> [Gilliland] had absolutely no reason to lie to you. He had no reason to even be here other than the fact that he was under subpoena. He had no obligation to be here.
>
> Mr. Moscowitz talked a lot about agreements between the government and Mr. Gilliland. There wasn't any. There was no agreement between Mr. Gilliland and the government that created a situation where he had to come and testify. Nothing. It's gone. It's done.

(Doc. 1563, pp. 173-74). Because the plea agreement, technically, remained in full force and effect, defendant reasons that defense counsel was required to object to Heldmyer's misrepresentation. (Doc. 1723, pp. 73-74).

For the reasons articulated in the analysis of the claims raised in ground two (h)(1) and (2), defendant has not shown, in accordance with *Giglio v. United States*, 405 U.S. 150, 153 (1972), "any reasonable likelihood [the testimony or closing argument] affected the judgment of the jury." Thus far, defendant has declined to address the significant quantum of incriminating evidence marshaled against him at trial, which evidence countervails heavily upon his attempt to show prejudicial error. Having failed to establish a reasonable likelihood that the allegedly false testimony or closing argument remarks affected the judgment of a jury confronted by overwhelming independent evidence of guilt, defendant has not carried his burden to demonstrate that counsel's alleged errors rendered the trial unfair or the result unreliable. *See Fretwell*, 506 U.S. at 369.

*Credibility and Religious Beliefs*

Defendant argues in ground two (i) that counsel rendered ineffective assistance by (1) failing to object to Gilliland's testimony that his religious beliefs vouched for his credibility, (2) failing to object to the prosecution's attempt to enhance Gilliland's credibility by eliciting information concerning his religious beliefs, and (3) questioning Gilliland regarding his religious beliefs on re-cross-examination. (Doc. 1723, p. 75). After Gilliland admitted several times at Dohan's trial that he had lied previously in other proceedings arising as a direct consequence of the Ponzi scheme, the prosecution attempted to rehabilitate the credibility of its witness on redirect:

> Q. What actually happened to you to cause you to . . . start telling the truth?
>
> . . . .
>
> A. I consider myself a moral, Christian man, and consequently, when I was locked up, there is a tremendous amount of self-examination that goes on in that you have to - - at a minimum, have to have made a whole series of extremely bad decisions, and you've hurt a lot of people. And that weighed very heavily on me. And so I was locked in solitary confinement at the jail for a period of time. And during that time with, basically, myself and God, I determined that I had to do everything I could to try to make things right.
>
> Q. Did you consider yourself a moral, Christian man while you were engaging in this process?
>
> A. I think that I was prideful - - I think I was still a Christian man, but I was an extremely prideful, carnal, greedy, ambitious man.

(Doc. 1560, pp. 132-34). Defense counsel also relied on a religiously-themed inquiry when questioning Gilliland on re-cross-examination: "Mr. Gilliland, you told this jury on redirect that you were a moral, Christian man, and that influenced how you

feel about this matter. Sir, what's the Ninth Commandment?" (Doc. 1560, p. 149). Before Gilliland could respond in full, Heldmyer entered an objection, which the trial judge sustained. (Doc. 1560, p. 149).

Citing FEDERAL RULE OF EVIDENCE 610, defendant concludes that "counsel's failure to timely object to Gilliland's statement that he was a 'moral, Christian man' constituted ineffective assistance of counsel as did his failure to object to the prosecutor's attempt to bolster Gilliland's credibility with this statement." (Doc. 1723, p. 76). Further, Dohan reasons that "[d]efense counsel . . . rendered ineffective assistance when he improperly attempted to use Gilliland's religious beliefs to impeach his credibility." (Doc. 1723, p. 78). Indeed, FEDERAL RULE OF EVIDENCE 610 makes inadmissible "[e]vidence of a witness's religious beliefs or opinions" for the purpose of attacking or supporting the witness's credibility. As with the previous claim, the Eleventh Circuit gave careful consideration to some of these exact questions on direct appeal:

> Dohan's contention that comments by Gilliland that he was a "moral, Christian man" violated FED. R. EVID. 610 fails. The government did not elicit the testimony on direct examination. The unsolicited comment came from the witness upon the prosecution's redirect examination, responding to defense counsel's having questioned him on why the jury should believe him at trial when he had previously committed perjury and other bad acts. Further questions by the prosecution were not for the purpose of showing that the witness's credibility was enhanced by his religious beliefs. At no time did defense counsel object, but instead attempted upon recross to ask his own impermissibly religious question. Furthermore, the government agreed not to mention the unsolicited religious reference in its closing argument, where it even invited the jury to disregard Gilliland's entire testimony if it wished, and convict on other evidence. The court concludes that there was no plain error.

*United States v. Dohan*, 508 F.3d 989, 992-93 (11th Cir. 2007).

The appellate court's analysis is instructive, and none of the three allegations of ineffective assistance advanced under this ground are convincing. As the Eleventh Circuit explained, the government did not actively seek to elicit Gilliland's reference to his religion. Rather, Gilliland injected this unsolicited theory into the proceedings of his own volition. At most, then, defense counsel could have moved to strike Gilliland's response, as Ms. Heldmyer's initial question–"What actually happened to you to cause you to . . . start telling the truth?"–was not objectionable. The follow-up question, "Did you consider yourself a moral, Christian man while you were engaging in this process?," though referencing religion, was not for the purpose of bolstering Gilliland's credibility by way of his religious beliefs. Consequently, the inquiry did not traverse the bounds of FEDERAL RULE OF EVIDENCE 610, and defense counsel did not perform deficiently by withholding objection. As a result, both of these allegations must fail. *See Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002) (conditioning a successful claim of ineffective assistance of counsel upon a showing of some error or deficiency in the representation).

The third claim advanced under this ground, which the Eleventh Circuit did not explore, is somewhat curious. Defendant theorizes that counsel rendered constitutionally deficient assistance when, in trying to cure the prejudice he perceived as arising from Gilliland's spiritually-themed testimony, Moscowitz inquired of the witness as to the content of the Ninth Commandment (the admonition against bearing false witness against one's neighbor). Defendant does not provide adequate explanation as to how this question, in response to which the prosecution entered a successful objection, prejudiced the defense. If anything, the question and any

potentially corresponding testimony, which the trial judge preempted, would have prejudiced the government. As it stands, Gilliland did not have an opportunity to respond and defendant has not shown what conceivable effect this question had on the fairness of the proceedings or reliability of the result. For these reasons, no relief is available on this ground. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.").

*The Jencks Act*

In ground two (j), defendant alleges that counsel rendered ineffective assistance by failing to require the government to provide material subject to the Jencks Act. (Doc. 1723, p. 79). The Jencks Act, 18 U.S.C. § 3500(b), requires the government in any criminal proceeding to produce statements or reports made by a government witness or prospective government witness (other than the defendant), after the witness has testified. *See United States v. Williams*, 180 F. App'x 108, 109 n.2 (11th Cir. 2006) ("The Jencks Act governs demands for production of witness statements and reports in a criminal proceeding."). "The purpose of the Jencks Act is to enable the defense in a criminal proceeding to impeach a government witness during cross-examination." *Id.* (*citing United States v. Prieto*, 505 F.2d 8, 11 (5th Cir. 1974)). Here, defendant asserts that defense counsel requested, but did not receive from the government, Jencks Act material in the form of Gilliland's testimony (1) in grand jury proceedings in the Northern District of Indiana, (2) before a grand jury in

the Middle District of Pennsylvania, and (3) from depositions given on behalf of the receivership.[14] (Doc. 1723, pp. 79-80).

As an initial matter, Moscowitz disagreed in his sworn declaration with the premise of these accusations:

> I do not recall not receiving any Jencks [material] which we requested. In fact, we had obtained before trial several depositions Gilliland had given in the receivership, grand jury testimony, trial testimony, and hearing testimony he had given about Mr. Dohan when the SEC receivership was begun. Mr. Gilliland was cross-examined extensively using all of this prior testimony.

(Doc. 1747, p. 70) (emphasis in original). Dohan's trial counsel thus disputes the allegation of omission underlying this ground, suggesting the defense team was in possession of, and relied upon at trial, the very testimonies defendant now contends were withheld by the government.[15] Nevertheless, the government responds by reproducing Moscowitz's declaration statements, but does not identify when in Dohan's trial the defense used, or considered using, the Jencks material in

---

[14] A letter dated January 11, 2006, from Moscowitz to Heldmyer, confirms that defense counsel requested the provision of Gilliland's grand jury testimony from the Northern District of Indiana and the Middle District of Pennsylvania, as well as two depositions administered by Mr. Quilling. (Doc. 1723-41, pp. 2-3). Bill Brock ("Brock"), legal assistant to Ms. Heldmyer, responded by email the same day, stating, "We do not have any of the documents you mention from the Northern District of Indiana and Middle District of Pennsylvania." (Doc. 1723-42, pp. 2-3).

[15] According to Moscowitz, Gilliland testified before at least three grand juries and pursuant to no fewer than five depositions administered by Mr. Quilling. (Doc. 1723-41, pp. 2-3). A careful review of the trial transcripts reveals that Moscowitz did, in fact, cross-examine Gilliland on testimony given before the grand jury in the Northern District of Florida, and on testimony rendered under deposition in connection with a proceeding initiated by the receivership (*Quilling v. Shaw*). (Docs. 1559, pp. 237-38; 1560, pp. 19, 72, 113, 143). Yet there is no indication in the transcripts that defense counsel ever cross-examined Gilliland on any of the grand jury or deposition testimony requested in the January 2006 letter Moscowitz addressed to Ms. Heldmyer.

controversy to impeach Gilliland. (Doc. 1747, pp. 42-43). Instead, the government speaks primarily to the prejudice prong of *Strickland*, arguing that provision of the subject Jencks material would not have furthered the cause of the defense in any meaningful way or altered the outcome of the proceeding, because Gilliland had been made to confess on repeated occasion to lies of different stripes, several told under oath. (Doc. 1747, pp. 42-43).

Where the government violates the strictures of the Jencks Act, the statute provides for the imposition of sanctions:

> If the United States elects not to comply with an order of the court under subsection (b)[16] or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

18 U.S.C. § 3500(d). The Jencks Act, by the plain meaning of its terms and in accordance with the judicial gloss applied to its interpretations, however, does not require the government to comply with pretrial requests for production. *See id.* § 3500(b) ("After a witness called by the United States has testified on direct

---

[16] Subsection (b) details the procedure by which a defendant may invoke his rights under the Jencks Act:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(b).

examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."); *United States v. Calderon*, 127 F.3d 1314, 1335 (11th Cir. 1997) ("Our precedent on this issue could not be more clear. The government is not required to disclose any statement in its possession until after the witness has testified on direct."); *United States v. Fontenot*, 628 F.2d 921, 926 (11th Cir. 1980) ("Strictly applied, the defendant is statutorily authorized to demand copies of [Jencks] statements only after the witness making them has testified on direct examination."); *United States v. Harris*, 458 F.2d 670, 679 (5th Cir. 1972) (holding defendant was not entitled to Jencks statement upon pretrial motion for discovery, and concluding that defendant "was under obligation to request production of the statement within a reasonable time proximate to the direct testimony so as to alert the district judge and the government of the nature of his request," which request should have been "made immediately before, during, or immediately after the direct examination"); *United States v. Montos*, 421 F.2d 215, 220-21 (5th Cir. 1970) (holding defendant was not entitled to examine Jencks material at pretrial hearings on motions to suppress statements ultimately subject to discovery under the Act, because express terms of the statute do not require production until government witness has testified on direct examination at defendant's trial). Here, Gilliland commenced his direct testimony on the third day of Dohan's trial, February 13, 2006, and concluded the following day. (Docs. 1558, p. 160; 1559, p. 190). Gilliland also testified on redirect examination on February 15, 2006, the fifth day of trial. (Doc. 1560, pp. 124, 149). Defense counsel asked the prosecution by letter dated January 11, 2006, to disclose Gilliland's pertinent grand

jury and deposition testimony (doc. 1723-41, pp. 2-3), but did not move the court at any point of the trial to order the government to produce the subject Jencks material. Irrespective of its intent or awareness of controlling authority, the government proceeded under no obligation to make pretrial disclosure,[17] *see Harris*, 458 F.2d at 679, *Montos*, 421 F.2d at 220-21, and defense counsel failed to "request production of the statement[s] within a reasonable time proximate to the direct testimony so as to alert the district judge and the government of the nature of his request." *See Harris*, 458 F.2d at 679. As a result, no prosecutorial misconduct is evident.[18]

---

[17] Defendant notes the government's practice in this district of divulging *Jencks* material the Friday before trial. (Doc. 1845). The court recognizes that such a practice may exist, but for purposes of this analysis, this practice does not rise to the level of an obligation from which sanctions would be justified. The government is bound by 18 U.S.C. § 3500(b), "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." The Eleventh Circuit has also affirmed this duty. *See, e.g.*, *Calderon*, 127 F.3d at 1335 ("Our precedent on this issue could not be more clear. The government is not required to disclose any statement in its possession until after the witness has testified on direct."). Notably, Magistrate Judge Miles Davis, in the opinion cited by defendant, *United States v. Hammond*, No. 3:04cr5/MCR, 2009 WL 6371626 (N.D. Fla. Dec. 22, 2009), does not impose sanctions, and it is entirely unclear if Judge Davis, given the context currently before the court, would find that sanctions against the government would be justified. Furthermore, in his remarks in *Hammond*, Judge Davis summed up the burden on the defendant quite succinctly, "[d]efendant appears not to comprehend the heavy burden he faces in proving his claim. He has failed to show that Jencks material existed that was either not provided to or not used by counsel, and that counsel could have used the information at trial to impeach the witnesses, and that had counsel done so, the outcome of the proceedings would have been different." 2009 WL 6371626, at *10. Judge Davis's summation is consistent with the analysis the court is presently conducting.

[18] Nonetheless, the court notes that the response issued by Mr. Brock on Ms. Heldmyer's behalf would not satisfy the government's burden of production under the statute, provided a timely request for production from defense counsel were made and the requested documents were in the possession of the appropriate government entities. *See United States v. Cagnina*, 697 F.2d 915, 922

At the appellate level, a violation of the Jencks Act is subject to review for harmless error. *See United States v. Beasley*, 2 F.3d 1551, 1557 (11th Cir. 1993) ("The harmless error doctrine is applicable to Jencks Act violations, but it must be strictly applied."). "A failure to produce Jencks Act material at trial . . . is harmless error where there is no 'substantial inconsistency, contradiction or variation' between the prior statements and the witness' trial testimony." *United States v. Keller*, 14 F.3d 1051, 1055 (5th Cir. 1994) (*quoting United States v. Merlino*, 595 F.2d 1016, 1019 (5th Cir. 1979), *cert. denied*, 444 U.S. 1071 (1980)); *see also United States v. Sink*, 586 F.2d 1041, 1051 (5th Cir. 1978) (agreeing with trial court that government's failure to produce report at trial was harmless error under the Jencks Act, because comparison of the report and preparing agents' trial testimony disclosed "no substantial deviation"). "'The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.'" *United States v. Beasley*, 576 F.2d 626, 629 (5th Cir. 1978) (*quoting Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "It is rather, even so, whether the error itself had substantial influence [on the verdict of the jury]." *Id.* (*quoting Kotteakos*, 328 U.S. at 765).

The deficiency in the government's initial response to this claim of ineffective assistance, which focused chiefly on the prejudice (or lack thereof) emanating from defense counsel's omission, lay in the absence of the Jencks material from the trial

---

(11th Cir. 1983) ("A statement is 'in the possession of the United States' for Jencks Act purposes if it is in the possession of a federal prosecutorial agency."); *United States v. Beasley*, 576 F.2d 626, 631 (5th Cir. 1978) ("The Jencks Act does not on its face restrict its command to the production of statements in the hands of, or known to, the particular prosecuting attorney assigned to the case, the U.S. Attorney's office, the Criminal Section of the Justice Department, or even the entire Justice Department. Its order is unqualified.").

and post-conviction records. In another context, an appellate court would not be permitted to speculate whether the defense could have utilized the unproduced Jencks material to impeach Gilliland's testimony to such degree as to substantially influence the jury's verdict. *See Goldberg v. United States*, 425 U.S. 94, 112 n.21 (1976) ("Since courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial, the harmless-error doctrine must be strictly applied in Jencks Act cases.") (internal citations omitted (*quoting Clancy v. United States*, 365 U.S. 312, 316 (1961))); *United States v. Beasley*, 576 F.2d 626, 629 (5th Cir. 1978) (*citing Rosenberg v. United States*, 360 U.S. 367, 376 (1959) (holding that in making harmless error analysis, reviewing "courts should be hesitant to take it upon themselves to decide that the defense could not have effectively utilized a . . . statement" subject to production under the Jencks Act)). Rather, "'fidelity to the principle underlying Jencks and the Jencks statute requires . . . that when the defense has been denied a statement producible under the statute, an appellate court should order a new trial unless the circumstances justify the conclusion that a finding that such a denial was harmful error would be clearly erroneous.'" *Beasley*, 576 F.2d at 629 (*quoting Rosenberg*, 360 U.S. at 376).

Here, the course required by statute would have been for the defense to request the Jencks material in the temporal vicinity of Gilliland's testimony on direct, and for the government, assuming it challenged the relativity of the sought-after material to the subject matter of the testimony of the witness, to produce the requested grand jury and deposition testimony for in camera inspection by the district judge, who then could have could given to the defense only the excerpts of that testimony which related to Gilliland's testimony at Dohan's trial. *See* 18 U.S.C. § 3500(c); *United*

*States v. Rivero*, 532 F.2d 450, 460 (5th Cir. 1976). Though the post-conviction court does not conduct a harmless error inquiry, but rather reviews counsel's performance for prejudicial error, the *rationale* underpinning this circuit's harmless error standard for Jencks Act violations is, in an abundance of caution, helpful. Because the defense apparently did not ask for the grand jury and deposition testimony in accordance with the statutory procedures, this court could not, without more, assume that counsel's omission was not prejudicial. *Cf. United States v. Conroy*, 589 F.2d 1258, 1273 (5th Cir. 1979) ("[W]here the court fails even to look at the complete materials, thereby abdicating its responsibility to government counsel, the reviewing court has no choice but to vacate the judgment and remand for an appropriate examination."); *Rivero*, 532 F.2d at 461 ("Indeed, by its very nature, [harmless error] cannot be demonstrated in the absence of the very document which will reveal whether there is or is not a substantial, inconsistency, contradiction or variation.").

Before further excursion into this point, the court notes what appears to be a minority view among the federal courts. This view might bar the present claim at the threshold. The U.S. Court of Appeals for the Eighth Circuit ("Eighth Circuit") and its component district courts, have held consistently that claims alleging violations of the Jencks Act are not cognizable under 28 U.S.C. § 2255. *See Lindhorst v. United States*, 585 F.2d 361, 366 (8th Cir. 1978) ("Appellant's claim that the government failed to produce evidence under the Jencks Act, 18 U.S.C. [§] 3500 (1970), is not cognizable in a [§] 2255 proceeding."); *Wilson v. United States*, 554 F.2d 893, 894 (8th Cir. 1977) ("We find no error in the district court's denial of relief on appellant's allegation of Jencks Act violations because such a claim is not cognizable under 28 U.S.C. [§] 2255."); *Houser v. United States*, 508 F.2d 509, 515 (8th Cir. 1974)

(observing that "the refusal to turn over statements required by Jencks v. United States, now codified as the Jencks Act, have been determined not properly considered upon a [§] 2255 motion" (*citing Black v. United States*, 269 F.2d 38, 41-42 (9th Cir. 1959), *United States v. Angelet*, 255 F.2d 383, 384 (2d Cir. 1958))); *Blom v. United States*, No. CR. 99–195 JRTRLE, Civ. 02–3734 JRT, 2003 WL 21639165, at *5 (D. Minn. July 2, 2003) (holding that violations of the Jencks Act, "[a]s a rule," are not cognizable under § 2255, except "however, [if] the violation led to a complete miscarriage of justice, the violation might give rise to a viable claim"). Even where the allegation of conduct violative of the Jencks Act has been advanced, as here, under the guise of ineffective assistance of counsel, the Eighth Circuit has disposed of the claim on procedural grounds. *See Wilson*, 554 F.2d at 894 (declining to consider appellant's claim that "the failure of [appointed] counsel . . . to advise him to move for production of the [Jencks] materials constituted ineffective assistance of counsel"). Moreover, at least one district court in the Eleventh Circuit has recently commented on the same such claims of ineffective assistance relating to production of material subject to the Jencks Act. *See United States v. Thompson*, Civ. No. 09–00017–CB, Crim. No. 03–00168–CB, 2011 WL 98548, at *6 (S.D. Ala. Jan. 11, 2011) ("[A] defense attorney cannot and does not control the government's actions; therefore, a prosecutor's alleged misdeed cannot be asserted as an ineffective assistance of counsel claim.").

In support of this result, which acts to bar the Jencks claim in the habeas context, the preceding authorities have reasoned that error arising from infringement of the Jencks Act, or absence at trial of Jencks material, does not implicate constitutional concerns, and can and must be raised, if ever, on direct appeal. *See,*

*e.g.*, *Black v. United States*, 269 F.2d 38, 41 (9th Cir. 1959) (observing that "[a] writ of habeas corpus is not ordinarily permitted to do service for an appeal," and holding that failure to supply documents as required by *Jencks v. United States*, 353 U.S. 657 (1957), cannot be the basis for relief under § 2255, because "[a] sentence is not ordinarily subject to collateral attack in a section 2255 proceeding for errors of law which could have been corrected by an appeal"); *United States v. Angelet*, 255 F.2d 383, 384 (2d Cir. 1958) (holding that denial of movants' alleged entitlement to agent's grand jury testimony, established by the *Jencks* decision, did not constitute "a deprivation of rights so fundamental as to amount to a denial of a fair trial," and thus did not justify setting aside of the general rule that "[a] motion under § 2255 cannot ordinarily be used in lieu of an appeal to correct errors committed in the course of a trial"); *Blom v. United States*, No. CR. 99–195 JRTRLE, Civ. 02–3734 JRT, 2003 WL 21639165, at *5 (D. Minn. July 2, 2003) (holding "alleged Jencks Act violation did not give rise to a complete miscarriage of justice" and was not cognizable on § 2255 motion, because defendant had not "shown that he was prejudiced by the failure to raise this issue on appeal"). Insofar as codification of the *Jencks* precedent did not establish any right of a constitutional dimension, *see United States v. Augenblick*, 393 U.S. 348, 356 (1969) ("[O]ur *Jencks* decision and the Jencks Act were not cast in constitutional terms."), *Palermo v. United States*, 360 U.S. 343, 353 n.11 (1959) (observing of the Jencks Act, "[t]he statute as interpreted does not reach any constitutional barrier"), *United States v. Beasley*, 576 F.2d 626 (5th Cir. 1978) (characterizing the Jencks Act as "a statutory command that may, at the will of Congress, exact more than the constitutional minimum"), *Calley v. Callaway*, 519 F.2d 184, 225 (5th Cir. 1975) ("The decision in Jencks v. United

States and the Jencks Act itself do not set forth constitutional requirements."), this logic is not unappealing.

Nevertheless, deviation from the rule announced by the Eighth and other circuits is justified under the circumstances obtaining here. First, Dohan sets forth the instant claim not as based merely on prosecutorial misconduct violative of the Jencks Act, but as one of ineffective assistance originating in counsel's failure to pursue Jencks Act rights and remedies to their statutory end. The latter claim *does* implicate constitutional rights, as are guaranteed under the Sixth Amendment, *see Stano v. Dugger*, 921 F.2d 1125, 1149 (11th Cir. 1991) ("The Sixth Amendment right to counsel implicitly includes the right to effective assistance of counsel."), and ordinarily could not be raised on direct appeal. *See United States v. Arango*, 853 F.2d 818, 823 (11th Cir. 1988) (noting the well-established rule that "claims of ineffective assistance of counsel may not be considered on direct appeal," but rather are "properly raised by collateral attack in the district court"). In other words, the post-conviction forum is, in the usual course, the only forum in which such a claim could enjoy meaningful judicial review. As a corollary, defendant could not have opted to pursue a Jencks Act violation under the circumstances on direct appeal, because the government, technically speaking, committed no violation. Defense counsel's request for Jencks material relating to Gilliland's testimony, addressed and submitted to the prosecution more than a month before the witness testified at Dohan's trial on direct examination, did not satisfy the requirement under the statute to move for production "[a]fter a witness . . . has testified on direct examination," *see* 18 U.S.C. § 3500(b), and thus did not trigger the government's productive obligations.

From a factual perspective, moreover, such Jencks-related claims as defendant raises in the instant ground are more easily disregarded where, for instance, the reviewing court can satisfy itself, by inspection of a record inclusive of the material at issue, that no error occurred or an attorney's listless pursuit or the government's belated production of Jencks statements worked no appreciable prejudice to the fairness of the proceeding or the reliability of the verdict. *See, e.g.*, *United States v. Beasley*, 2 F.3d 1551, 1557 (11th Cir. 1993) (finding government's error in failure to produce report subject to Jencks Act was harmless, as careful review of report and witness's testimony at trial revealed no differences in any respect); *United States v. Fontenot*, 628 F.2d 921, 926 (11th Cir. 1980) (denying appellate claim of ineffective assistance based on counsel's alleged failure to obtain certain Jencks Act statements from the government, because it was "clear that defense counsel acted properly and, in fact, obtained those statements earlier than he was entitled to"); *United States v. Anderson*, 574 F.2d 1347, 1357 (5th Cir. 1978) (determining any error in failure to disclose statement under Jencks Act was, at most, harmless, where "[t]he statement itself would have had no value to the defense even for impeachment, since it corroborated [the witness's] direct testimony"); *United States v. Thompson*, Civ. No. 09–00017–CB, Crim. No. 03–00168–CB, 2011 WL 98548, at *6 (S.D. Ala. Jan. 11, 2011) (denying ineffective assistance claim that counsel failed to obtain Jencks Act materials from the government, because, *inter alia*, requested transcript from prior proceeding was not in the government's possession at the time of the defendant's trial, as it did not yet exist).

Given the absence of Jencks material, insofar as this court could determine from the record and the government's filings, the undersigned conducted an

evidentiary hearing on September 4, 2012. (Doc. 1843). The purpose of this evidentiary hearing was to determine which of the supposedly missing Jencks Act materials[19] the government would be able to produce. (Doc. 1842). At the evidentiary hearing, the government produced Gilliland's grand jury transcript from the Northern District of Indiana (doc. 1843-14), and a letter accompanying the transcript from the U.S. Attorney's office for the Northern District of Indiana (doc. 1843-15). Shortly thereafter, on September 14, 2012, the government filed a status report with this court (doc. 1847), accompanied by Gilliland's deposition testimony given on behalf of the receivership in *Quilling v. Wolcott Lifetime Trust*, Case No. 1:00cv826, in the United States District Court for the Western District of Michigan. (Doc. 1847-1). After being advised on September 24, 2012, that an IRS case agent had uncovered Gilliland's grand jury testimony in the Middle District of Pennsylvania, the government submitted that grand jury testimony (doc. 1855), and accompanying cooperation agreement from the U.S. Attorney for the Middle District of Pennsylvania (doc. 1856), to the court and defense counsel.[20] As of the completion of this Report and Recommendation, the only document that remains outstanding is

---

[19] As discussed previously, defendant asserts that defense counsel requested, but did not receive from the government Jencks Act material in the form of Gilliland's testimony (1) in grand jury proceedings in the Northern District of Indiana, (2) before a grand jury in the Middle District of Pennsylvania, and (3) from two depositions given on behalf of the receivership. (Doc. 1723, pp. 79-80). The two depositions at issue are *Quilling v. Wolcott Lifetime Trust*, Case No. 1:00cv826, a civil litigation case in the United State District Court for the Western District of Michigan and Quilling's civil litigation against the insurance carriers of Mark Talley, Case No. 2:00cv3041, in the United States District Court for the Western District of Tennessee. (Doc. 1848, p. 3).

[20] The court notes that both the cooperation agreement letter and Gilliland's grand jury testimony were received by e-mail from the government on September 27, 2012, and were later uploaded to the docket for completeness of the record.

Gilliland's deposition testimony in Michael Quilling's civil action for the receivership against the insurance carriers of Mark Talley, brought in the Western District of Tennessee, Case No. 2:00cv3041. (Doc. 1848, p. 3).

With that in mind, and without first deciding whether Moscowitz's conduct was deficient in regards to the missing Jencks materials, the court will analyze the submitted documents under *Strickland* to see if their absence prejudiced the defendant. *See* 466 U.S. at 697 ("A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed."). Such prejudice is shown only if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

The first document, Gilliland's grand jury testimony in the United States District Court for the Northern District of Indiana, mirrors much of the testimony Gilliland gave during direct and cross-examination. The government began the grand jury testimony by discussing Gilliland's cooperation with the government and pending Rule 35 modification of a sentence before Judge Collier. (Doc. 1843-14, pp. 3, 5-6). These topics were discussed at length on direct (doc. 1558, pp. 163-64; doc. 1660, pp. 125-30), and on cross-examination (doc. 1559, pp. 221-34). During the grand jury testimony, Gilliland also discussed his education, family, and prior work experience before becoming involved in Hammersmith. (Doc. 1843-14, pp. 6-7). These topics were developed at trial. (Doc. 1558, pp. 165-69; Doc. 1560, pp. 26-27). Following the discussion of Gilliland's background before the grand jury, the testimony turned to Gilliland's criminal history and involvement with Hammersmith.

(Doc. 1843-14, p. 8). Gilliland described for the grand jury what type of investment fund Hammersmith was and then proceeded to detail his role in its operation. (Doc. 1843-14, p. 9). Gilliland told the grand jury that he initially believed Hammersmith to be a legitimate enterprise (doc. 1843-14, p. 9), and that he began to first have suspicions regarding Hammersmith's legitimacy in the middle of 1997 due to the fund's continued failure to produce a profit on investments. (Doc. 1843-14, p. 10).

Gilliland's Indiana grand jury testimony was primarily concerned with Rodger Griggs, an individual associated with the Howe Financial Trust–a financial entity that had invested money with Hammersmith. (Docs. 1843-14, pp. 10-12; Doc. 1559, p. 129). Ironically, the Howe Financial Trust was also a fraudulent enterprise. (Doc. 1559, p. 129). Upon review of the grand jury transcript, the focus of the investigation in the Northern District of Indiana appears to be on the fraudulent activity of the Howe Trust and Griggs, not on the fraud perpetrated by Gilliland and Dohan through Hammersmith and its related entities. Gilliland's grand jury testimony continues on to describe Hammersmith's contracts with the Howe Trust, the structure of these contracts, and a general overview of the Hammersmith operation. (Doc. 1843-14, pp. 14-15). Dohan's name appears briefly when Gilliland states, "Hammersmith's involvement, and mine particularly, was primarily to push the paper, transfer moneys around, coordinate the lawyers for a client with Mr. Gunn and to take whatever the proposed investment for the moneys, the story line, what we used to kind of - - what came to be known as the investment dossier, of how the money was going to make those types of returns that Mr. Bill Dohan (phonetic) came up with and would relay to me in writing and e-mails and such." (Doc. 1843-14, p. 15).

The remaining portions of this grand jury transcript simply further detail Griggs' own fraudulent scheme and Griggs' attempts at restructuring certain contracts with Hammersmith. (Doc. 1843-14, pp. 16-17). A third party, James Conway, is mentioned later in the testimony, but Conway appears to be a party who was, in some capacity, involved with the Howe Trust fraud and became panicked after being contacted by the FBI. (Doc. 1843-14, p. 18). Near the end of the grand jury testimony, Gilliland admits that the relationship with Griggs was sort of a symbiotic mutual scam, where each party is attempting to scam each other out of innocent investors' funds. (Doc. 1843-14, p. 18).

The Howe Trust was discussed briefly at trial. Gilliland testified that he first met Quilling through Quilling's role as receiver for the Howe Trust. (Doc. 1559, p. 129). Quilling was attempting to recover money that the Howe Trust had extracted from investors and had subsequently invested in Hammersmith. (Doc. 1559, p. 129). Gilliland also testified that the Howe Trust's investments were "Ponzi'd" and that he had lied to Quilling about the status of the money when he first met with Quilling. (Doc. 1559, pp. 191-92). Quilling gave extensive background information about the Howe Trust and its operation. (Doc. 1560, pp. 155-158, 175-76).

In defendant's post-hearing brief (doc. 1857), he argues that the Indiana grand jury transcript would have provided Moscowitz with "further valuable evidence to impeach the Government's and Gilliland's misrepresentations to the jury at trial that he had stopped lying upon pleading guilty; he had been testifying truthfully since; and therefore his trial testimony should be believed." (Doc. 1857, p. 10). Defendant proceeds to note various portions of the testimony that supposedly support this contention.

The first portion of the record cited is Gilliland's testimony discussing his ownership interest in DivCap, Hammersmith, Bridgeport Alliance, and the corporate jet. (Doc. 1857, p. 10). Defendant's cited pages of testimony appear to take issue with Gilliland's use of the words "owners" and "owned." In Gilliland's grand jury testimony, he stated, "Mr. Bill West, who was the person who owned and managed Bridgeport, approached me about taking a meeting with Rodgers Griggs in Elkhart, Indiana," (doc. 1843-14, p. 11), and "Mr. Griggs apparently had asked Mr. West to come up and have this meeting and to bring me with him as to be able to discuss some of these issues with a person who had a more direct relationship with the owners of Hammersmith." (Doc. 1843-14, p. 12). Gilliland later testified that his conversation with Griggs ended with Gilliland affirming that he would "take this information back to the people who own Hammersmith and our in-house corporate attorney . . . ." (Doc. 1843-14, p. 12). These statements, defendant contends, purportedly show that Gilliland is contradicting himself by holding himself out as having no ownership stake in Hammersmith. Unfortunately, defendant's cited portions of the record mirror Gilliland's trial testimony. Notably, in his grand jury testimony cited above, Gilliland never explicitly denied that he had an ownership interest or was an "owner" of Hammersmith. Instead, Gilliland merely referenced that he had a direct relationship to the owners of Hammersmith and could relay information to the "owners." Assuming Gilliland's grand jury statements indicate that he was affirmatively denying ownership interest in Hammersmith or DivCap, Gilliland's trial testimony was consistent with such a belief. (Doc. 1560, pp. 56-59, 61-66, 68, 70-72). If defendant's point here is that Gilliland's belief about not having ownership interest

in Hammersmith or DivCap was a mistake or outright lie, this point was already made by Moscowitz on cross-examination. (Doc. 1560, pp. 56-73).

Defendant also takes issue with the portion of Gilliland's Indiana grand jury transcript in which Gilliland said, "[Hammersmith] was set up by a gentleman originally from California who moved to England and another gentleman from Australia and the man who brought me into it who was from Memphis, Tennessee." (Doc. 1843-14, p. 9). Dohan posits that this is a lie because evidence presented at trial proved that Gilliland had hired David Johnson to create Hammersmith and act as its trustee. (Doc. 1857, pp. 10-11). Defense counsel's referenced document and pages (doc. 1560, pp. 84, 89, 94), prove only that David Johnson formed Hammersmith (doc. 1560, p. 84), that Johnson was Hammersmith's trustee (doc. 1560, p. 84), and that Gilliland likely executed the agreement for Johnson to serve as the trustee of Hammersmith. (Doc. 1560, p. 89). Gilliland testified on direct that Poole had, in fact, known Johnson through a connection, and that Poole had Johnson create a corporate entity for Hammersmith. (Doc. 1558, pp. 179-80). Absent is testimony indicating that Gilliland hired Johnson to create Hammersmith. Even assuming such a statement presents an inconsistency, Gilliland was cross-examined about his relationship with Johnson, and Gilliland admitted that he had lied under oath at a previous hearing when he testified that the defendant had hired Johnson. (Doc. 1560, pp. 89-90). This fact would greatly minimize the potential impact of such impeachment material. On a broader point, testimony at trial showed that Dohan, Gilliland, Poole, and Muirhead were all involved in some respect in the formation of Hammersmith. (Doc. 1558, pp. 179-82). Gilliland's statements to the Indiana grand jury do not appear to be exhaustive of each individual's role, nor

explicitly exclude his own participation in the formation of Hammersmith. (Doc. 1843-14, p. 9). Gilliland was responding to Assistant U.S. Attorney Grimmer's question asking him to describe Hammersmith in a "very general sense." (Doc. 1843-14, pp. 8-9). Gilliland's commentary appears to merely be a generalized, brief summation of the background and formation of Hammersmith. Gilliland does not mention the individual parties by name; instead he merely describes the individual parties by their country of origin, signaling that his recapitulation of the facts is not meant to be thorough. (Doc. 1843-14, p. 9). If defendant's argument is that Gilliland is attempting to hide his true role in the conspiracy and the above quoted sentence is the supposed proof, the court cannot make that leap.

Defendant next cites Gilliland's mention of his belief that at its inception Hammersmith was a legitimate enterprise (doc. 1843-14, p. 9), and he only began to have suspicions about its legitimacy "in the middle of 1997" after Hammersmith "continually fail[ed] to produce profit on the investments . . . ." (Doc. 1843-14, p. 10). The government argued in its closing, "Mr. Gilliland testified to you that everyone knew up front, including Mr. Dohan, that what they had to do to get [Hammersmith] off the ground was Ponzi." (Doc. 1563, p. 123). Gilliland's grand jury testimony, defendant postulates, provides important exculpatory evidence that contradicts the government's trial argument that Hammersmith was intended as a fraudulent enterprise from the outset. (Doc. 1857, p. 11). This contention might have presented a colorable claim of some prejudice under different circumstances; but in the instant case Moscowitz already exposed this point of contention during his cross-examination of Gilliland:

Q. Now, in fact, as you've testified, Hammersmith Trust was always a Ponzi; is that correct?

A. Yes.

Q. In fact, you never had a program in Hammersmith Trust that generated any profits that would allow Hammersmith Trust to pay the interest rates that you were promised, correct?

A. Correct.

Q. Any payments that were made to investors were simply the return of their monies with the monies of other investors, correct?

A. Correct

Q. And you knew from the very beginning [Hammersmith] was a Ponzi, correct?

A. No, not from the very beginning.

Q. Do you recall in one of the proceedings that you testified in on behalf of Mr. Quilling was entitled Quilling versus Adam Shaw, Thomas Smith, Michael Klein and others, Leon Hurst?

A. Yes, I remember that

Q. And you recall testifying -- and you were videotaping [sic] these depositions?

A. Yes.

Q. You recall testifying on June 20, 2001 page -- I believe it's page 42, the question was asked: "Okay. And from inception through my appointment as receiver, to your knowledge - -" this is Mr. Quilling

asking the question -- "there was never a single moment in time when Hammersmith was a legit business enterprise?" Answer: "No." Question: "It was always a Ponzi scheme?" Answer: "It had never successfully completed any investment. It never made an interest payment out of the Diamond earnings." Question: "The only way it was able to make payments was to use new monies coming in to do so?" Answer: "That's correct." Do you recall that?

A. Yes.

(Doc. 1559, pp. 236-38). Not only was Gilliland's trial testimony consistent with his testimony before the Indiana grand jury–he did not believe Hammersmith was a Ponzi scheme when it first started–Gilliland was thoroughly impeached at trial with prior testimony from a deposition that called such testimony into question and made Gilliland look suspect.[21] With this knowledge, the jury still found the defendant guilty. Defendant cannot show how an additional statement that affirms Gilliland's trial testimony, and was emphasized during cross-examination, prejudices the defendant. In short, the point had already been made regarding Gilliland's reliability as a witness and his opinion about the legitimacy of Hammersmith at its inception.

Finally, defendant points to Gilliland's statement in which he admitted that he had been cooperating with the federal government in various investigations taking place in other jurisdictions and districts. (Doc. 1843-14, pp. 2-3). Defendant suggests that this portion of the grand jury transcript led the government, at the evidentiary hearing, to disclose defendant's plea and cooperation agreement (doc.

---

[21] The likely conclusion to be drawn is that Gilliland, whether through ignorance or limitation, simply thought that at the outset Hammersmith was a legitimate investment opportunity, and as time passed he came to realize that Hammersmith had been a Ponzi scheme all along. The court, however, makes no finding in this regard and notes that the foregoing analysis is simply the court's conjecture.

1155-1), which contained information detailing several other cases Gilliland had assisted in. (Doc. 1857, pp. 11-12). Defendant argues that the absence of the Indiana grand jury transcript was prejudicial because it would have led to the discovery of the cooperation agreement and, within it, the specific information about Gilliland's testimonies in various proceedings. This argument is without merit. Moscowitz had possession of Gilliland's notice of substantial assistance prior to trial. (Doc. 1853-1, p. 9). Moscowitz mentions the specific agreement defendant is now referencing (doc. 1155-1), in a letter to Heldmyer, and requests production of Gilliland's two missing Quilling depositions, the Indiana grand jury transcript, and the Pennsylvania grand jury transcript. (Doc. 1853-1, p. 9). Due to the fact that Moscowitz already had this cooperation agreement in his possession prior to trial and was aware of its contents, the Indiana grand jury transcript could not have been the only vehicle for discovery of this document and its contents. Accordingly, as to this argument, no prejudice is shown from the supposed failure to obtain the transcript.

This conclusion, however, does not end the court's inquiry into the instant matter. Defendant proceeds to move this court for leave to amend so that he may supplement his Jencks claim with some of the documents[22] cited in the government's notice to the court of defendant's substantial assistance. (Doc. 1857, p. 12). Such a request must be denied. As previously discussed, Moscowitz had possession of the cooperation notice and requested specific testimony referenced in the notice. (Doc.

---

[22] The documents defendant seeks are affidavits in support of the extradition of three fugitive codefendants, an interview with agents from St. Louis, Missouri regarding Hammersmith coconspirator Rick Shirill, a 2002 interview by the FBI and Customs regarding William Cooper and American International Bank, and a written memorandum to the Government regarding coconspirator Don Knoll and the Key West Swiss Bank in Nassau, Bahamas. (Doc. 1155-1, p. 3).

1853-1, p. 9). Moscowitz made specific page, paragraph, and sub-paragraph citations to the notice in his request for documents, signaling that he thoroughly examined the notice. (Doc. 1853-1, p. 9). Unlike the Jencks material originally at issue, the evidence before the court does not show that Moscowitz made an actual request for this additional secondary, or even tertiary, material, so failure of counsel to "follow through" could not be an issue. This issue, therefore, is not factually similar to the larger Jencks issue, concerning those materials that were requested by counsel.

With that in mind, and briefly diverting to a performance analysis under *Strickland*, one might ask why Moscowitz did not request these other documents, having been aware of them. This question is itself grounded in an assumption, because there has been no affirmative showing by defendant that his lawyer did not, at some time, possess or review the pertinent documents. Even assuming that counsel did not pursue the documents, this court does not view such decision in a vacuum; instead counsel's actions must be seen in the context of all the other evidence and circumstances in the case. *See Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) ("When reviewing whether counsel's performance was deficient, courts must, in a highly deferential manner, examine 'whether counsel's assistance was reasonable considering all the circumstances.'" (*quoting Strickland v. Washington*, 466 U.S. 668, 688 (1984))). When assessing counsel's actions, his lengthy experience as an attorney will be considered. *See Wood v. Allen*, 542 F.3d 1281, 1304-05 (11th Cir. 2008) (affording weight to tactical decisions by experienced counsel); *see also Chandler*, 218 F.3d at 1316 n.18 ("Our point is a small one: Experience is due some respect."). In terms of Moscowitz's defense strategy, constitutionally effective counsel "is not required to present every nonfrivolous defense . . . ." *Chandler*, 218

F.3d at 1319. "[N]or is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy." *Id.* Rather, in certain instances "more is not always better . . . . Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Id.* (*quoting Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir. 1994)). Here, counsel could have certainly reasoned that these particular documents, among a great many defendant's legal team could have emphasized and pursued, would not, given their trial strategy, advance the cause of the defense in any substantial manner.[23]

Even if this evidence contained potential exculpatory or impeachment material, defendant has not established that his attorneys' decision to rely on and pursue alternative evidence in crafting a defense strategy was an unreasonable one, nor that Moscowitz failed to conduct an investigation into the viability of such evidence. *See Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("[T]he decision [of counsel] will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" (*quoting*

---

[23] Other possible reasons that Moscowitz may not have pursued these documents: he already possessed the documents, he believed these documents to be repetitive of information he already had, the temporal restrictions associated with Jencks Act material forced him to choose which material he would review, or that he believed these documents all addressed parties or instances not important to the defense's trial strategy and therefore could muddle the evidence and defense he was presenting. It is also possible that Moscowitz concluded many of these documents are not even Jencks Act material. *See United States v. Delgado*, 56 F.3d 1357, 1364 (11th Cir. 1995) ("Statement, however, is a legal term of art. Agent's reports of witness interviews, or debriefings, are not Jencks statements unless they are substantially verbatim, contemporaneously recorded transcripts, or are written by the witness and signed or otherwise ratified by the witness."). The court emphasizes that Moscowitz sent most of his files (over 60 boxes) and discovery documents to successor counsel, making it nearly impossible to determine if Moscowitz ever actually possessed these documents. (Doc. 1853-1, p. 1). The only remaining files are what Moscowitz could locate in his electronic directories.

*Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983))). In short, it is entirely reasonable, given his limited resources and time, that Moscowitz opted to pursue and analyze some documents instead of others, craft his defense strategy and Gilliland's cross-examination around certain points and arguments, and focus these arguments so as to not inundate the jury with repetitive information and themes. *See Chandler*, 218 F.3d at 1318 n.22 ("*Strickland's* approach toward investigation 'reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources.' How a lawyer spends his inherently limited time and resources is also entitled to great deference by the court.") (*quoting Rogers*, 13 F.3d at 386-87) (citations omitted).

As for defendant's concern as to why these materials were not sought by Moscowitz, in the absence of affirmative evidence to the contrary, the presumption is that counsel rendered reasonable professional assistance and, by extension, that Moscowitz made a reasonable decision in the context of his entire trial strategy. "[I]n habeas proceedings . . . the petitioner bears the burden[24] of establishing his right to relief . . . . Because of this burden, when the evidence is unclear or counsel cannot recall specifics about his actions due to the passage of time and faded memory, we presume counsel performed reasonably and exercised reasonably professional judgment." *Blankenship v. Hall*, 542 F.3d 1253, 1274 (11th Cir. 2008) (citations

---

[24] The defendant cannot demonstrate, based only upon Moscowitz's electronic directory of Gilliland's testimony and e-mails in pursuit of the original Jencks material at issue, that there was deficient performance on Moscowitz's behalf pertaining to these additional documents. The defendant bears the burden of putting forward sufficient evidence to support his claim, a burden which defendant has not carried. For this reason, and the reasons discussed herein addressing these additional documents, "Defendant's Motion to Amend Claim 2(J) In Light of Newly Discovered Evidence" (doc. 1862) should be denied.

omitted); *see also Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) ("There is a strong presumption that counsel's conduct falls within the 'wide range of reasonable professional assistance.'" (*quoting Waters v. Thomas*, 46 F.3d 1506, 1511-12 (11th Cir. 1995) (en banc))). "[I]n order to show that counsel's performance was unreasonable, the petitioner must establish that *no competent counsel would have taken the action that his counsel did take*." *Grayson*, 257 F.3d at 1216; *see also Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) ("Because it is a 'wide range' of performance that is constitutionally acceptable, 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.' Cases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between." (*quoting Rogers*, 13 F.3d at 386)). "Where . . . the evidence does not clearly explain what happened, or more accurately why something failed to happen, the party with the burden loses." *Romine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001); *see also Chandler v. United States*, 218 F.3d 1305, 1315 n.15 (11th Cir. 2000) (en banc) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]."); *Williams v. Head*, 185 F.3d 1223, 1227-28 (11th Cir. 1999) (noting that "'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" particularly "where the record is incomplete or unclear about [counsel's] actions") (*quoting Strickland*, 466 U.S. at 690); *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990) ("[R]eviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance."). It would be reckless for the court to conclude that

Moscowitz's purported decision to not pursue the documents was error solely because Moscowitz did not record his reasons for doing so. There is no requirement, as far as this court is aware, that counsel maintain exhaustive records detailing every decision and tactical maneuver taken up to and during trial. Accordingly, defendant has not demonstrated that counsel's performance was constitutionally deficient in this regard. This analysis and conclusion will apply with like force to the remaining discussion on this point.

Turning back to a prejudice analysis, the information contained in the Indiana grand jury transcript holds little relevant or substantive information that pertains to the defendant. The majority of the information contained in the transcript sheds greater light upon a separate Ponzi scheme that was itself being defrauded by Hammersmith. The defendant is mentioned once in the transcript, and much, if not all of the pertinent information contained in the transcript was utilized at trial or already known by the parties. In terms of the additional Jencks documents contained in the cooperation agreement, Moscowitz's actions and motivations, even if not extensively documented, cannot be shown to be unreasonable. In all, there is simply nothing in the grand jury testimony that would show defendant suffered the prejudice, contemplated in this type of case, by its omission from trial. *See Strickland* 466 U.S. at 687 (holding that prejudice is shown if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.").

As to the next Jencks document, Gilliland's grand jury testimony in the United States District Court for the Middle District of Pennsylvania, (doc. 1855), such testimony appears primarily concerned with two individuals, John (Jack) Meyers and Lindsey Berry. (Doc. 1855, pp. 3, 5). Gilliland began his grand jury testimony by

describing his relationship and involvement with DivCap. (Doc. 1855, p. 4). Gilliland next testified that he "thinks" he worked for DivCap for about two years and that his title was Vice-President of Special Projects, a role which required him to write business plans for companies seeking venture capital. (Doc. 1855, pp. 4-5).

The government focused its questioning on Lindsay Berry of Sandford Investments. (Doc. 1855, p. 5). Gilliland testified that he was introduced to Berry through Chris Roberts in an effort to put together some investment opportunities with Sandford Investments. (Doc. 1855, p. 5). Sandford Investments sent $300,000 to DivCap and this money was placed in an escrow account opened by Gilliland. (Doc. 1855, pp. 6-7). Gilliland then detailed what happened to Sandford's money. At first, DivCap unsuccessfully invested Sandford's money, but was later able to make money on a second investment, eventually paying Sandford back somewhere in excess of $350,000. (Doc. 1855, p. 9). The grand jury testimony continued to focus on the relationship between Berry and DivCap and a dispute over installment money allegedly owed by DivCap to Berry. (Doc. 1855, pp. 9-12). This dispute eventually involved Jack Meyers, an individual who sought this money owed by Gilliland and DivCap. (Doc. 1855, pp. 12-13). Eventually the parties reached some sort of a settlement arrangement, after which Meyers disappeared. (Doc. 1855, pp. 14-15). Berry, however, continued to insist that he was owed some additional amount of money from DivCap. (Doc. 1855, p. 15).

After the questioning by the government ended, the individual grand jurors asked Gilliland questions. Gilliland testified that he was not a principal of DivCap and that it belonged to another gentleman for whom he worked (Poole), that he left DivCap in part because of the principal's drug and alcohol problem, and that most of

the business that Gilliland does is in Europe involving brokerage houses, banks and lawyers. (Doc. 1855, pp. 17-18). Discussing the first investment of Sandford's money, Gilliland said it failed because the funding never materialized. (Doc. 1855, p. 20). For the first investment, a group in Europe was supposed to provide a leveraged facility of credit, but before the money could be released the group needed to provide a surety bond. (Doc. 1855, pp. 20-21). The surety bond was never provided and the transaction failed. (Doc. 1855, pp. 20-21).

Dohan expresses interest in several portions of Gilliland's Pennsylvania grand jury testimony. First, Dohan correctly notes that the grand jury transcript does not mention or reference him. (Doc. 1857, p. 5). Gilliland's grand jury testimony was chiefly concerned with DivCap and the interactions DivCap had with Berry, Meyers, and Sandford Investments. The only secondary parties Gilliland mentions are Poole and Gunn, ostensibly because Poole was a principal of DivCap and had dual control of the account that Berry/Sandford's $300,000 was deposited into (doc. 1855, p. 8), and Gunn, as DivCap's attorney, was involved in the various dealings and legal matters at issue. (Doc. 1855, pp. 10, 14-15). This court cannot find prejudice in the absence of defendant's name from Gilliland's testimony. It strains credulity to find that Gilliland's mere failure to mention the defendant's name in a focused grand jury session somehow indicates that the defendant was not involved in the fraud or that he was not a key player in DivCap. Instead, a more likely explanation, is that the defendant was not one of the relevant parties intimately involved in the pertinent issues surrounding the financial transactions with the Berry/Meyers/Sandford investment. There are numerous other possible reasons why Gilliland failed to mention the defendant's name, none give rise to a suggestion of innocence.

Defendant also asserts that Gilliland attributed the defendant's supposed role at DivCap–a key player and its trader–to others: "[]Gilliland, Mr. Poole, Mr. Gunn, Mr. Callaway, Mr. Roberts, Unnamed solicitor, and an unnamed European trade group with whom there was a master contract were discussed[]." (Doc. 1857, p. 6). This argument also has no merit. First, there are arguably several "key players" at DivCap, and Gilliland's failure to mention the defendant in the grand jury testimony does not exclude him from being a "key player." Gilliland's grand jury testimony was primarily concerned with the interactions that he and a few others had with two specific Berry/Meyers/Sandford monetary investments. The lineup for these transactions is not probative on the question of whether Dohan had those roles attributed to him at trial. Gilliland believed his title at DivCap to be Vice-president of special projects (doc. 1855, p.4), and that he worked with Berry to develop some investment opportunities. (Doc. 1855, p. 5). Poole is mentioned as a principal of DivCap and as someone who had dual control of the account, with Gilliland, in which the $300,000 investment was deposited. (Doc. 1855, p. 8). Gunn was mentioned as the attorney for DivCap (doc. 1855, p. 10), and dealt with disputes that arose regarding the contested transactions at issue before the grand jury. (Doc. 1855, pp. 12-15). These parties were involved in client solicitation and developing new investment opportunities and contracts, but neither of these roles preclude defendant's role as a "key player" and trader. As for Callaway, he is mentioned briefly, by mistake, and no specific role is assigned to him. (Doc. 1855, p. 7). As for Roberts and the unnamed solicitor, they introduced Gilliland to Berry. (Doc. 1855, p. 17). In sum, there is no evidence of Gilliland attributing the defendant's roles at DivCap or Hammersmith exclusively to the parties discussed in this grand jury testimony.

Even if the parties mentioned in the Pennsylvania grand jury testimony had overlapping responsibilities or roles with the defendant, this would not suggest that defendant was not a "key player" or a trader for DivCap. Defense counsel also fails to point to a specific instance of a role being assigned to any of the listed parties that that would contradict an instance at trial of a role being assigned to the defendant. This furthers the court's finding of no prejudice to the defendant. On a final note regarding this allegation, a similar claim concerning Dohan's role at DivCap is addressed later in this writing. *See infra* pp. 151-53.

Dohan continues this line of argument by citing to two specific instances in the grand jury testimony where Gilliland supposedly made statements contradicting the role attributed to Gilliland at trial as a "'glorified back-office lackey with no proprietary interest.'" (Doc. 1857, p. 6). Gilliland testified before the grand jury that "most of the business that [he did was] in Europe with brokerage houses and banks and lawyers[,]" (doc. 1855, p. 17), and that he arranged for the opening of an escrow account, using funds from his personal account, to receive the $300,000 from Berry and Sandford Investment. (Doc. 1855, pp. 7-8). Gilliland admitted on direct that he, as well as the defendant, had set up bank accounts for Hammersmith. (Doc. 1558, p. 182). The fact that Gilliland opened a bank account for DivCap is not surprising and it certainly cannot be used for a showing of prejudice. As an additional note, Moscowitz cross-examined Gilliland about the job titles and roles that he and the defendant had. (Doc. 1559, pp. 258-59; Doc. 1560, pp. 52-55). As to the statement regarding with whom Gilliland conducts business, Gilliland testified at trial that he met with various investors and brokers for DivCap in England. (Doc. 1558, pp. 168-69). Gilliland also stated that, while working in England, he was "cloistered in a

hotel room generating all these different contracts for all these different people that Mr. West and Mr. Poole and probably four or five other people were submitting . . . ." (Doc. 1559, pp. 172-73). This fact, coupled with the global nature of both DivCap and Hammersmith, demonstrate that Gilliland was very likely working with European clients, including brokerage houses and banks. No prejudice is shown from the referenced statements.

Dohan next takes issue with Gilliland's statements concerning Berry's investment and subsequent repayment. (Doc. 1857, p. 6). Gilliland testified at trial that Berry's money had been used by DivCap to pay expenses. (Doc. 1558, p. 227). Superficially, this appears contrary to what Gilliland testified to before the Pennsylvania grand jury. (Doc. 1855, pp. 9, 15). Gilliland testified before the grand jury that Berry lost no money on his first investment and then received $350,000 on his second investment of $300,000. (Doc. 1855, p. 9). Importantly, Gilliland testified to the grand jury that Berry may have invested additional money with DivCap in the future:

> Q. Did you have any further contact with Mr. Berry after you paid him that $350,000?
>
> A. Yes, I believe that we did, because he was eagerly looking forward to potentially bringing additional funds forward to go into other transactions. That's about the most that I recollect of it at the time.

(Doc. 1855, p. 11). It seems reasonable that Berry's later investments comprised the money utilized to pay expenses, according to Gilliland's trial testimony. It also seems reasonable that the money Berry received back on his second investment was not the original money he invested, but was instead a third party's money that DivCap had

acquired. Another scenario is that Berry was owed a greater amount than the $350,000 that he received, but that the excess went to pay expenses. Regardless, this inconsistency is not material within the context of the remainder of the evidence. It appears to be a minor (within the context of Hammersmith and the Ponzi scheme) transaction related to the broader picture in that it only occurred in one of Hammersmith's prior machinations. It is not even entirely clear that Gilliland's testimony is inconsistent. Simply put, the prejudicial impact of an assumed inconsistency in testimony concerning an investment loosely related at best to the defendant and Hammersmith is minimal.

Defendant follows the preceding argument by pointing to the issuance of a bond to protect Berry's first investment. (Doc. 1857, p. 6). This bond failed to go through, causing the first investment transaction to fail. (Doc. 1855, p. 21). Defendant argues that this fact, coupled with a letter defendant wrote on behalf of AAH Rem to DivCap's escrow agent requesting the return of a separate investment due to a delay of a supposedly similar security, provides corroborating evidence that the defendant had no reason "to know or suspect that any other DivCap client, including Frank Scott, had lost any money . . . ." (Doc. 1857, p. 7). This inference, if proven, would, in defendant's view, undermine the government's argument concerning defendant's "false" motive to join the Hammersmith conspiracy. (Doc. 1857, p. 7). Such reasoning is unavailing. The court first notes that there is no evidence affirming the argument that DivCap's practice was to make sure all investments were insured by some sort of a security. That DivCap, on these two occasions, decided to seek a security bond for the investment, does not imply that all DivCap investments had that same requirement. In fact, the failure of Berry's first

investment to get off the ground and the defendant's request to return the AAH Rem investment due to delay, underscores just how difficult such a practice would have been had it applied to all DivCap investments.

Furthermore, the argument concerning the defendant's knowledge of potential monetary losses by DivCap clients is unreasonable given the entirety of the evidence produced that counters such an assertion. Starkly opposing defendant's argument is testimony by Frank Scott at trial. Mr. Scott testified at length about the conversations he had with Gilliland and Dohan after losing his initial investment, and how such conversations convinced him to further invest money.[25] (Doc. 1528, pp. 65-69). Scott also recounted how Gilliland and Dohan attempted to convince him to invest additional money in Hammersmith. (Doc. 1528, p. 84-86). Scott's testimony on this matter is consistent with Gilliland's testimony. (Doc. 1558, pp. 178-79, 185-86, 193-94, 204, 227, 287). Once again, the defendant is attempting to mold the evidence into some indicia of prejudice. Given the trial testimony directly refuting the above contention, by a party cited by the defendant, it appears that any prejudicial value of the statement is non-existent. Further, given the significant amount of evidence against the defendant recounted herein, even any possible prejudice would be quite diluted.

Dohan next argues, with regard to the Pennsylvania grand jury testimony, that Gilliland said he believed DivCap was shuttered and closed for business, therefore contradicting the government's trial argument that Hammersmith was formed to take

---

[25] Dohan's knowledge and involvement with Mr. Scott's investments are again discussed later in this writing. *See infra* pp. 175-77.

over a failed and dissolved DivCap's debts. (Doc. 1857, p. 7). Defendant's recount of the government's evidence at trial is incorrect. The court first notes that plain reading of the grand jury transcript reveals Gilliland to be uncertain as to the current state of DivCap at that point in time:

Q. Is DIVCAP still in business?

A. I don't believe so. I was not a principal of any of that. That all belonged to another gentleman I worked for.

(Doc. 1855, p. 16). It is evident from Gilliland's response that he expressed no conclusion regarding DivCap's current state with certainty, lessening any possible advantage for Dohan through impeachment. Contrary to defendant's assertions, at trial Gilliland testified that Hammersmith was created as distinct from DivCap so that Dohan, Gilliland, and Muirhead could raise additional money. (Doc. 1558, p. 179). Gilliland further said that Hammersmith was, at its inception, intended as a "vehicle to be able to raise money to go into programs." (Doc. 1558, p. 180). Hammersmith did carry over Mr. Scott's debt from DivCap, but it appears that such an act was done only after Mr. Scott brought additional money into Hammersmith. (Docs. 1558, pp. 185-86; 1560, pp. 147-48). Mr. Scott's story is consistent with the government's "genesis" theory of Hammersmith. (Doc. 1528, pp. 17-19). The government argued, and Mr. Scott's story illustrates, that investors' debt from DivCap would "roll over" into Hammersmith as a way to placate investors and convince them to invest additional funds. (Doc. 1528, pp. 17-19; Doc. 1560, pp. 147-48). In sum, Gilliland's statement before the grand jury, when compared to his actual testimony and evidence at trial, does not suggest actual prejudice.

The final missing Jencks document uncovered by the government is Michael Quilling's deposition of Gilliland in *Quilling v. The Wolcott Lifetime Trust, et al.* (Doc. 1846-1).[26] Quilling, in his efforts as receiver, sought to recover a house located in Grand Rapids, Michigan. (Doc. 1846-1, pp. 1-2). Also claiming an interest in the property was Gilliland's ex-wife Melody. (Doc. 1846-1, pp. 1-2). This deposition, like the Indiana and Pennsylvania grand jury transcripts, focuses upon transactions and disputes that are tertiary, at best, to the case against Dohan and that do not directly address the defendant's involvement in the Hammersmith conspiracy.

The deposition begins with Gilliland detailing the background of his divorce and his relationship to two properties in question, one in Memphis and one in Michigan. (Doc. 1846-1, pp. 2-4). Gilliland established the Wolcott Lifetime Trust, aided by attorney Jerry Gunn, with the goal of ensuring that Gilliland's ex-wife Melody would be a lifetime beneficiary of the house. (Doc. 1846-1, p. 5). The trust was designed so that Melody would be unable to encumber the Michigan property, thereby preserving it for the Gilliland children. (Doc. 1846-1, p. 4). The deposition continues on to describe in detail various nuances associated with the trust and schemes utilizing the property. In short, Jack Higgins, Gilliland's one-time assistant, became trustee and subsequently signed over the property in the trust, without the authority to do so, to Jeff Saxon, a Hammersmith investor who was seeking repayment from Hammersmith. (Doc. 1846-1, pp. 14-15). Also present at the

---

[26] The deposition transcript contains 143 separate pages. These deposition pages are placed four to a page in the document (Doc. 1846-1), totaling 36 pages in all. Due to the length of the deposition, the summary presented here will be generalized, supplemented in greater detail as needed to address the arguments.

deposition were the attorneys for financial institutions and banks who were mortgagees or assignees of mortgages by Saxon in exchange for loans from the banks. (Doc. 1846-1, p. 20). The security underlying the mortgage, and therefore underlying the loans, was the Michigan property owned by the Wolcott Trust. (Doc. 1846-1, p. 20).

Relating to the subject matter of the present case, Gilliland briefly detailed Hammersmith's formation (doc. 1846-1, p. 19), and on cross-examination gave a broader overview of the functioning of Hammersmith, Microfund, and to a lesser extent, Luxor. (Doc. 1846-1, pp. 20-27). Later in the cross-examination, Gilliland focused on the investment side of the Ponzi scheme–where the money went and how it was spent–and again touched on the initial creation of Hammersmith. (Doc. 1846-1, pp. 29-31).

Dohan contends that Gilliland's deposition testimony provides exculpatory and impeachment evidence showing Gilliland had continued to lie after he plead guilty and, therefore, his trial testimony that "'materially incriminated [the] defendant' should not have been believed." (Doc. 1857, p. 8). Defendant first cites Gilliland's testimony pertaining to the formation of Hammersmith and why Gilliland decided to begin working there. (Doc. 1846-1, p. 22). Defendant contends that Gilliland's statements about when he started working at Hammersmith, and why, are contradicted by outside evidence. (Doc. 1857, p. 8). Specifically, defendant again claims that evidence adduced at trial shows Gilliland hired David Johnson to create Hammersmith and act as its trustee, and that Hammersmith was formed in October 4, 1996. (Doc. 1857, p. 8). Defendant's claim of Gilliland hiring Johnson to form Hammersmith and act as trustee has already been addressed herein. *See supra* p. 85.

The court will not rehash the issue, but will note that Gilliland was cross-examined about his relationship with Johnson, and admitted he lied under oath at a previous hearing when he testified that Dohan had hired Johnson. (Doc. 1560, pp. 89-90). Gilliland also expressed some confusion as to previous statements he had given addressing with whom exactly David Johnson worked. (Doc. 1560, pp. 94-95). In short, Gilliland's reliability in these matters had already been called into question and thoroughly impeached. Any possible prejudice from the referenced material would therefore be greatly diminished in value and not significant for present purposes. As for any claims that Gilliland somehow contradicted Hammersmith's October 4, 1996, organization date in his deposition testimony, after review of the transcript, Gilliland actually testified that Hammersmith was incorporated "at the end of 1996 . . . ." (Doc. 1846-1, p. 31). This statement is consistent with the referenced date.

Defendant also argues that Gilliland lied during his cross-examination testimony when he stated, "I don't recall that, sir. And if my lawyer said [Mr. Dohan and Mr. Johnson were on the scene running these activities before I even showed up], he was wrong." (Doc. 1560, p. 92). Again, the supposed inconsistency in Gilliland's statement does not exactly jump out. Gilliland admits he was working at least part time at Hammersmith when it was initially formed, making the previous statement accurate. (Doc. 1846-1, p. 31). Gilliland also testified that he worked for DivCap before Dohan did. (Doc. 1558, pp. 172-73). Dohan also claims that Gilliland's testimony that "[Dohan, Poole, and Muirhead] wanted me to stay on and basically manage [Poole's] business affairs in order to generate monies to reimburse -- to pay back investors of Doug Wilson's Research and Recovery company which basically was ceasing operations due to his death," (doc. 1846-1, p. 22), is inconsistent with the

government's case that defendant lied to investors because he knew Hammersmith started out in debt. (Doc. 1857, p. 9). This portrait of the government's case is not accurate. *See supra* pp. 101-02. Additionally, Gilliland recounted during the deposition the same story he would later detail at trial regarding Hammersmith's inception:

> Q. And [Hammersmith's] only business was that of selling these investments, high interest rate investments; is that correct?
>
> A. That's correct. So [Poole] was selling those as Divcap and then because Divcap had had some failures and had rolled up about a million dollars worth of liabilities to its investors is when he formed Hammersmith, specifically so that there would not be any name identification, you know, to where he would be able to go out and raise money to -- at that time it was represented to me to replace the money that he owned in Divcap that he had lost.

(Doc. 1846-1, p. 23). Gilliland testified at trial that Hammersmith was created because DivCap's name was "pretty much smeared and there would have to be some new entity if we were going to be able to raise more money . . . ." (Doc. 1558, p. 179-80). The similar stories presented by Gilliland in testimony several years apart cuts against the defendant's contention. As to Gilliland's statement about paying back investors, it is unclear which investors he is referring to. Perhaps Gilliland is referencing Frank Scott who lost over $900,000 in DivCap and whom Gilliland sought to potentially reimburse by bringing him into the Hammersmith investment scheme. (Doc. 1558, pp. 185-86). Even assuming *arguendo* some inconsistency in Gilliland's deposition statement, such statement's effect is negated when clarified by Gilliland's later comment addressing why Poole actually formed Hammersmith.

Taken in light of that later statement, and Gilliland's consistent testimony, no prejudice is apparent.

The defendant continues by claiming that Gilliland falsely testified in the *Wolcott* deposition that "Hammersmith started receiving investors' funds in early 1997, which served to wrongfully reduce the amount of money the receiver could recover from Gilliland's family to benefit his victims." (Doc. 1857, p. 9). Review of the record proves this assertion to be incorrect. Gilliland's testimony came in reference to when he started to receive compensation from Hammersmith investors, not when Hammersmith did:

> Q. So it's fair to say that all the money that was paid to Melody Gilliland as set forth on Exhibit Number 25 is directly traceable to defrauded investors in either the Hammersmith program or the Microfund program?
>
> A. From the 1997 dates forward, that would be true.
>
> Q. Right. And then -- and so we're clear, you first started receiving money from Hammersmith investors in early 1997, correct?
>
> A. That's correct.
>
> Q. So anything in 1996 would have either been your funds attributable to something else or money that you were raising?
>
> A. I think it's April of 1997 is when I started working for Hammersmith.
>
> Q. Okay. So to the extent this spreadsheet shows any transactions prior to April of 1997, those funds did not come from defrauded investors?
>
> A. That's correct.

(Doc. 1846-1, p. 19). In the above exchange Gilliland speaks to when he first started to receive Hammersmith compensation (investor funds). He does not, however, make a conclusive statement about when Hammersmith first started to receive investment funds. The court cannot conclude from the trial testimony that Gilliland was lying and, if he was, that he is doing so to further defraud investors and benefit his family. There is simply not enough evidence to make that determination and the evidence presented to the court is inconclusive. As such, no prejudice is apparent.

The defendant next argues a point previously dealt with in this writing, namely that Gilliland lied about his ownership interest in Hammersmith. *See supra* pp. 84-85. The court will reemphasize that Gilliland was already cross-examined by Moscowitz on this point, limiting any potential prejudice. Now Dohan contends that Gilliland lied when he testified in the deposition that he was "watching the French Open yesterday trying to see Mr. Dohan's face in his center court box seats that he has." (Doc. 1846-1, pp. 33-34). The court has no way of knowing whether Gilliland was serious or joking, lying or being truthful. Maybe Gilliland was looking for the defendant when watching the French Open, maybe he wasn't. The defendant had a residence in France and was living abroad at this time. The deposition occurred while the French Open was taking place. This is an unsupported accusation, and there is simply no evidence one way or the other. As such, the court cannot find this was a potentially useful piece of impeachment evidence.

The court has done a close review of the submitted Jencks materials initially at issue in this proceeding. The Indiana and Pennsylvania grand jury transcripts, as well as the *Wolcott* deposition, do not contain nearly the degree of exculpatory or impeachment material that the defendant claims they do. "'The petitioner bears the

burden of proof on the performance prong as well as the prejudice prong of a *Strickland* claim, and both prongs must be proved to prevail.'" *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (*quoting Johnson*, 256 F.3d at 1176) (citations omitted).

Gilliland's testimony, to the extent it contained falsities or inconsistencies, was not material or substantial within the context of the remainder of the evidence. Defendant was not indicted, and ultimately convicted, merely on account of Gilliland's testimony. Rather, defendant was indicted and convicted on the strength of testimony from multiple witnesses and documents connecting Dohan, in various capacities, to the numerous frauds perpetrated against legitimate investors. Moreover, Gilliland's value as a witness and his credibility was already significantly diminished at trial. *See supra* p. 30; *see also Dohan*, 508 F.3d at 993 (observing that "the government . . . in its closing argument . . . even invited the jury to disregard Gilliland's entire testimony if it wished, and convict on other evidence"). Accordingly, any inconsistencies or impeachment value present in the materials do not meet the prejudice requirement demanded by *Strickland*. 466 U.S. at 694 (the defendant "must show that there is a reasonable probability that, but for, counsel's unprofessional errors, the result of the proceeding would have been different."); *see also Pooler v. Sec. Fla. Dep't of Corr.*, No. 12-12059, 2012 WL 6555012, at *17 (11th Cir. Dec. 17, 2012) ("To satisfy the prejudice prong, the 'likelihood of a different result must be substantial, not just conceivable.'") (*quoting Harrington v. Richter*, 131 S. Ct. 770, 792, 178 L. Ed. 2d 624 (2011)).

The government was able to uncover the three Jencks materials discussed above, but one document remains missing–Quilling's civil case against the insurance

carriers of Mark Talley, Case No. 2:00cv3041, in the United States District Court for the Western District of Tennessee. (Doc. 1848, p. 3). The undersigned, therefore, must confront the question, in the context of the instant case, of how to determine if a missing document evidences prejudice under *Strickland* when the court cannot analyze the document.

As a threshold matter, the undersigned has substantial doubt whether the missing deposition is even subject to the Jencks Act. If such a document were not Jencks material, then the government would be under no obligation to turn over the document, even with the appropriate request. As a result, Moscowitz's claimed failure to follow up his initial request and obtain the missing document would not be deficient under the argument currently constructed by the defendant. Moscowitz would not have the statutory authority to compel the government to disclose this document. The imposition of sanctions or penalties under the Jencks Act would, therefore, also be inapplicable.

Under the Jencks Act a document must be "in the possession of the United States which was made by a Government witness or prospective government witness . . . ." § 3500(a). "A statement is 'in the possession of the United States' for Jencks Act purposes if it is in the possession of a federal prosecutorial agency." *United States v. Cagnina*, 697 F.2d 915, 922 (11th Cir. 1983); *see also United States v. Mack*, 436 F. App'x 915, 917 (11th Cir. 2011) (same); *United States v. Trevino*, 556 F.2d 1265, 1271 (5th Cir. 1977) ("A 'statement . . . in the possession of the United States' can only be read to mean a statement in the hands of the federal prosecutor.").

Michael Quilling was a receiver appointed by the court to oversee many of the entities involved in the Hammersmith conspiracy. In his trial testimony, Quilling

detailed his role as receiver: "[a] receiver is basically an independent third party that's put in by the Court to maintain the status quo, pending further orders of the Court . . . . The receiver works for the Court. The receiver answers to the Court. The receiver doesn't, for instance, report to the government. The receiver doesn't report to the defendants. He works for the Court." (Doc. 1560, pp. 153-54). An employee of the court, or an independent, non-prosecutorial third party would be excluded from reach of the Jencks Act requirements. *See Cagnina*, 697 F.2d at 922 ("Anything in the control of a district court, such as the court reporter's notes, is not in the possession of the prosecutor and therefore does not fall within requirements of the Jencks Act."); *see also Trevino*, 556 F.2d at 1271 (noting that because the presentence report was in the custody of a probation officer who serves "by appointment of and under the direction of the district courts" the Jencks Act was not applicable to the report; however, the Jencks Act may be applicable if the presentence report was in the possession of the prosecutor).

The distinction presented in *Trevino*, and language of the Jencks Act, tasks this court with further analysis. The court must determine whether Gilliland's deposition was in the possession of Heldmyer or a federal prosecutorial agency. This inquiry is, of course, shaded by the fact that Dohan, as the movant, has the burden of proof. Quilling, in his affidavit, stated, "I provided to [Heldmyer] . . . copies of all transcripts and depositions that I had in my possession of Benjamin David Gilliland taken in connection with various lawsuits I was defending and/or pursuing in proceedings ancillary to the receivership." (Doc. 1853-2, pp. 1-2). In Heldmyer's affidavit, she stated, "I provided all discovery material in our possession to defense counsel Norman Moscowitz and/or his trial team. Among the materials we provided

to him were all transcripts in our possession of B. David Gilliland's prior testimony." (Doc. 1853-4, p. 2). Similarly, Tracey Preisser, the IRS case agent assigned to the case, stated, "Heldmyer (the lead prosecutor) and I provided all discovery material in our possession to defense counsel Norman Moscowitz and/or his trial team. Among the materials we provided to him were all the transcripts in our possession of B. David Gilliland's prior sworn testimony." (Doc. 1853-3, pp. 1-2). Moscowitz, through his testimony and actions, was apparently not in possession of the deposition transcript at issue, at least when he requested it on January 11, 2006. (Doc. 1853-1, pp. 1-10).

In the estimation of the undersigned, two scenarios may be inferred from the events described above. First, Quilling was in possession of the Talley deposition he conducted with Gilliland. Quilling stated that he turned over to the government all of Gilliland's depositions in proceedings ancillary to the receivership. Heldmyer testified that she turned over all transcripts of Gilliland's prior sworn testimony. Therefore, if the government or Quilling possessed this Talley deposition, it would, based upon the only available evidence, have been given to Moscowitz. Although, the government would have been in possession of the deposition, making the Jencks Act applicable, once Moscowitz possessed the deposition this entire consideration becomes moot, as any possible deficiency in his performance is extinguished as to that document. In Moscowitz's initial affidavit, filed with the government's answer, he states he "[did] not recall not receiving any Jencks which [defendant's counsel] requested." (Doc. 1747, p. 70). Admittedly, that statement is in dispute; regardless, it certainly has some bearing on the likelihood of the foregoing scenario. This statement, coupled with Moscowitz's vague recollection of the Pennsylvania grand

jury transcript as not significant (doc. 1853-1, p. 2), and a cover letter[27] from the Indiana Assistant U.S. Attorney to Heldmyer dated January 30, 2006, that accompanied the grand jury transcript and contained the statement "[e]nclosed please find the grand jury transcript per your request[,]" (doc. 1843-15), evidences that Heldmyer made active efforts to obtain and transfer possession of the sought-after Jencks material to Moscowitz. We have no suggestion of a scenario in which Heldmyer sought to obtain the Indiana grand jury transcript, without intending to forward it onto Moscowitz, particularly following Moscowitz's formal Jencks request two weeks before. The fact that Moscowitz likely had two of the four missing Jencks materials in his possession adds weight to the likelihood that he had the missing Talley deposition as well. One final wrinkle–following the trial–Moscowitz forwarded to successor counsel 60 boxes of documents obtained in discovery and gathered during Moscowitz's own investigation. (Doc. 1853-1, p. 1). That Moscowitz did not transfer all 60 boxes to electronic form before sending them off to successor counsel hardly gives rise to an inference that he never possessed the documents. In this scenario, defendant has not show deficient performance.

Alternatively, though, if Moscowitz never had the Talley deposition, such was most likely a result of Heldmyer or the government not having that document, in the context of the Jencks Act. The undersigned simply cannot conclude that Heldmyer would send some Jencks materials, but hold back others, especially when much of the

---

[27] This cover letter (doc. 1843-15) was disclosed to defense counsel at the evidentiary hearing, yet could not be found in the court's submitted exhibit records. After review of the government's brief, the court requested submission of this document and received it via e-mail on January 9, 2013. It was uploaded to the record that same day.

Jencks material already divulged to Moscowitz contained significant, and damaging, impeachment information. A more logical, and more likely explanation is that Quilling (or the private attorneys in the Talley case) simply did not turn over the deposition to Heldmyer or another entity within the scope of the Jencks Act. The practical result of this, however, would be that the government would have never possessed the deposition and thus would not be obligated to turn the document over to Moscowitz under Jencks. In this scenario, the deposition does not pass the threshold of the United States' possession required by the Jencks Act. Accordingly, defendant has not shown a violation, because any request would have been futile.

The final, and least plausible scenario, is that the government had the deposition in question, and whether intentionally or by mistake, failed to turn over the deposition. In light of the evidence in the record, Heldmyer's affirmative request for the Indiana grand jury transcript (doc. 1843-15), and the affidavits of Moscowitz, Heldmyer, and Preisser, the court cannot impute such an act to the government. There is simply no evidence or inference signifying such a scenario, and it is illogical that Heldmyer would request Jencks documents only to withhold them from Moscowitz. In sum, it is the undersigned's opinion that the document in question, in light of the available evidence provided to the court, was either never in possession of the government therefore excluding it from the Jencks Act, or alternatively, came to be in Moscowitz's possession, satisfying the Jencks Act as to this document. Accordingly, Moscowitz's performance, in this respect, was not deficient under *Strickland.* 466 U.S. at 687; *see also Blankenship*, 542 F.3d at 1274 ("[W]hen the evidence is unclear or counsel cannot recall specifics about his actions due to the

passage of time and faded memory, we presume counsel performed reasonably and exercised reasonably professional judgment.") (citations omitted).

Notwithstanding the foregoing analysis and dispositive conclusion, the court will address the prejudice aspect of the missing deposition under *Strickland*. 466 U.S. at 687. This discussion, however, does not, in any way, suggest that Dohan has carried the burden of demonstrating deficient performance. The court, in its previous Order granting an evidentiary hearing (doc. 1842), analogized the prejudice analysis this court is obligated to conduct under *Strickland* to the harmless error analysis the Eleventh Circuit conducts when reviewing a violation of the Jencks Act. (Doc. 1842, pp. 9-11). Inherently, of course, the prejudice analysis under *Strickland* and harmless error analysis undertaken at the appellate level are two distinct standards of review. Accordingly, a document could present a "'substantial inconsistency, contradiction or variation' between prior statements and the witness' trial testimony[,]" *Keller*, 14 F.3d at 1055 (*quoting Merlino*, 595 F.2d at 1019), overcoming harmless error, and still not surmount the prejudice requirement demanded by *Strickland*. 466 U.S. at 693-94 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.") (citations omitted); *see also Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) ("A finding of prejudice requires proof of 'unprofessional errors' so egregious 'that the trial was rendered unfair and the verdict rendered suspect.'") (citations omitted). This

difference, however, does not preclude consideration of harmless error as informing the court's analysis.

Earlier this court expressed its hesitancy to simply assume counsel's purported omission was not prejudicial, in the absence of the contested document. (Doc. 1842, p. 11). Harmless error inquiry, as it is generally conducted, continues to be instructive to this court's prejudice analysis. In the context of harmless error, sufficient independent evidence can negate possible error or omission. *See United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006) ("A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different. When the record contains sufficient independent evidence of guilt, any error is harmless.") (citations omitted). This conclusion has been applied to Jencks Act statements. *See United States v. Delgado*, 56 F.3d 1357, 1364-65 (11th Cir. 1995) ("The following factors impel us to conclude the error, if any, was harmless: Jencks Act statements are strictly limited to impeachment. The most [defendant] could have achieved with the requested statements was to discredit the agent . . . . Most important, independent evidence linking [defendant] to the crimes charged in the instant case was overwhelming. Strictly applying the harmless error standard, we find no reversible error.") (citations omitted).

In the present case, the circumstantial and direct evidence against defendant, standing alone, was overwhelming, and easily sufficient to support the defendant's convictions. Contrary to defendant's intimations, Gilliland was not the sole foundation for the government's case. Apart from Gilliland, the jury was presented with testimony of several investors, the receiver, and a forensic accountant. These

testimonies were affirmed by several documents demonstrating defendant's involvement in the scheme. In addition, evidence showed that the defendant was personally involved in marketing the program to investors. For example, a recorded telephone conversation in which Dohan assured Papagni, a Hammersmith investor, that, assuming the solvency of as venerable an institution as Barclays Bank, there was no risk to investment. (Doc. 1560, pp. 149-52; GE Tape-01). Another witness, Alexander Gilliland, an Australian investor, recalled no fewer than three presentations defendant made, as the principal for the Microfund program, to prospective investors in Australia. Defendant not only explained the mechanics of the program, but advised these potential investors that the capital would be guaranteed. (Doc. 1558, pp. 52-63). Notably, Alexander Gilliland recounted a presentation in which the defendant assured investors that investments were already generating significant monthly returns and that the defendant gave no indication of any problems with his investment programs. (Doc. 1558, p. 54). Heldmyer, in her closing, echoed the importance of these witnesses' testimonies:

> "You follow these documents, and you will see exactly what role that [defendant] had. And you factor in, you take into consideration strongly what Mr. Dohan was representing to these investors, and he is guilty. That's what convicts him. It's not David [Benjamin] Gilliland. It's not Milo Segner. It's people like Alexander Gilliland and Mr. Mizrahi and Mr. Fred Gilliland, who lost a bunch of money, millions and millions of dollars."

(Doc. 1563, p. 180). The court will not go on *ad infinitum* recounting the independent testimony and evidence presented against the defendant. The court notes, however, that such evidence is further discussed throughout this report. Even excluding Gilliland's testimony, there was overwhelming independent evidence of

intent, and this evidence proved beyond a reasonable doubt that Dohan knew of the Ponzi schemes and acted intentionally to further them.

It is also helpful to understand, from a prejudice standpoint, what could realistically be gained from Gilliland's deposition in the Talley case. "Jencks Act statements are strictly limited to impeachment." *Hernandez v. United States*, 56 F.3d 1357, 1364 (11th Cir. 1995) (*citing United States v. Palermo*, 360 U.S. 343, 349 (1959) ("[18 U.S.C. § 3500(a)] manifests the general statutory aim to restrict the use of such statements to impeachment.")). The supposed value of Gilliland's missing deposition, therefore, is in the information it may contain that could then be utilized to weaken Gilliland's credibility.

The limited usefulness of the missing deposition further weakens Dohan's argument of possible prejudice. This is not an instance in which a defendant was convicted based on the testimony of one witness whose credibility could have been diminished with the missing Jencks material. This is a case, as detailed above, with substantial independent evidence from which the jury could infer defendant's guilt. Furthermore, the witness whose credibility could be undermined by the deposition, namely Gilliland, had already been impeached extensively and effectively with past inconsistent statements and untruths. There comes a point at which, having repeatedly shown someone to be a serial liar and fraud, yet another showing that the person has lied is of little or no value at the margin, and the potential impact is severely diminished. Such is the case at hand.

Gilliland was impeached and forced to admit on cross-examination that he had spoken falsely on multiple occasions. (Docs. 1559, pp. 192, 206-17, 226-27, 232-33, 240, 255; 1560, pp. 29-30, 58, 61, 70-72, 90). Gilliland had to admit that he had a

history of lying under oath in court (doc. 1559, pp.187, 208), that he had a history of lying about the extent and nature of the defendant's involvement in the Ponzi scheme (doc. 1559, p. 232), that he had lied repeatedly to Quilling (doc. 1559, p. 192), and that he had given inconsistent statements under oath at a previous deposition administered to him by Quilling (doc. 1560, pp. 29-30). In one exchange, Gilliland admitted on no fewer than six occasions that he had lied, at times under oath, about the nature and extent of Dohan's involvement in the fraud, and that each such deception was made before he entered the plea agreement. (Doc. 1559, pp. 232-33). Moscowitz also weakened Gilliland's credibility by probing his cooperation and plea agreement with the government. (Doc. 1559, pp. 221-34). The best evidence of the damage done by Moscowitz's cross-examination was the government's statement during closing argument that the jury could "completely disregard" Gilliland's testimony. (Doc. 1563, pp. 173-74); *see also United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (observing that "the government . . . in its closing argument . . . even invited the jury to disregard Gilliland's entire testimony if it wished, and convict on other evidence").

The court will also not ignore the fact that Moscowitz had in his possession ample Jencks material with which to impeach Gilliland (doc. 1848-1, p. 4), and that this material contained at least three other civil depositions conducted by Quilling. These facts demonstrate the decreased likelihood of even conceivable prejudice from the missing deposition.

In sum, the significant independent evidence corroborating the defendant's guilt assures the court that even with the one missing deposition, deployed for maximum impeachment effect, the defendant would have been convicted. Gilliland's

testimony, while certainly useful, was not the end all of the government's case. In light of the substantial independent evidence against the defendant, the focus on Gilliland and rhetorical shift to Gilliland versus Dohan, appears to have been a trial strategy utilized by the defense to weaken the government's arguments, bring the evidence into question, and deter the jury from crediting the abundance of independent evidence attesting to the defendant's guilt.

As to the possible value of the deposition and any impeachment material it could contain, throughout cross-examination Moscowitz repeatedly exposed Gilliland's numerous falsehoods, thereby diminishing in significant degree both his value as a witness and the value of any additional impeachment evidence. By the end of Gilliland's cross-examination, the jurors were well aware of just how reliable Gilliland was as a witness. Gilliland had already been shown to have lied under oath to Quilling in a previous deposition. (Doc. 1560, pp. 29-30). It would hardly be surprising, to the court or the jury, that Gilliland had lied in another deposition given under similar circumstances. Accordingly, a reasonable judicial observer would have to engage in an act of knowing suspension of disbelief to conclude that Gilliland's missing deposition, in the context of the totality of evidence and in light of Gilliland's cross-examination, would be sufficient to meet the prejudice requirement demanded by *Strickland*. 466 U.S. at 693-94 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different.") (emphasis added); *see also Pooler*, 2012 WL 6555012, at *17 ("To satisfy the prejudice prong, the 'likelihood of a different result must be substantial, not just conceivable.'") (*quoting Harrington*, 131 S. Ct. at 792).

As a final flourish on this point, defense counsel at the evidentiary hearing and in the post-hearing brief (doc. 1857), argues for an application of the theory of spoliation to Gilliland's missing deposition.  (Doc. 1857, pp. 2-5).[28]  One must not ignore that this is a post-conviction action, filed after defendant's trial and appeal have been concluded, and commenced several years after the deposition in question was given.  This deposition was given in the context of a civil action, brought by a third party receiver attempting to recover money owed to investors from what appears to be alleged coconspirator Mark Talley's[29] insurance carriers.  The defendant has not shown who, at the time of trial, was in possession of the deposition, or whether the deposition was even available for production.

Also, the defendant can make no claim that the government was in some way involved in the unshown, but tacitly suggested, destruction or loss of this deposition.  *See Williams*, 598 F.3d at 789 ("'The petitioner bears the burden of proof on the performance prong as well as the prejudice prong of a *Strickland* claim, and both prongs must be proved to prevail.'") (*quoting Johnson,* 256 F.3d at 1176) (citations

---

[28] The present case is not the typical run-of-the-mill criminal case in terms of the evidence collected and criminal scheme overall.  The Ponzi scheme here took in over 60 million dollars and operated throughout several countries.  There were several defendants, all with varying roles, tried in this court.  There were even more individuals, who participated in or benefitted from the scheme, that faced proceedings in various jurisdictions throughout the United States.  The government agencies involved run the gamut of local and federal law enforcement.  There were civil, criminal, and even international litigation in this matter.  There was, apparently, even another independent fraudulent scheme somehow involved with Hammersmith.  Common sense would dictate that preserving every single piece of evidence in every single proceeding somehow related to the defendant's case would be nearly impossible.  Adding to this difficulty, and discussed herein, is the defendant's delay in coming to the United States to face the charges against him.

[29] Mark Talley was acquitted at trial.  (Doc. 495).  No showing has been made whether the deposition was given before or after Talley's acquittal.

omitted).  By all reasonable inferences, under the Jencks scenarios discussed herein, the government was operating either without the transcript or with the knowledge that such a transcript had been turned over to Moscowitz.

Nevertheless, the undersigned will address to some extent the law cited by the defendant in his brief.  The materials cited by the defendant are all inapposite in a fundamental way–they involve the complicity of a party to litigation.  *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 947 (11th Cir. 2005) (destruction of an automobile in a personal injury case involving allegations of a manufacturing defect in the vehicle's airbag system warranted dismissal of the case; such a sanction was appropriate because "[The Eleventh Circuit] [could not] imagine a case in which the evidence destroyed would prove more critical."); *Britton v. Wal-Mart Stores East, L.P.*, No. 4:11cv32/RH/WCS, 2011 WL 3236189 (N.D. Fla. June 8, 2011) (defendant's intentional destruction of video evidence likely corroborating plaintiffs' innocence in a theft merited sanctions); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003) (defendant's failure to preserve tapes containing potentially relevant e-mail correspondence of key employees was "grossly negligent, if not reckless . . . .").  All these cases feature parties concretely liable for the destruction of evidence, and all these instances occurred during the discovery stage of the proceedings.  Here, defendant has made no showing concerning whether the government was even marginally negligent, much less acting recklessly, in regard to maintenance of the Talley deposition.  In *Zubulake*, the court refused to impose a sanction of adverse inference due to its severity, even though, "UBS had a duty to preserve all of the backup tapes at issue, and destroyed them with the requisite culpability.  Zubulake cannot demonstrate that the lost evidence would have

supported her claims." 220 F.R.D. at 222. Such is the situation in the instant case. Only rank speculation would lead one to conclude the contents of the missing deposition would have been useful.[30] Once again, no one knows whether the deposition was available for production at trial. Simply put, the circumstances present in the instant case do not justify the imposition of the sanctions suggested by the defendant.[31]

Accordingly, for the foregoing reasons, ground two (j) must fail.

*The Financial Records*

Defendant asserts in ground two (k) that counsel rendered ineffective assistance by failing to (1) move for a mistrial or continuance in light of the government's untimely provision of certain financial materials, (2) move for a

---

[30] Even if the deposition contained impeachment material, it would not meet the needed prejudice requirement demanded by *Strickland*. This point has been discussed extensively herein. Additionally, one must doubt that an adverse inference instruction would even be fruitful if given. The jury knew Gilliland lied multiple times under oath and an additional example would have little utility.

[31] On a final note regarding the possible imposition of sanctions for failure to produce a witness's statement under the Jencks Act, courts have expressed a hesitancy to strictly adhere to bright-line rules dictating the form of such sanctions. *See United States v. McGregor*, 785 F. Supp. 2d 1253, 1257 (M.D. Ala. 2011) ("[O]ther courts have found that there is broad discretion as to whether to impose sanctions under Rule 26.2(e) or the Jencks Act for a refusal to comply with a court order to produce a witness's statement.") (*citing United States v. Taylor*, 13 F.3d 986, 990 (6th Cir. 1994) ("When the [Jencks Act] violation occurs through negligence or oversight, the trial court has the discretion to formulate remedies as justice requires under the circumstances of the case."); *United States v. Budzyna*, 666 F.2d 666, 673 (1st Cir. 1981) ("This court and other circuit courts have held that district courts have significant discretion in applying the exclusion provisions of the Jencks Act.")). With that in mind, the undersigned, given the wide latitude available in imposing sanctions, finds any argument claiming prejudice from the failed imposition of specific sanctions unavailing. It is entirely unclear what sanctions, if any, the court would have determined appropriate given the context of the case.

mistrial or continuance based on Segner's use of an extract the government allegedly withheld from discovery, (3) obtain a copy of the extract Segner used to refresh his memory, and (4) cross-examine Segner so as to expose alleged errors in his calculations. (Doc. 1723, p. 81). The record, however, generally refutes or diminishes the import of these contentions.

Milo Segner, a certified public accountant who worked closely with Michael Quilling to trace the proceeds of the Ponzi scheme, testified extensively at Dohan's trial. (Docs. 1529, pp. 4-139; 1562, pp. 46-64; 1563, pp. 19-92). Segner explained that he received from Quilling and other sources approximately 140 different account records, which he used to compile a database of spreadsheets showing the source of funds invested or infused into the trading schemes, and their final destination. (Doc. 1529, pp. 6-7). In compiling these spreadsheets, Segner reviewed not only bank account records, but correspondence, investor files, and claims. (Doc. 1529, p. 6). As part of this process, Segner reviewed each account to identify those related to entities created or controlled by Dohan; Segner described these as accounts defendant had "touched" or that "affected" him. (Doc. 1529, pp. 8-9). After reading a list of twenty-eight bank accounts he asserted were associated with defendant, Segner, based on his calculations, attributed to Dohan $1,781,557.03. (Doc. 1529, p. 69).

The chronology of events preceding Segner's testimony begins on February 8, 2006, the day before Dohan's trial commenced, when the government provided to the defense a collection of financial schedules and summary charts, upon which Segner intended to rely in fashioning his testimony. (Doc. 1559, p. 5). On the fourth day of trial, February 14, 2006, the government furnished to the defense additional schedules. (Doc. 1559, p. 5). Mr. Moscowitz objected that the timing of the most

recent disclosure did not afford the defense fair notice of the additional schedules or time sufficient to prepare an effective cross-examination of the expert, who had not yet testified. (Doc. 1559, pp. 6-9). Moscowitz, therefore, requested additional time to review the allegedly new information. The prosecution countered, asserting that the "information . . . [was] absolutely no different" than that previously turned over to the defense. Citing time constraints, the trial judge denied this request, but agreed to have the witness return for further cross-examination, provided defense counsel could demonstrate that the latest disclosures contained information different from that already in Moscowitz's possession. (Doc. 1559, p. 9).

Ultimately, the prosecution did not call Segner to testify until two days later, on February 16, 2006 (the sixth day of trial). (Doc. 1439, p. 6). With the prosecution's consent, the defense was permitted to have their forensic accountant, Alex Fernandez ("Fernandez"), present in the courtroom during the entirety of Segner's testimony. (Docs. 1439, p. 5; 1529, p. 2). That day, defense counsel cross-examined Segner for approximately seventy-five minutes. (Doc. 1439, p. 6). One week later, on February 23, 2006, the defense had a second opportunity to cross-examine the government's forensic accountant, doing so for another seventy minutes. (Docs. 1439; 1563, pp. 32-74). In arguing before the Eleventh Circuit on direct appeal, Dohan recounted some of the concessions Segner made during the lengthy cross-examinations:

> The government's expert, Milo Segner, testified that the records traced $1,781,57.03 to Dohan or to corporate bank accounts he controlled - over and above the funds he returned. (DE1529:36-37, 60-69, 87, 103.) On cross-examination, however, Segner conceded that he double counted $200,000, that Dohan was not a signatory on the vast

majority of these accounts, and that significant portions of the money he attributed to Dohan could not have gone to him. (DE1529:72, 76, 107-110, 132-133.) . . . Finally, Segner admitted that in October 1998 Dohan returned $2 million of the funds under his control, in February 1999 he returned $200,000 and in March and April 1999, he returned another $6.2 million. (DE1529:74-75, 77, 132-134; Day9:49; Day10:53-61.)

Initial Brief of Appellant at *20, *United States v. Dohan*, 508 F.3d 989 (11th Cir. 2007) (No. 06-14320-HH), 2006 WL 5004027, at *20. In his sworn declaration, moreover, Moscowitz elaborated on his strategy, raising a direct challenge to defendant's interpretation of the surrounding events:

These allegations are substantially incorrect. We received voluminous Jencks [material] for Mr. Segner. After he left the stand, the first time, we received additional Jencks [material], which showed that he made material errors in his calculations relating to the monies received by Mr. Dohan. He was brought back for further questioning. We decided that it would be more effective to re-open cross-examination using the new materials, without giving him advanced notice of his errors, rather than making any motion. (The remedy would likely have been the same; an opportunity for cross-examination, except that Segner would have been on notice of the errors.) In fact, Segner had to acknowledge before the jury that he made significant errors in his computations.

(Doc. 1747, p. 70).

In ground two (k)(1) and (k)(4), respectively, defendant alleges ineffective assistance on the basis of counsel's alleged failure to move for a mistrial or continuance in light of the government's untimely provision of the additional financial schedules, and alleged failure to cross-examine Segner so as to expose the alleged errors in his calculations. (Doc. 1723, p. 81). In support of these claims,

Dohan argues that "defense counsel failed to effectively enunciate the grounds underlying his objection to the tardy production of [the financial] material in a manner that would have made the prejudice to the [defendant] clear to the Court." (Doc. 1723, p. 84).

First, the record reveals that Moscowitz argued clearly and forcefully in support of his objection to the untimely disclosure of the financial schedules. After entering his objection, Moscowitz argued that he would not have time, given the allegedly new material, to prepare for Segner's cross-examination, that the government had provided unfair notice of the new schedules, and that the financial analysis was critical to Dohan's case. (Doc. 1559, pp. 5-6). That the court did not sustain the objection or credit the supporting explanation as persuasive does not necessitate a finding of deficient performance–what defendant really takes issue with, then, is not so much the conduct of counsel, but the court's exercise of its discretion. Without more, however, defendant cannot be heard to complain about counsel's tactical approach merely because the court declined to grant a continuance or delay. *See Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) ("This Circuit reviews a lawyer's conduct under the 'performance' prong with considerable deference, giving lawyers the benefit of the doubt for 'heat of the battle' tactical decisions." (*quoting Mills v. Singletary*, 161 F.3d 1273, 1285-6 (11th Cir. 1998))); *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) ("Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.").

A motion for mistrial may have been more compelling but for the fact that nine days separated the tardy disclosure and the defense's *second* cross-examination of the

government's expert accountant. The defense thus had significant time to review and incorporate the new schedules into its impeachment strategy. In other words, Dohan has not shown how the belated disclosure or Moscowitz's strategic navigation of that potential obstacle materially prejudiced the defense. Similarly, defendant does not make clear what in particular Moscowitz failed to extract from Segner on cross-examination. Rather, defendant simply determines that the "tardy production of [the financial] materials . . . left defense counsel completely unable to adequately cross-examine Segner as to which transactions he included in the calculations he made to determine how much money to attribute to [Dohan]." (Doc. 1723, p. 86). Even with the benefit of years to review the belatedly-produced schedules, defendant has not enunciated with any degree of specificity how trial counsel could have further impeached the testimony of Milo Segner. As explained in analyzing preceding grounds of ineffective assistance of counsel, conclusory allegations of prejudice will not suffice. *See Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) ("Conclusory allegations of ineffective assistance are insufficient." (*quoting United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991))). Accordingly, no relief is available on either ground two (k)(1) or (k)(4).

In ground two (k)(2), defendant alleges ineffective assistance on the basis of counsel's failure to move for a mistrial or continuance in light of Segner's reliance on an extract–used to refresh his memory–the government allegedly withheld from discovery. Defendant contends in ground two (k)(3) that counsel rendered ineffective assistance by failing to cross-examine Segner on, or obtain a copy of, that extract. The genesis of these claims is found amidst Segner's initial cross-examination, during which Moscowitz questioned the accountant regarding bank accounts held by

defendant in the name of a firm called Tamsdale Limited ("Tamsdale"). (Doc. 1529, p. 127). Specifically, Moscowitz questioned the accuracy of Segner's analysis, which attributed to defendant $1,400,000 in the subject accounts. (Doc. 1529, pp. 127-28). In response, Segner offered to review each individual transaction to show how he had arrived at the total figure. (Doc. 1529, p. 128). In preparing to review the pertinent accounts, Segner referred to a document he brought with him, at which point Moscowitz asked, "Sir, what are you gonna be looking at now?" (Doc. 1529, p. 129). "I'm looking at my extracts," Segner replied, "a summary that you probably don't have." (Doc. 1529, p. 129). Defense counsel proceeded to request a copy of the extract. (Doc. 1529, p. 130). Segner stated, "I can produce it. I don't have an extra copy with me, no. I'm sure that there is one in the courthouse." (Doc. 1529, p. 130). Moscowitz agreed to proceed as long as a copy was provided him after Segner's testimony concluded, so he could reconcile it. (Doc. 1529, p. 131).

Defendant's argument proceeds on the premise that the government's failure to disclose Segner's extract, which defendant refers to as the "Key Summary," constituted a violation of the rule enunciated in *Brady v. Maryland*, 373 U.S. 83, 83 (1963) (holding that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment"). Given this alleged violation, defendant argues that Moscowitz should have moved for a mistrial or delay (to pour over the new numbers), concluding that counsel's decision to proceed without reviewing the extract "allowed the [g]overnment to succeed in misleading the jury . . . [he] had . . . improperly benefitted by over $1.5 million." (Doc. 1723, pp. 87-88). In addition, defendant maintains that defense counsel should have obtained a copy of the extract and failed to cross-

examine the accountant thereon "in a manner that would expose that errors in [Segner's] calculations inflated the amount of money attributable to [him]." (Doc. 1723, p. 1723).

Preliminarily, Moscowitz disputes that he never obtained the extract, asserting that he received additional material from Segner following his first cross-examination. (Doc. 1747, p. 70). More tellingly, defendant concedes that "defense counsel [eventually] received and reviewed the 'Key Summary' . . . ." (Doc. 1768, p. 50). That the court cannot discern with certainty whether Moscowitz ultimately obtained the supposedly elusive extract does not work in defendant's favor. *See Grayson v. Thompson*, 257 F.3d 1194, 1218 (11th Cir. 2001) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]." (*quoting Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc))); *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.").

Yet even if Moscowitz lapsed in his duty as defendant asserts, defendant struggles to demonstrate actual prejudice. "To establish a *Brady* violation, the defendant must show (1) that the government possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence and could not obtain the evidence with reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different." *United States v. Woodruff*, 296 F.3d 1041, 1043 n.1 (11th Cir. 2002). Defendant, who admits

counsel received the Key Summary (doc. 1768, p. 50), thus has not demonstrated either that the government suppressed the evidence or that he could not obtain it with reasonable diligence. Further, Dohan has not shown that his rights were violated under *Brady*, because the alleged favorable evidence, even if disclosed to him at an earlier date, would not have changed the outcome of the trial. Significantly, the government did not only present evidence of Dohan benefitting from profits touching the Tamsdale accounts. Instead, the Tamsdale transactions were among the many Segner considered in his extensive analysis of the Ponzi scheme's financial dealings and Dohan's profits in particular. Defendant merely speculates that counsel's earlier receipt and review of the extract would have made the difference in the jury's finding of guilt. As Moscowitz recalled, however, he impeached Segner's credibility on several occasions, exposing "material errors in [Segner's] calculations relating to the monies received by Mr. Dohan." (Doc. 1747, p. 70). In a trial producing much in the way of incriminating evidence, as recounted throughout this writing, an extract relating merely to one of the conspiracy's several companies would have questionable value, even at the margins. For these reasons, defendant has not demonstrated "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). As a result, relief is not warranted on either ground two (k)(2) or (k)(3).

In ground two (l), defendant contends counsel rendered ineffective assistance by failing to (1) object to the admission into evidence of Roger Allen Cox's Rem-Cohig chart as irrelevant and misleading, (2) cross-examine Cox so as to reveal that none of the Hammersmith or Microfund contracts promised that treasuries would be

held in Rem's Cohig account, and (3) object to the admission of the chart as unfairly prejudicial and as having a propensity to confuse the issues and mislead the jury. (Doc. 1723, p. 91).

Roger Allen Cox, an investment advisor and expert in debt markets, testified at Dohan's trial as part of the government's case-in-chief. In preparation for his testimony, Cox explained, he reviewed a number of investment contracts issued by Hammersmith and Microfund to their respective investors. (Doc. 1560, p. 218). According to Cox, the Hammersmith contracts called for the company to purchase specific U.S. Treasury bills to secure the investments. (Doc. 1560, p. 227). Next, Cox reviewed various securities transactions that took place in Hammersmith's account with Cohig. (Doc. 1560, p. 221). Cox stated that the purpose of this analysis was to determine whether the transaction activity would confirm that Hammersmith had in fact purchased the Treasury bills, as was its contractual obligation. (Doc. 1560, pp. 227-28). "[T]here was very little relationship" between the two, Cox concluded. (Doc. 1560, p. 228).

In presenting the transaction activity in the Hammersmith-Cohig account, Cox relied on a demonstrative aid, published to the jury, to show the amount of money in the account and securities held at all times material to the charges against Dohan. (Doc. 1560, p. 229). Cox employed the same demonstrative approach to give the jury a longitudinal picture of the monies and securities in another Cohig account, held by AAH Rem (an Australian investment company controlled by Dohan and Muirhead, as noted above). (Docs. 1528, p. 220; 1560, p. 221). Over Mendez's objection, the Rem-Cohig chart was published to the jury in conjunction with Cox's explanation as

to what it depicted.[32] (Doc. 1560, p. 231). Indicating that all of the transactions in the Rem-Cohig account were in one particular Treasury bond, Cox testified that the account went "short" in the beginning of April or May 1997, and that its security positions remained that way through the end of the time period shown. (Doc. 1560, p. 232).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401; *see Huddleston v. United States*, 485 U.S. 681, 687 (1988) (defining as relevant "evidence that makes the existence of any fact at issue more or less probable"). Relevant evidence is admissible unless the RULES provide otherwise. *See* FED. R. EVID. 402. In other words, the FEDERAL RULES OF EVIDENCE do not require that evidence be conclusive of the fact at issue to be admissible. Here, the fifth superseding indictment alleged that Dohan was secretary of Hammersmith and (through AAH Rem) a fifty percent owner of the firm.[33] (Doc. 966, p. 7). Further, the indictment alleged that one of Dohan's

---

[32] Mendez objected on the ground that Cox's testimony concerning the Rem-Cohig account constituted undisclosed expert testimony, standing in contravention of the court's pretrial discovery ruling. (Doc. 1560, pp. 221-27).

[33] The evidence adduced at trial confirmed this latter assertion, set forth initially in the indictment, that AAH Rem owned half of Hammersmith Trust. On the first day of trial, Steven Signer, who assisted Gilliland and Dohan in opening the Hammersmith and Rem accounts at Cohig, testified on direct examination as to the connection between the two entities:

> I didn't know initially what the relationship between the two [firms] was, but sometime later . . . I was told [by Gilliland] that AAH Rem had half of Hammersmith and Hammersmith had half of AAH Rem, it was the H in AAH Rem. There was some portion of both accounts that the other party owned.

coconspirators, Kenneth Cobb, told Hammersmith investor John McGarry ("McGarry") that his funds had been used to purchase a Treasury bill, when, in fact, McGarry's funds ($206,000) had been disbursed to Dohan through AAH Rem. (Doc. 966, p. 10).

Defendant cannot establish the inadmissibility of the chart merely because it refers nominally to AAH Rem, which he claims did not obligate itself contractually to purchase Treasury bills. Cox's Rem-Cohig chart was relevant to prove, to the exclusion of any reasonable doubt, that Rem, as half owner of Hammersmith, was not purchasing the Treasury bills to satisfy Hammersmith's contractual obligations. Alternatively, the chart was relevant to substantiate the government's allegation that investor capital had been diverted to Rem rather than allocated to the purchase of Treasury bills in accordance with prior promises. As an objection on relevance grounds would have been overruled, defense counsel did not perform deficiently by failing to enter one. *See Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (holding that "[c]ounsel was not ineffective for failing to raise these issues because they clearly lack merit"). Likewise, defendant makes no showing that the chart, which he concedes was arranged similarly to the Hammersmith-Cohig visual, would likely have been excluded as misleading.

Defendant argues next that "counsel . . . failed to render effective assistance when he failed to cross-examine Cox in a manner that would reveal that none of the Hammersmith or Microfund contracts promised that treasuries would be held in Rem's Cohig account." (Doc. 1723, p. 93). Dohan concludes that "Cox would have

---

(Doc. 1528, p. 216).

had to concede that [the] Rem Cohig chart was irrelevant and misleading . . . and defense counsel would have succeeded in raising further reasonable doubt of the [defendant's] guilt." (Doc. 1723, p. 93). As discussed, the Rem-Cohig chart corroborated, *inter alia*, the government's assertion that Hammersmith, which was controlled in substantial part by AAH Rem, was not making legitimate transactions in accordance with its contractual obligations. For this reason, counsel did not perform deficiently by failing to cross-examine Cox on relevancy grounds. The absence of some error or deficiency in the representation is fatal to a claim of ineffective assistance. *See Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002) ("[T]he petitioner must first show that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment.'" (*quoting Strickland v. Washington*, 466 U.S. 668, 687 (1984))). Moreover, defendant has not demonstrated how counsel's failure to extract from Cox such concessions, given the weight of the remaining evidence of record, "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *See Strickland*, 466 U.S. at 686.

Defendant submits in ground two (l)(3) that "counsel rendered ineffective assistance . . . when he failed to object to the admission of the Rem Cohig chart as unfairly prejudicial and as having a propensity to confuse the issues and mislead the jury." (Doc. 1723, p. 93). Dohan theorizes that Cox's presentation of the Rem-Cohig chart "was clearly calculated to mislead the jury into believing that [he] had knowledge of the fraud that was occurring with . . . the Hammersmith investors' funds." (Doc. 1723, pp. 93-94). Pursuant to FEDERAL RULE OF EVIDENCE 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed

by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Nevertheless, "'because it permits a trial court to exclude concededly probative evidence, Rule 403 is an extraordinary remedy which should be used sparingly.'" *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (*quoting United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. Unit B 1982)).

Defendant's interpretation of the Rem-Cohig chart as prejudicial (as most prosecution evidence will certainly be) is not unpersuasive, but he has not shown that it was unfairly so–Dohan personally controlled AAH Rem, which owned half of Hammersmith, thus implicating defendant in the machinations of that company. Moreover, the chart tended to establish not only the interconnectedness of the various investment companies and accounts, but also a pattern of conduct defined in part by the general failure to purchase Treasury bills to secure the investments. Defense counsel is not required to lodge an objection simply because evidence adduced by the prosecution is prejudicial. *See King*, 713 F.2d at 631 ("[I]n a criminal trial relevant evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that the rule permits exclusion."). Contrary to defendant's contentions, none of this information was presented in such a manner so as to confuse the issues or mislead the jury. Nor has defendant demonstrated that Cox's derivative testimony, which Moscowitz described generally as "not damaging," rendered the trial unfair or the result unreliable. (Doc. 1747, p. 70). Far from relying on a single incriminating piece of evidence or the proverbial "smoking gun," the prosecution told through the evidence an extensive yet generally consistent story of fraudulent misrepresentations and conduct, of which Dohan was surely a part. The evidence,

when viewed in its totality, weighs heavily on defendant's attempt to establish prejudice. This ground of ineffective assistance is, therefore, unavailing.

*The Indictment*

Defendant asserts in ground two (m) that counsel rendered ineffective assistance by "failing to . . . file a motion to dismiss the [i]ndictment based upon prosecutorial misconduct before the grand jury . . . ." (Doc. 1723, p. 94). In support of this allegation, defendant submits that the prosecution knowingly used "false testimony to improperly and substantially influence the grand jury's decision" to indict him. (Doc. 1723, p. 94). Grand jury proceedings regarding Dohan were held on June 20, 2000, and October 16, 2001. (Docs. 1723-2, 1723-4). During each of these proceedings, Michael Quilling, the receiver for the original litigation against Hammersmith and its related entities, testified against Dohan. In addition, Gilliland testified at grand jury proceedings regarding Bridgeport Alliance and its role in the Ponzi scheme, on September 19, 2001. (Doc. 1723-5).

Citing various alleged misrepresentations, defendant contends that "well before . . . trial, defense counsel knew that the prosecutor had knowingly presented . . . misrepresentations of fact before the grand jury to substantially influence the decision to indict" him. (Doc. 1723, p. 96). More specifically, defendant maintains that Quilling misrepresented the facts on October 16, 2001, when he testified before the grand jury that he knew with "absolute certainty" that Dohan had additional bank accounts in the Carribean not reflected in grand jury exhibit 1 (doc. 1723-2, p. 5); that Dohan was "hiding in Europe," "between his house in France and his house in England" (doc. 1723-2, p. 6); and that Dohan had kept approximately $1,500,000 in illicit proceeds, as shown by the aforementioned exhibit. (Doc. 1723, pp. 96-103).

Further, defendant asserts that Quilling misrepresented the facts on June 20, 2000, when he testified before the grand jury that Dohan, through Rica Services ("Rica"), only returned $2,000,000 to Hammersmith *after* federal authorities intervened under his receivership (doc. 1723-4, p. 3); that Dohan stated he never did anything with investors' money "other than hold it on deposit and [make] a couple percentage points like a normal deposit account would" (doc. 1723-4, p. 3); and that he was in London "trying to find" Dohan (doc. 1723-4, p. 4). (Doc. 1723, pp. 103-05).

Regarding Gilliland's testimony, defendant contends Gilliland misrepresented the facts on June 20, 2000, when he testified before the grand jury that DivCap was owned by Sonny Poole ("Poole") and Larry Callaway ("Callaway") (doc. 1723-5, p. 3); Dohan became DivCap's financial manager (doc. 1723-5, p. 4); Hammersmith was owned by Poole, Muirhead, and Dohan, and Dohan worked with Poole and another individual, David Johnson ("Johnson"), to form that company (doc. 1723-5, p. 5); Dohan was funds manager of Hammersmith (doc. 1723-5, p. 11); and Dohan and Sid Tweady ("Tweady") were planning some transactions through a Costa Rican bank to address complaints raised by an investor. (Doc. 1723, pp. 105-10).

"[T]he possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony . . . ." *United States v. DiBernardo*, 775 F.2d 1470, 1475 (11th Cir. 1985). Rather, "to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct." *Id.* To make out a claim of prosecutorial misconduct based on the use of false testimony, defendant "must demonstrate that the prosecutor 'knowingly used perjured testimony, or failed to correct what [she] subsequently learned was false testimony, and that the falsehood

was material.'" *See United States v. Woodruff*, 296 F.3d 1041, 1043 n.1 (11th Cir. 2002) (*quoting United States v. Dickerson*, 248 F.3d 1036, 1041 (11th Cir. 2001), *cert. denied*, 536 U.S. 957 (2002) (quotations omitted)). "The requirements of perjury are that '(1) the testimony must be under oath or affirmation; (2) the testimony must be false; (3) the testimony must be material; and (4) the testimony must be given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.'" *United States v. Ellisor*, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008) (*quoting United States v. Singh*, 291 F.3d 756, 763 n.4 (11th Cir. 2002)). "Conviction beyond a reasonable doubt without the use of the tainted testimony or alleged misconduct at trial makes it highly improbable that the grand jury indictment was based on insufficient probable cause." *United States v. Garate-Vergara*, 942 F.2d 1543, 1550 (11th Cir. 1991).

In his sworn declaration, Moscowitz explained that, at least initially, he contemplated filing a motion to dismiss based on what he perceived to be false testimony in the grand jury proceedings:

> Before trial, we obtained and reviewed the grand jury testimony of Michael Quilling and David Gilliland. We determined that they contained materially false statements. (I believed that Gilliland's false statements were intentional. I made no judgment as to Mr. Quilling's.) I considered filing a motion to dismiss based on this false testimony. However, I found no instances in the Eleventh Circuit where such a motion had been granted. I decided that, on balance, it was better to save this material for cross-examination during trial.

(Doc. 1747, p. 71). The grand jury testimony cited by defendant, though containing some factual errors and misrepresentations, tends to reinforce Moscowitz's suggestion that a motion to dismiss based on allegedly false testimony would have

stood little chance at success. First, several of the statements do not even satisfy the requisites of falseness and materiality. Quilling, for instance, testified that Dohan was "hiding in Europe" between his homes in the United Kingdom and France. (Doc. 1723-2, p. 6). Defendant submits that this assertion is false, citing his September 1999 meeting with Quilling, as arranged by his solicitor, Gerald Cooke, as evidence that he was living in the open. (Doc. 1723, pp. 97-98). This argument, based entirely on a literal interpretation of the word "hiding," is not persuasive. Merely because the government knew defendant's whereabouts does not mean that he was not also attempting to avoid adverse litigation and prosecution, which is exactly what Quilling surmised: "Dohan is hiding in Europe . . . . He is very well to do over there, but I haven't been able to - - I haven't sued him here in the United States because I would never get him served." (Doc. 1723-2, p. 6). Defendant's subsequent extradition challenge lends further support to Quilling's testimony in this regard. In short, the subject statement was not false.

Moreover, defendant has failed to present evidence that Quilling's testimony, to the extent it was false, was "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." *See Ellisor*, 522 F.3d at 1277 n.34 (*quoting Singh*, 291 F.3d at 763 n.4). The facts of this case, particularly as they pertained to the financial accounts, were voluminous and complex. That Quilling proved mistaken in his pretrial calculations or judgments does not, in and of itself, undermine the legitimacy of the indictment. This circuit has declined to "adopt the proposition that, absent perjury or government misconduct, an indictment is flawed simply because it is based on testimony that later may prove questionable." *See United States v. Sullivan*, 578 F.2d 121, 124 (5th Cir. 1978); *see also United*

*States v. Cathey*, 591 F.2d 268, 271-72 (5th Cir. 1979) (holding that absent a finding of perjury, there was no basis for dismissing the indictment).

On the other hand, Gilliland's grand jury testimony, to the extent it contained falsities, was not generally material in the context of the remainder of the evidence. For example, Gilliland testified that DivCap was owned by Poole and Callaway and that Dohan was the "funds manager" of Hammersmith. Conversely, defendant maintains that it was, in fact, Gilliland who owned DivCap (in conjunction with Poole) and acted as funds manager for Hammersmith. (Doc. 1723, pp. 105-06, 107-08). Defendant does not adequately explain the relevance of Gilliland and Poole's ownership of DivCap. More importantly, defendant fails to recognize that he was not indicted, and ultimately convicted, merely on account of Gilliland's testimony that Dohan was the Hammersmith funds manager, which, in and of itself, is not a criminal act. Rather, defendant was indicted and convicted on the strength of testimony from multiple witnesses who connected Dohan, in various capacities, to the numerous frauds perpetrated against legitimate investors. In short, defendant cannot establish the materiality of Gilliland's grand jury testimony except by obscuring the surrounding evidence.

Defendant is equally unpersuasive as to the knowledge he would impute to the prosecutor, Ms. Heldmyer. Dohan offers the summary conclusion that "the prosecutor knew [Quilling and Gilliland's] testimony was false and therefore, she committed prosecutorial misconduct by presenting it." (Doc. 1723, p. 95). Defendant tries to justify this deduction, asserting, for example, that Heldmyer knew certain testimony to be false because "she obviously had familiarized herself with the account analyses" and "was fully aware . . . of all the facts in this case." (Doc. 1723, pp. 97,

105). It is not unreasonable to assume that Heldmyer had familiarized herself with the content of the trials of Dohan's coconspirators, such as Gilliland, but it hardly follows that she "was fully aware . . . of all the facts" in Dohan's case, which, at the time of the subject grand jury testimony, was still in the investigative stages. Again, merely because some allegations cannot be substantiated at the grand jury proceedings and remain wanting of proof thereafter does not occasion dismissal of the indictment. *See Sullivan*, 578 F.2d at 124. Given the preceding considerations, Moscowitz's judgment to forego a motion to dismiss the indictment was not an unreasonable one. Because the constitutional guarantee of effective representation does not require counsel to file what is likely to be a motion lacking in merit, *see Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (holding that "[c]ounsel was not ineffective for failing to raise these issues because they clearly lack merit"), *Meeks v. Moore*, 216 F.3d 951, 968 (11th Cir. 2000) (affirming district court's assertion that counsel has no duty to bring forth non-meritorious motions), defendant has not demonstrated deficient performance on this ground.

*The Receiver and the Accountant*

In ground two (n), defendant alleges counsel rendered ineffective assistance by failing to impeach Quilling's credibility with his allegedly false grand jury and detention-hearing testimony.[34] Dohan argues that Quilling misrepresented the facts at the detention hearing, held on September 13, 2005, when Quilling testified that no Microfund investors were told that their money would be transferred to an account

---

[34] Quilling's relevant grand jury testimony is detailed directly above and will not be recounted here, except as called for in the analysis of this ground.

held by another entity, Primary Services (doc. 1342, p. 51); the $800,000 Dohan reported AAH Rem deposited in Hammersmith's account at Barclays Bank ("Barclays") actually came from Hammersmith's Cohig account, because AAH Rem's account with Cohig had sustained significant losses and needed those funds to cover them (doc. 1342, pp. 123-24); and, despite "trying everything," he could not obtain records from Barclays (doc. 1342, p. 126). (Doc. 1723, pp. 111-12).

As Moscowitz explained in his sworn declaration, however, the limited scope of Quilling's direct testimony did not implicate his prior inconsistent statements:

> I was prepared to impeach Mr. Quilling with prior inconsistent statements and incorrect statements he had given in the grand jury [proceedings] and at the bond hearing. However, we succeeded in severely limiting the scope of his direct testimony at trial, by objection, so there was no basis for such impeachment.

(Doc. 1747, p. 71). A review of Quilling's direct examination confirms Moscowitz's analysis, revealing little in the way of testimony that might have occasioned impeachment with the allegedly false grand jury or detention hearing testimony. Failing to identify any grounds for impeachment with Quilling's prior testimony, defendant cannot show that counsel's performance was unreasonable in this regard.

In addition, defendant relies on what might be generously termed an attenuated theory as to how counsel's alleged oversights prejudiced the outcome of his trial. To that end, defendant's argument proceeds on the premise that Segner, whom Quilling retained to analyze the flow of funds in and out of the Ponzi scheme, did not attribute ownership of the numerous bank accounts and financial entities, but rather relied on Quilling's determinations as to ownership when making generally numerical calculations. (Docs. 1529, pp. 83-84, 86-87, 89-90; 1560, pp. 208-09; 1723, p. 113).

Dohan thus posits that "counsel's failure to impeach Quilling's credibility prejudiced [him] at trial as it limited his ability to expose errors in Segner's analysis of the accounts and companies he attributed to [him], which impacted [his] theory of defense." (Doc. 1723, p. 113). Despite his general protestations of erroneous attribution, defendant has not pinpointed any account or company that was improperly attributed to him as a consequence of counsel's omission of prior testimony from Quilling's cross-examination. Nor has defendant shown that the jury was exposed to the allegedly false statements, which were rendered at other proceedings. Owing to the substantial competent proof offered to establish the guilt of the accused, defendant cannot demonstrate that the errors alleged were so egregious as to deprive him of a fair trial or reliable verdict. *See Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) ("Under our decisions, a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" (*quoting Strickland*, 466 U.S. at 687)).

Defendant argues in ground two (o) that counsel rendered ineffective assistance by failing to impeach Segner's credibility with, or effectively cross-examine him on, evidence that (1) he participated in the preparation of grand jury exhibit 1 (which Dohan contends is based on false information), (2) he gave false testimony at the trial of coconspirator William Harry West, (3) he gave false testimony at West's loss hearing, (4) the Colonial Gold account was used to repay Microfund investors (rather than to develop a new Ponzi scheme), and (5) he consistently "netted-out" transfers between Dohan's companies. (Doc. 1723, p. 114).

Regarding ground two (o)(2), defendant asserts that Segner misrepresented the facts at West's April 2001 trial when he testified that he had never received any bank

records from Primary Services, one of Dohan's several entities, and that he had no knowledge of a $1,558,353 transfer Primary Services made to Microfund investors in Spring 1999. (Docs. 1723, p. 115; 1723-7, pp. 3-7). Here, the premise of defendant's theory of ineffective assistance is faulty, as Segner had already admitted, on direct examination, that Primary Services had made payments to Microfund investors in the amount of 1,558,353. (Doc. 1529, p. 68). Defendant does not articulate how his attorneys might have exploited an already favorable admission by an adverse witness to such effective degree as to alter the result of the proceeding. Consequently, defendant has shown neither unreasonable performance under prevailing professional norms, nor carried his burden to satisfy the prejudice prong of the *Strickland* analysis. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."); *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) ("The standard for counsel's performance is 'reasonableness under prevailing professional norms.'" (*quoting Strickland*, 466 U.S. at 688)).

Similarly, defendant labors in ground two (o)(3) to demonstrate deficient performance or prejudice deriving from counsel's failure to cross-examine Segner regarding the allegedly false testimony he rendered at West's July 2001 loss hearing, where he stated that money disbursed to the Droubi Group ("Droubi"), another Dohan entity, "didn't come back . . . ." (Docs. 1723, p. 115; 1723-8, p. 8). At Dohan's trial, Segner testified on direct examination that Droubi and its related entities, Primary Services and Rica Services, in fact returned to investors approximately $500,000 more than they had taken in. (Doc. 1529, pp. 67-68). Again, Segner's favorable,

exculpatory testimony largely obviated the need for impeachment on this issue, which, as Moscowitz recognized in his declaration, would have served only the interests of confusion: "There was no point in cross-examining [Segner] about his testimony in the first trial which did not relate to Mr. Dohan. Such cross-examination would have been confusing and since it was not the subject of his direct examination, probably would have been excluded." (Doc. 1747, p. 71). Unable to show either deficient performance or prejudice, defendant cannot garner relief on this claim of ineffective assistance. *See Chandler*, 218 F.3d at 1313 (observing that "trial lawyers, in every case, could have done something more or something different" and, therefore, "omissions are inevitable").

In ground two (o)(1), defendant, in essence, rehashes the prior argument that grand jury exhibit 1, prepared in part with Segner's input, contains the allegedly erroneous conclusion that Dohan kept $1,467,133 in illicit proceeds. (Doc. 1723, p. 100). As proof of this accounting error, defendant cites several transfers to investors, allegedly omitted from the grand jury exhibit, from his various entities and their accounts. (Doc. 1723, pp. 100-01). Yet defendant concedes that each of these transfers allegedly omitted before the grand jury was presented by the government in an accurate light at some juncture of his trial. (Doc. 1723, pp. 100-01). Moreover, defendant can only surmise that the jury would have credited his current position that Segner knowingly misrepresented evidence during the grand jury proceedings, rather than accept the equally, if not more plausible explanation that his errors, to the extent any were made, were the result of oversights amidst the analysis of tens of thousands of banking transactions. In short, suppositions will not suffice to carry defendant's burden to affirmatively show prejudice, particularly where Segner, by Dohan's own

account, rectified his alleged omissions before the grand jury and credited Dohan at trial with having returned the relevant funds.

Defendant advances ground two (o)(4) on the theory that the Colonial Gold account was used to repay Microfund investors, rather than, as Segner testified, to develop a new Ponzi scheme. (Doc. 1723, p. 117). At Dohan's trial, the prosecution asked Segner about exhibit MHS-80, a spreadsheet created to show activity in an account at AMPAC Bank, held by an entity called Colonial Gold ("Colonial"), which had been created by George Muirhead. (Doc. 1562, p. 52). Ms. Heldmyer also questioned Segner on exhibit 2, a related AMPAC Bank spreadsheet prepared by the accountant. (Doc. 1562, p. 54). Segner testified that Colonial's money had been commingled with investments from Microfund clients, and that the first series of deposits coming into the account appeared to be investor funds. (Doc 1562, pp. 54-55). Further, Segner noted that the account showed both money coming in from investors, and transfers out to investors. (Doc. 1562, p. 56). The prosecutor asked, "What's happening here, Mr. Segner[?] We have money coming in from new investors and we have money going out to old investors. What are they doing?" (Doc. 1562, pp. 56-57). Segner replied, "Developing a Ponzi." (Doc 1562, p. 57).

Citing a memorandum authored in August 1999 by his solicitor, Gerald Cooke (doc. 1723-23), defendant attempts to explain the $310,000 in Colonial Gold disbursements to Microfund investors as simply the result of a legitimate agreement between the entities, whereby Colonial agreed to satisfy the demands of four Microfund investors, who had insisted on repayment. According to defendant, the arrangement was necessitated by Microfund's lack of funds, the better part of which were then invested in an interest rate arbitrage facility Primary Services had

established at the Bank of Beirut and the Arab Countries ("BBAC"). Defendant reasons that, had Microfund liquidated its positions in this facility prior to the date of maturity (to satisfy the aforementioned repayment demands), its investors would have incurred significant unforeseen costs. Upon maturity, defendant explains, Colonial instructed Primary Services to wire the $311,386 owed from this transaction to Tamsdale Limited, where Colonial intended to invest the repaid sums. (Doc. 1723-23, ¶ 112).

Defendant now takes issue with counsel's failure to elicit this explanation from Segner on cross-examination, the lack of which "allowed the jury to be misled into believing that [Dohan] was engaging in further criminal activity." (Doc. 1723, p. 119). A review of Segner's cross-examination, however, reveals that Moscowitz did test the accountant on his analysis of transactions involving Colonial Gold and Hammersmith, Microfund, or Landfair Custodial Services ("Landfair"), a firm owned by another coconspirator, Melody Rose. In the process, Segner admitted that the only identifiable transaction between Colonial's AMPAC account and either of those three entities was a $100,000 transfer from Colonial Gold to Landfair. (Doc. 1529, pp. 105-10). Defendant even concedes that Moscowitz cross-examined Segner regarding his direct testimony that money in Colonial's bank account had been commingled with the investment funds of Microfund clients. (Doc. 1723, p. 119).

The thrust of defendant's argument, then, is that counsel failed to delve specifically into the $310,000 transfer between Colonial and Microfund, occasioned by the agreement described above. But the mere fact that defense counsel did not broach this particular agreement does not, standing alone, render his performance deficient. *See Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000) (en

banc) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable."). On the contrary, the record makes clear that Moscowitz understood the prejudicial effect of Segner's identification of a new, separately emerging Ponzi scheme, and challenged him on cross-examination accordingly. (Doc. 1529, pp. 105-10). In any event, defendant has not shown that the omission "worked to his 'actual and substantial disadvantage.'" *See Adams v. Wainwright*, 709 F.2d 1443, 1446 (11th Cir. 1983) (*quoting Washington v. Strickland*, 693 F.2d 1243 (5th Cir. Unit B 1982)). Put another way, it does not appear that such a strategy, in light of the remainder of the evidence, would have worked to defendant's advantage in any material way. *See id.* Accordingly, no relief is available on ground two (o)(4).

Defendant contends in ground two (o)(5) that counsel failed to cross-examine Segner on his alleged failure to consistently "net-out" transfers between Dohan's various entities and corresponding bank accounts. (Doc. 1723, p. 120). At trial, Segner testified on direct examination that he calculated how much Hammersmith and Microfund investor money had been transferred to Dohan directly or to one of his entities. (Doc. 1529, p. 65). Segner noted that he had prepared spreadsheets reflecting Dohan's accounts and the dollars accumulated therein. (Doc. 1529, p. 66). Explaining that he subtracted from the accumulated amounts the money from Dohan's entities that had been returned to Hammersmith or Microfund, Segner testified that he "came up with . . . net numbers." (Doc. 1529, p. 66). Elaborating, Segner also testified that he had "eliminated the . . . intercompany transfers between the related [P]rimary groups" (i.e., Primary Services, Rica Services, and Droubi Group, all Dohan firms). (Doc. 1529, pp. 67-68).

Noting the $311,386 transfer from Primary Services to Tamsdale, occasioned by the agreement between Colonial Gold and Microfund (which had to repay four investors), defendant argues that Segner should not have attributed this amount to Dohan, who owned both the transferor and transferee entities. Defendant cites this alleged oversight as proof that Segner did not apply the netting-out technique in a consistent fashion. (Doc. 1723, p. 121). Again, however, defense counsel cross-examined Segner on this very issue, and did so extensively, expending considerable effort to extract from Segner a concession that he had counted the $311,386 transfer twice. (Doc. 1563, pp. 63-74). Although Segner ultimately would not agree with this proposition, Moscowitz asked precisely the right questions and is not responsible for the cross-examination responses of an adverse witness. At a prior juncture of the cross-examination, Moscowitz exposed an accounting error of the same nature as it concerned transfers of $431,674 between Colonial Gold and Tamsdale. (Doc. 1563, p. 34). Simply put, defendant has not shown that counsel performed deficiently in his cross-examination of Milo Segner, and therefore cannot prevail on this ground of ineffective assistance.

*DivCap*

In ground two (p), defendant alleges counsel rendered ineffective assistance by failing to expose the allegedly false testimony that Dohan was a "key player" in DivCap and that Hammersmith was formed at Cliffhouse to assume the debts of a failed and dissolved DivCap.[35] (Doc. 1723, p. 123). Relying on more than a dozen

---

[35] Gilliland rented Cliffhouse, a residence located outside of London, when it became too expensive to stay at the Park Lane Hotel. (Doc. 1558, p. 178). According to Gilliland, he resided at Cliffhouse with Dohan and Muirhead in the months leading up to the formation of Hammersmith

different instances where defense counsel allegedly failed to expose vulnerabilities in the prosecution's case, defendant concludes that counsel's omissions "allowed the [g]overnment to establish [its] false 'genesis' story and [Dohan's] motivation in joining the conspiracy as fact." (Doc. 1723, pp. 124-28). By "genesis" story defendant refers to Ms. Heldmyer's opening argument, wherein she asserted that Hammersmith was "conceived and born" at Cliffhouse to unburden DivCap of its debts, and therefore started $1,000,000 in the red itself. (Doc. 1528, pp. 17-18).

Again, defendant exaggerates the established nature of the Sixth Amendment right to counsel, which is not a guarantee of flawless or even surpassing legal representation. *See Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (observing that "petitioner was not entitled to error-free representation, only representation that fell within the range of competence demanded of attorneys in criminal cases and conformed to professional standards of reasonable investigation of facts and understanding of the law"); *Adams v. Wainwright*, 709 F.2d 1443, 1446 (11th Cir. 1983) ("Effective counsel . . . does not mean errorless counsel."); *Birt v. Montgomery*, 709 F.2d 690, 705 (11th Cir. 1983) (emphasizing the well-established standard that "a defendant is not entitled to perfect, error-free counsel . . . ."). This is not to say that defendant's attorneys performed deficiently–as stressed above, counsel need not "present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy." *See Chandler*, 218 F.3d at 1319; *see also Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) ("Our decisions are

---

Trust. (Doc. 1558, pp. 178-80).

inconsistent with any notion that counsel must present all available mitigating circumstance evidence . . . ."). This standard "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *See Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1984). Rather, "[g]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Chandler*, 218 F.3d at 1319 (*quoting Rogers*, 13 F.3d at 388).

Here, the supposed weak points defendant would have had his attorneys attempt to exploit can be distilled into temporal and geographical inconsistencies that were relatively unimportant in the context of the body of evidence adduced by the government at his trial. At least in this case, the "where" and "when" were considerably less important than the "what" and "how" regarding execution of the criminal scheme. In his sworn declaration, Moscowitz placed the testimony related to DivCap in its proper context, realizing in addition that it would be difficult to refute:

> The testimony as to DivCap was not a significant part of the Government's case, which focused on the Hammersmith and Microfund entities. In fact, there was documentary evidence that Mr. Dohan became involved with Gilliland at DivCap. The Government's first investor witness was Frank Scott, who testified that Mr. Dohan spoke with him by phone about his investments while at DivCap. I cross-examined him vigorously. It is my recollection that he acknowledged that Mr. Dohan appeared to be subordinate at DivCap to Gilliland.

(Doc. 1747, pp. 71-72). As Mr. Moscowitz intimates, the record evidence of defendant's involvement with DivCap was substantial. Nonetheless, the better part of the government's case was devoted to establishing defendant's relationships with Hammersmith, Microfund, and Bridgeport Alliance. Having represented Dohan in

a prosecution defined by myriad complex financial agreements, tens of thousands of banking transactions, and the involvement of no less than fifteen coconspirators, defense counsel cannot be faulted for picking their battles and reserving the most forceful exculpatory evidence at their disposal for junctures of the trial where it could be applied to greatest effect–such tactical decisions are "virtually unchallengeable." *See Bolender v. Singletary*, 16 F.3d 1547, 1557 (11th Cir. 1994) (*quoting Lightbourne v. Dugger*, 829 F.2d 1012, 1025 (11th Cir. 1987)). Simply stated, defendant has failed to demonstrate deficient performance.

Also as to this contention, a showing of prejudice would be out of defendant's reach as well. The DivCap testimony was offered mainly to set the stage for Dohan's relationship with Gilliland and Dohan's subsequent participation in the fraudulent trading schemes initiated in the wake of DivCap's apparent dissolution. Though useful for explanatory purposes, evidence of Dohan's entwinement with DivCap was not, as Moscowitz judged, critical to the government's case. Defendant has not shown a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome, that but for counsel's alleged failure to distance Dohan from DivCap, the result of his trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). This ground of ineffective assistance is, therefore, unavailing.

*Ralph Mizrahi and Kenneth Cobb*

Defendant asserts in ground two (q) that counsel rendered ineffective assistance by failing to properly impeach the credibility of Ralph Mizrahi and expose the government's "knowing use and exploitation of [Mizrahi's] misrepresentation that he invested monies" in the Microfund program after, and as a direct result of, meeting

Dohan. (Doc. 1723, p. 129). Mizrahi testified on direct examination at Dohan's trial that he met defendant on February 8 or 9, 1999. (Doc. 1528, p. 151). Mizrahi stated that he subsequently invested $750,000 with Microfund *because* of his meeting with Dohan, whom he believed "had all the pillars of society . . . ." (Doc. 1528, pp. 161-62, 168). "Had defense counsel properly exposed the [g]overnment's knowing use of Mizrahi's misrepresentation and impeached his credibility," concludes Dohan, "the jury would have definitely known that [defendant] was not responsible for obtaining Mizrahi's investment . . . ." (Doc. 1723, pp. 130-31).

In support of this conclusion, defendant again identifies several supposedly foregone opportunities to introduce what he perceives as decisive exculpatory documentary evidence or testimony. For example, defendant cites Quilling's Statement of Allowed Claims ("Statement") against Hammersmith Trust and unidentified "bank records" to prove that "Mizrahi never invested any monies after meeting with [him]." (Doc. 1723-36). Though the Statement does not include an entry for Mizrahi and the investments to which he testified, it is not conclusive of the proposition for which defendant asserts it stands. Defendant also takes issue with counsel's failure to introduce evidence that Mizrahi, a certified public accountant and tax strategist, maintained the email address, "screwIRS@ . . . ." (Doc. 1723, p. 130). Likewise, this fact is probative of little, if anything, material to Dohan's prosecution, and defendant does not otherwise explain its significance.

Further, defendant assigns error to counsel's decision not to call Kenneth Cobb ("Cobb"), another coconspirator, as a witness. Moscowitz, however, explains the reasoning behind this decision in his sworn declaration:

> I do recall that Mr. Mendez impeached Mizrahi about his own participation in investments with Gilliland. As to co-conspirator Ken Cobb, we subpoenaed him and considered calling him as a witness. Mr. Mendez had numerous conversations with him. However, Cobb was extremely hostile, was cooperating with the Government, and threatened to provide damaging testimony against Mr. Dohan if we called him. We decided that, on balance, as with [Jack] Higgins, it was not worth the risk to put him on the stand.

(Doc. 1747, p. 72). As emphasized in the analysis made in connection with ground two (a), wherein defendant claimed ineffective assistance on the basis of counsel's decision not to call Higgins as a witness, "[i]neffective assistance claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because all allegations of what a witness would have testified are largely speculative.'" *See Chaney v. Sec'y, Fla. Dep't of Corr.*, No. 10–13039, 2011 WL 5555846, at *2 (11th Cir. Nov. 15, 2011) (*quoting Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978))). "'Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision' that seldom, if ever, serves as grounds to find counsel's assistance ineffective." *Id.* (*quoting Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004)). So is the case here, where defendant has failed to even acknowledge the likelihood that Cobb may have offered testimony damaging to his prospects of acquittal. On the whole, defendant has not demonstrated either that his attorneys performed deficiently in their general approach to Mizrahi's cross-examination, or that the omissions alleged worked constitutionally significant prejudice to the outcome of his trial. Consequently, no relief is available on this ground.

*The Papagni Tape*

In ground two (r), defendant argues that counsel rendered ineffective assistance by failing to impeach Gilliland or cross-examine him so as to expose the falsity of his testimony regarding Dohan's tape-recorded discussion with John Papagni, an investor in the Hammersmith program. (Doc. 1723, p. 131). At Dohan's trial, the prosecution introduced a tape recording of a conversation between Papagni, his wife, Pam Albion, and the defendant; the discussion took place at the offices of Phil Nesmith, a broker with whom the Papagnis had invested and a coconspirator in the instant Ponzi scheme. (Doc. 1560, pp. 149-50). The tape was admitted and published to the jury during Gilliland's testimony. (Doc. 1560, pp. 149-52). Before playing the tape, the prosecution asked Gilliland a series of background questions, during which time Gilliland testified that Papagni, already an investor with Hammersmith whose money was being held in an account at Barclays Bank, had expressed interest "in taking $10 million of his personal money and putting it independently into a program, which Mr. Dohan had arrangements - - or we were promoting at that time . . . ." (Doc. 1560, p. 150). The investment opportunity to which Gilliland referred called for Barclays to exchange its payment guarantee in the agreed amount for the applicable funds in Papagni's Barclays account. On the tape, Dohan could be heard telling Papagni that there was no risk to this investment unless Barclays failed. After the tape was played, Ms. Heldmyer continued her examination of Gilliland:

> Q. Were you aware of the rates of return that were talked about on this tape?
>
> A. Yes.

Q. And the representation by Mr. Dohan that there was no risk to this investment unless Barclay's [sic] Bank fails, were you aware that representations were being made to that effect?

A. Yes.

Q. Was that true?

A. No.

(Doc. 1560, pp. 151-52). Defense counsel declined an opportunity to cross-examine Gilliland on his testimony concerning the tape. (Doc. 1560, p. 152).

Defendant submits that "Gilliland's testimony that [Dohan's] statement regarding the risk of this investment was a lie was nothing short of devastating to [his] defense." (Doc. 1723, p. 133). Concluding that "counsel virtually conceded that [he] was indeed guilty of making fraudulent statements to investors," defendant asserts that Moscowitz should have cross-examined Gilliland to expose the alleged falsity of his prejudicial testimony. (Doc. 1723, p. 134). In support of this argument, defendant offers several facts to prove that the investment under discussion was in fact completely dependent upon the solvency of Barclays Bank (rather than, for example, Hammersmith or Microfund). (Doc. 1723, pp. 134-35).

For his part, Moscowitz acknowledged that Gilliland's testimony vis-a-vis the Barclays investment was harmful, but feared drawing additional attention to it:

> The tape recording of Mr. Dohan describing an investment to Papagni was very damaging and we moved to exclude it on the ground of judicial estoppel (the Government had moved to exclude it at a prior trial when offered by another defendant) and as other acts evidence. I recall that Mr. Dohan stated on the tape that this very high yield investment was risk free – more specifically, that the only risk was if the

> bank . . . failed. It didn't take Gilliland to explain to the jury that
> statement was false. In my view, nothing was to be gained by trying to
> demonstrate that it was true.

(Doc. 1747, p. 72). To establish deficient performance under the *Strickland* test,

defendant must prove that "counsel's performance failed to meet the standard of

'reasonableness under prevailing professional norms.'" *See Newland v. Hall*, 527

F.3d 1162, 1184 (11th Cir. 2008) (*quoting Strickland v. Washington*, 466 U.S. 668,

688 (1984)). This court "must 'indulge a strong presumption' that counsel's

performance was reasonable and that counsel 'made all significant decisions in the

exercise of reasonable professional judgment.'" *Id.* (*quoting Strickland*, 466 U.S. at

689-90); *see Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) ("There is a

strong presumption that counsel's performance was reasonable and adequate."). "To

overcome that presumption, 'a petitioner must establish that no competent counsel

would have taken the action that his counsel did take.'" *Gordon v. United States*, 518

F.3d 1291, 1301 (11th Cir. 2008) (*quoting Chandler v. United States*, 218 F.3d 1305,

1315 (11th Cir. 2000) (en banc)). The standard is an objective one, in that this court

"consider[s] whether there was any reasonable justification for the attorney's

conduct." *See Newland*, 527 F.3d at 1184; *see also Gordon*, 518 F.3d at 1301 ("The

relevant question is not what actually motivated counsel, but what reasonably could

have motivated counsel.").

Recognizing the peril in which his client might find himself were the tape-

recorded conversation between Dohan and Papagni published for the jury, Moscowitz

made a pretrial motion to exclude the tape on the ground of estoppel and as other acts

evidence. (Doc. 1747, p. 72). Once the tape had been played for the jury and

Gilliland had testified, in effect, that Dohan had deceived an investor, Moscowitz made a professional decision that to cross-examine Gilliland, thereby exposing the issue to further scrutiny and attention, would not redound to defendant's benefit. In other words, Moscowitz deployed a pretrial strategy to exclude the evidence, failing which he resolved to take the sting out by isolating it from any additional discussion. Because defendant has not shown that counsel's strategy was an unreasonable one, this claim of ineffective assistance is unavailing. *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."); *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (rejecting claim of ineffective assistance because "there [were] several reasons why counsel reasonably could have chosen to rely on a simple plea for mercy from petitioner himself").

*Benjamin David Gilliland*

Defendant asserts in ground two (s) that counsel rendered ineffective assistance by failing to present exculpatory evidence to refute Gilliland's allegedly false testimony that Dohan had insisted on paying Australian investors before American investors. (Doc. 1723, p. 136). On direct examination, the prosecution questioned Gilliland regarding the coconspirators' attempts to return money to individual investors in Spring 1999. (Doc. 1559, pp. 183-84). Gilliland testified that he and Dohan disagreed at times as to where the funds should be directed:

Q. What attempts did you make . . . to get the money to Mr. Quilling?

A. I was basically rounding up every dime that I could find in any account, and I was making requests of Mr. Dohan to send money back in order to give it to Mr. Quilling.

Q.  Do you recall . . . what Mr. Dohan was telling you?

A.  We were having lots of arguments . . . in terms of whose money was whose, how much money was Hammersmith money, how much was Microfund money, how [much] money was Microfund U.S. clients' money, how much money was Microfund Australian clients', et cetera.

Q.  Was there some information imparted to you by Mr. Dohan about paying Australians first?

A.  He believed that we should not take any monies that were being held for the various Australians and use it to pay Mr. Quilling, that that was basically a Hammersmith problem or a Microfund U.S.A. problem.

Q.  How was [Dohan] making that distinction between the Australian clients of Microfund and the U.S. clients of Microfund?

A.   Probably based upon how much money he believed that . . . [Muirhead's] clients had put into the programs, basically adding up everyone who was Australian.

. . . .

Q.  Do you know why Mr. Dohan was insisting on using the money to pay Australians and not Americans?

A.  Well, I would say his loyalties to - -

(Doc. 1559, pp. 183-84).  At this point, Moscowitz entered an objection, which the court sustained.  Ms. Heldmyer then asked, "Did you have any discussions with [Dohan] about why the Australians were more important to him than the Americans?"  Over Moscowitz's objection, Gilliland testified, "He said he was going to pay [Muirhead's] people first."  (Doc. 1559, p. 184).

Though defense counsel cross-examined Gilliland shortly thereafter, defendant takes issue with counsel's failure to present evidence that he did not send funds to Australian investors until Gilliland instructed him to do so, that he returned to American companies $6,353,000 before paying the Australian investors, and that he returned $531,647 to Microfund on the same day he returned $1,558,353 to Australian clients. (Doc. 1723, pp. 138-39). Defendant concludes that "counsel's failure to impeach Gilliland's credibility with this evidence, his failure to present any of this evidence in the defense case, and his failure to expose the prosecutor's knowing use of this misrepresentation was highly prejudicial," because the omissions "resulted in the prosecutor succeeding in painting [him] as un-patriotic and un-American before the jury in a post-9/11, conservative, American community with significant military ties." (Doc. 1723, pp. 139-40).

As the government points out, an even cursory review of the trial transcript reveals that the prosecution, more so than Gilliland, tried to raise the inference that defendant was unpatriotic. Gilliland, on the other hand, stated simply that Dohan prioritized the repayment of investors by reference to "how much money he believed that . . . [Muirhead's] clients had put into the programs . . . ." (Doc. 1559, p. 184). Moscowitz, moreover, disputed Dohan's present allegations, recalling in his sworn declaration that the defense team expended considerable effort to document the flow of funds to and from the defendant:

> This claim is incorrect. We showed in painstaking detail, both through Segner and our own forensic accountant, Alex Fernandez, the flow of monies to Mr. Dohan from various accounts at Microfund in the United States and investors in Australia and to those same accounts and investors from him.

(Doc. 1747, p. 72). Moscowitz's recollection is confirmed by the record, which reflects that on the sixth day of trial, he moved for the admission into evidence of defense exhibit WD-181, an April 1, 1999, memorandum drafted by Gilliland, in his capacity as funds manager, and addressed to Dohan. (Doc. 1529, p. 229). The memorandum, as defendant concedes, provided him with specific disbursement instructions for funds held in his custody. Moscowitz asked Gilliland on cross-examination, "What did you understand you were authorizing Mr. Dohan to do?" Gilliland answered, "Basically, pay all of the Australian [investors]." (Doc. 1529, p. 231). This exchange thus gives the lie to defendant's allegation that his attorneys did not "present exculpatory evidence" to refute Gilliland's testimony addressing the repayment of investors. Again, then, defendant has alleged as the basis for a claim of ineffective assistance omissions that counsel did not make. Even if Moscowitz had not presented and cross-examined Gilliland on this April 1999 memorandum, defendant still could not establish deficient performance, as counsel is not bound by an absolute duty to present every non-frivolous defense or all mitigation evidence, and is limited in his ability to do so by the constraints on time, energy, and financial resources to which every practitioner is subject. *See Chandler v. United States*, 218 F.3d 1305, 1318 n.22, 1319 (11th Cir. 2000) (en banc). In addition, defendant has not shown that counsel's omissions, to the extent any were made, had any conceivable effect on the fairness of the trial or reliability of the result. *See Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between

defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." ). For these reasons, no relief is available on this ground.

In ground two (t), defendant argues that counsel rendered ineffective assistance by failing to present exhibit OD-49 as exculpatory evidence, or cross-examine Gilliland so as to expose the alleged falsity of his testimony regarding this exhibit. (Doc. 1723, p. 141). At trial, the prosecution introduced into evidence exhibit OD-49, a June 13, 1998, memorandum from Dohan to Gilliland. (Doc. 1559, pp. 34-44). Gilliland testified on direct examination that it was his job to "take care of the client side and run the back office," whereas Dohan "was to . . . run the investment side . . . ." (Doc. 1559, p. 35). To retain capital, Gilliland explained, profits were paid to grumbling investors, the complaints of whom Muirhead and Gilliland kept Dohan abreast. (Doc. 1559, p. 37). A spreadsheet, attached to the memorandum, reflected a proposed schedule as to how future profits from specific investments would be allocated to pay certain investors. Further, Gilliland recalled, the spreadsheet showed future distributions to Dohan and himself (among others), and was similar to others Dohan had prepared to keep track of expected profits and their subsequent appropriation. (Doc. 1559, pp. 41-42). Upon receipt of profits, Gilliland and Dohan would each retain a share and allocate the remainder for distribution to clients. (Doc. 1559, p. 43).

Defendant contends that his attorneys should have cross-examined Gilliland on this exhibit to establish, *inter alia*, that Gilliland, rather than Dohan, determined how, and to whom, funds should be distributed; that Dohan sought advice from Gilliland as to where to direct distributions; that the memorandum concerned only a trading program called Eurofund, which was Gilliland's province, and not

Hammersmith; and that both Gilliland and Dohan genuinely believed Eurofund would generate legitimate profits. (Doc. 1559, pp. 144-46). Defendant concludes dramatically that counsel's alleged omissions were "fatal" to his case, reasoning that "[t]hese failures had catastrophic results . . . as they allowed the prosecutor to use . . . this exhibit to mislead the jury into believing that, because [he] tracked each investment and determined how much and when each [investor] would be paid, he obviously had knowledge of and participated in the crimes that the conspiracy was committing." (Doc. 1723, p. 147).

Defendant's characterization of the nature of counsel's cross-examination of Gilliland on this exhibit is plainly contradicted by the record. Defendant theorizes that counsel should have emphasized the content of the memorandum to establish that Gilliland managed the distribution of funds to investors, and that Dohan only sought Gilliland's "advice and direction" as to specifics. (Doc. 1723, p. 144). By the following exchange on cross-examination, Moscowitz did exactly that:

> Q. And this is the memorandum in which Mr. Dohan attaches his schedule that he's worked out for future distributions, correct?
>
> A. Yes, sir.
>
> Q. And he does this, he says, so he can get a better handle on it before we make these next distributions, correct?
>
> A. Yes, sir.
>
> Q. And he says - - he asked for modifications to make the sheets reflect the reality, correct?
>
> A. Yes, sir.

(Doc. 1560, pp. 118-19). Mr. Moscowitz thus focused his questioning on the precise language of the memorandum defendant claims was overlooked during the examination. Despite defendant's indications to the contrary, Moscowitz then established that the proposed distribution schedule concerned the Eurofund program:

> Q. If clients were receiving large payments in - - this is dated June of '98, those payments would have been coming from Eurofund distributions, correct?
>
> A. Should have been, yes, sir.

(Doc. 1560, pp. 120-21). In accordance with defendant's next directive, Moscowitz also inquired of Gilliland as to his state of mind regarding the Eurofund program:

> Q. So you knew that when Mr. Dohan is proposing to you, take my profits and roll them over, that's nonsense, because there are no profits to be rolled over, correct?
>
> A. No, sir, because we were dealing with Eurofund at this time, and we were dealing with it in the context that we believed we were receiving payments from Eurofund.
>
> Q. So you're suggesting, as far as you knew, Mr. Dohan believed he was going to have these profits to roll over, correct?
>
> A. Well, I believe we were both under that assumption at that time.
>
> Q. You believed that you were going to have profits to roll over from these investments?
>
> A. From Eurofund, sir.
>
> Q. You thought Eurofund was a real investment?

A.  Initially, yes, sir.

(Doc. 1560, pp. 123-24).    Counsel for the defense, therefore, cross-examined Gilliland so as to establish that he and Dohan perceived Eurofund to be an above-board investment vehicle.

Counsel's cross-examination of Gilliland on exhibit OD-49 matches up in all significant respects with defendant's self-described ideal impeachment on the issues raised in connection with the June 1998 memorandum and attached spreadsheet.  As a result, defendant has not identified a material discrepancy on which to base this claim of ineffective assistance.  To the extent defense counsel deviated slightly from Dohan's *post hoc* preferred cross-examination approach, the court must repeat the familiar truism that "[g]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *See Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000) (en banc) (*quoting Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir. 1994)).  That the foregoing cross-examination points did not avoid a conviction does not render counsel's performance deficient.  *See id.* at 1314 ("Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.").  Defendant, in sum, has not demonstrated that counsel's performance in this regard was constitutionally lacking, and thus cannot prevail on this allegation of ineffective assistance.

Defendant asserts in ground two (u) that counsel rendered ineffective assistance by failing to present allegedly exculpatory evidence to refute Gilliland's testimony that Dohan continued to perpetrate fraud after federal authorities searched the Florida offices of Bridgeport Alliance, and to refute the implication that he had lied about client funds.  (Doc. 1723, pp. 148).  At trial, the prosecution questioned

Gilliland concerning the time period surrounding the January 21, 1999, execution of a search warrant at Bridgeport's offices in Bluewater Bay, Florida. (Doc. 1559, p. 162). Ms. Heldmyer inquired about exhibit OD-44, a February 26, 1999, letter addressed to Gilliland from the defendant. After the letter was admitted into evidence, Heldmyer asked Gilliland to read from the exhibit, which referred to a letter from Lloyds Bank ("Lloyds"):

> Q. Now, February 26, Mr. Dohan saying, "Sending you a Lloyd's [B]ank letter. Please find the attached requested document for your personal use only." And it's a Lloyd's [B]ank letter to Mr. Dohan about proving up funds. Is that what it appears to be?
>
> A. Yes.
>
> Q. What was this all about? Why was he sending this to you in proof of funds?
>
> A. We obviously had some program that we had been approached on, and we wanted to give a proof of funds letter to see if it was valid.
>
> Q. So in February, a month after federal authorities came in and [took] all of your documents and all of your computers, are you still looking for programs?
>
> MR. MOSCOWITZ: Objection. Your Honor, the question has already been asked.
>
> THE COURT: Overruled.
>
> BY MS. HELDMYER:
>
> Q. Are you still looking for programs a month after the search warrant?

A.  Yes.

Q.  Was Mr. Dohan aware that the search warrant had been served?

A.  Yes.

(Doc. 1559, pp. 169-70).  The prosecution then introduced exhibit OD-45, which, Gilliland explained, was a letter dated March 3, 1999, sent by William Harry West to Dohan when the latter was in the Far East.  (Doc. 1559, p. 173).  Ms. Heldmyer asked Gilliland to read particular excerpts from the letter:

Q.  It says, "Dear Bill [Dohan], I realize you're under the weather." Read the second paragraph, please.

A.  "Your urgent reply to the status of the Microfund wire is essential. As per our last conversation, those funds should have been in your account this past Monday or Tuesday for immediate transfer to Landfair. The void in communication has caused further concerns for obvious reasons."

Q.  Keep reading.

A.  "Please note the attached two pages from Mr. Ross Bannerman and Mr. J.J. Toomey.  The continual statements of funds being transferred with nothing arriving is causing a domino effect of clients requesting a refund.

"I do hope you are well enough to respond to this critical situation. If not, please have someone respond on your behalf since accountability is drastically suffering.["]

(Doc. 1559, p. 174).  Gilliland then testified that West was asking Dohan for an update on the wiring of funds because West had been "fielding all the telephone calls" from Microfund investors at the time.  (Doc. 1559, p. 174).

In light of the foregoing exchanges, defendant argues more specifically in this ground that counsel rendered ineffective assistance by failing to (1) object to the leading question describing exhibit OD-44 as including a Lloyds Bank letter "about proving up funds," (2) impeach Gilliland's credibility regarding exhibits OD-44 and OD-45 and his allegedly "misleading testimony" that Dohan continued to pursue the fraud after authorities intervened to shut it down, and (3) present allegedly exculpatory evidence relating to the subject trial exhibits. (Doc. 1723, pp. 150-51). Defendant describes the prejudice resulting from counsel's alleged omissions as "catastrophic." (Doc. 1723, p. 153).

Regarding counsel's failure to object to the "leading" reference to a supposed proof of funds statement from Lloyds, defendant has not demonstrated what conceivable effect the omission had on the outcome of the proceeding, let alone that the lack of objection "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). Nor can defendant show deficient performance here–Moscowitz objected (to no avail) when the prosecution inquired about "still looking for programs" following the Bridgeport raid, and thus tried to preempt Gilliland's affirmative response, which defendant identifies as the "prejudicial" fallout emanating from the allegedly "leading" proof of funds question. (Doc. 1559, p. 170).

The two remaining allegations advanced under this ground, that counsel failed to impeach Gilliland's credibility regarding exhibits OD-44 and OD-45, or present allegedly exculpatory evidence relating to those exhibits, share a common shortcoming. Citing several factual details he states were "at [counsel's] disposal,"

defendant has now determined that this "evidence . . . indisputably shows that . . . [he] made a diligent and consistent effort to promptly return the funds entrusted to Primary Services pursuant to custodial agreements to the appropriate account as properly instructed." (Doc. 1723, pp. 151-53). The common thrust of these arguments is that counsel should have couched the exhibits as evidence of Dohan's allegedly successful attempt to return to investors approximately $2,200,000 in matured profits from Primary Services's investment in the interest rate arbitrage facility at the Bank of Beirut and the Arab Countries. (Doc. 1723, p. 151-52). Notwithstanding that the factual information on which defendant relies is not particularly probative, let alone conclusive, of this proposition, Moscowitz recalled that the defense team nevertheless pursued this end at trial:

> Gilliland confirmed that Mr. Dohan had invested money with Suheil Droubi in a genuine bank investment (the "interest rate arbitrage"). We showed that as these investments were "unwound," the monies were returned by Mr. Dohan to Microfund and his investors.

(Doc. 1747, pp. 72-73). The record corroborates this recollection in all substantial respects, revealing that counsel for the defense challenged both Gilliland and Segner on Dohan's return of large sums to Microfund investors. Assuredly, counsel cannot cross-examine a witness on all of his statements at once, and, especially in a trial of considerable length such as this one, impeachment often is not contemporaneous. Because counsel ultimately adduced evidence of the apparently legitimate BBAC interest rate arbitrage investment, as well as Dohan's return of the corresponding funds, defendant fails to satisfy either *Strickland* prong.

In ground two (v), defendant alleges that counsel rendered ineffective assistance by failing to refute the government's portrayal of him as the "trader"

running the investment programs, and failing to present evidence that Gilliland had defrauded him of more than $1,000,000 he invested in Hammersmith and Microfund via AAH Rem. (Doc. 1723, p. 153). In her opening statement, Ms. Heldmyer told the jury that Dohan "had entrenched himself in Europe in [the] DivCap program, looking for these high-yield investment programs, [and] was to be passed off as the trader, as the person . . . making the magic, doing the programs, making the trades . . . ." (Doc. 1528, p. 20). During closing argument, Heldmyer returned to the theme of Dohan as "the big trader in London ," stating in rebuttal that "primarily Mr. Dohan was going to be a trader." (Doc. 1563, pp. 138, 176). Defendant advances this ground of ineffective assistance on the theory that counsel "failed . . . to present exculpatory evidence that would have refuted [the] portrayal" of him as a trader for the investment programs. (Doc. 1723, p. 154).

Citing allegedly exculpatory trial testimony and exhibits in support of this conclusion, defendant contends first that counsel failed to cross-examine Gilliland so as to expose that he did not act as DivCap's trader or run a DivCap program. (Doc. 1723, pp. 154-55). As alluded to above, DivCap, its operations, and its transactions played a mostly secondary role in defendant's trial. The prosecution relied on evidence pertaining to DivCap and its apparent dissolution to establish context and background for the formation of defendant's business associations with Gilliland and the eventual creation of Hammersmith. What transpired after Hammersmith's genesis, on the other hand, was the primary focus of defendant's prosecution. To that end, the government elicited testimony from no fewer than five individuals, a series of investors and brokers who recruited investors to the fraudulent Hammersmith or Microfund programs in some capacity, that Dohan served as Gilliland's trader,

residing in Europe to comb the global markets for potential investments. (Docs. 1580, pp. 118, 129, 162, 168, 170-75; 1558, pp. 60-61; 1528, pp. 60-65, 90, 131-32, 147-56). For example, Alexander Gilliland recalled Muirhead's description of Dohan as "a highly intelligent facilitator," relaying the Australian's pronouncement that "if a program could be found that would be credible and reliable, it would be Mr. Dohan who would find it." (Doc. 1558, p. 52). That said, defendant has not shown that the omissions alleged deprived him of a fair trial or reliable result. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (requiring defendant attempting to prove prejudice to show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable").

Defendant claims next that counsel failed to cross-examine Gilliland so as to establish that Hammersmith and Microfund relied at all times on investment programs operated by third parties. (Doc. 1723, pp. 155-56). In his sworn declaration, Mr. Moscowitz disputed this assessment:

> This is incorrect. . . . The Government had numerous documents showing Mr. Dohan's and Mr. Muirhead's contacts with third parties regarding potential investments. We tried to turn them to our advantage, to show that Mr. Dohan was in good faith seeking to find investments and only committed investor funds when he found one with Mr. Droubi. We cross-examined Gilliland to show that to be the case. Surprisingly, Gilliland acknowledged that to be so.

(Doc. 1747, pp. 73). The trial record substantiates Moscowitz's assertions, and also reflects that Gilliland referred in several instances on *direct* examination to third party investment programs that Hammersmith or Microfund investigated or pursued. (Docs. 1558, pp. 179, 192, 210, 213, 215-20, 252, 260; 1560, pp. 99-101). It follows that cross-examination of this testimony would have been largely redundant and of

little benefit to the defense's case. Defendant, moreover, fails to explain, in even the most general terms, the significance of the conspiracy's reliance on third-party investment vehicles–in accordance with the archetypal configuration, this Ponzi scheme was defined by the receipt and diversion of investor funds to the personal accounts of the confederates. Dohan simply cannot avoid or cloud the attestations of five different investors and brokers, all of whom testified that they understood Dohan to be, or interacted with him in his capacity as, a trader for the conspiracy. Having failed to demonstrate either that counsel's conduct fell beyond the wide range of reasonably professional assistance or a reasonable probability that, but for the subject conduct, the result of his trial would have been different, defendant cannot make out a successful claim of ineffective assistance. *See Strickland*, 466 U.S. at 694; *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990).

Defendant's concluding allegation under this ground is that counsel failed to present evidence that he did not receive any money to invest until April 1998 or that Gilliland defrauded him of his Hammersmith and Microfund investments. (Doc. 1723, pp. 156-57). Conversely, Moscowitz recalled in his sworn declaration that the defense "traced all of the money which was sent to Mr. Dohan and returned by him, by date and account." (Doc. 1747, p. 73). In cross-examining Milo Segner, the government's expert accountant, and through the testimony of Dohan's own forensic accountant, Alex Fernandez, Dohan's attorneys worked meticulously to pursue the winding money trail and thereby reinforce the image of defendant as a scrupulous steward of investor funds. Defendant is not entitled to vacation of his convictions merely because this defense proved unpersuasive in the judgment of the jury. *See Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) ("Nor

does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness."). As to the accusation that Gilliland defrauded him as well, Dohan offers no more than bare, conclusory allegations, which will not satisfy his burden to prove unreasonable performance by a preponderance of the evidence. *See Chandler*, 218 F.3d at 1313 ("The burden of persuasion is on a petitioner to prove, by a preponderance of competent evidence, that counsel's performance was unreasonable."); *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) ("'Conclusory allegations of ineffective assistance are insufficient.'" (*quoting United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991))). For these reasons, no relief is available on this ground.

*Closing Argument*

Defendant asserts in ground two (w) that counsel rendered ineffective assistance by failing to object, during the prosecution's closing argument, to alleged misrepresentations of evidence and statements concerning evidence not adduced at trial, and by failing to move for a curative instruction or new trial on the basis of these remarks. (Doc. 1723, p. 158). "In closing argument, a prosecutor is not prohibited from making 'colorful and perhaps flamboyant' remarks if they relate to the evidence adduced at trial." *United States v. Mock*, 523 F.3d 1299, 1302 (11th Cir. 2008) (*quoting United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992)). As noted in the analysis of ground two (f), "[t]he test for determining whether a prosecutor's comments warrant the granting of a new trial is (1) whether the remarks were improper and (2) whether they prejudicially affected substantive rights of the defendants." *United States v. Vera*, 701 F.2d 1349, 1361 (11th Cir. 1983). "A defendant's substantial rights are prejudicially affected when a reasonable probability

arises that, but for the remarks, the outcome of the trial would have been different."
*United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006); *see Parker v. Head*,
244 F.3d 831, 838 (11th Cir. 2001) ("The reversal of a conviction or a sentence is
warranted when improper comments by a prosecutor have 'so infected the trial with
unfairness as to make the resulting conviction [or sentence] a denial of due process.'"
(*quoting Darden v. Wainwright*, 477 U.S. 168, 181 (1986))).

Defendant identifies as the basis for this ground nine comments from the
prosecution's closing argument he believes either misrepresented the evidence, or
addressed evidence not adduced at trial. (Doc. 1723, pp. 160-69). As a general rule,
however, the comments on which defendant relies were neither improper nor material.
For example, defendant's initial criticisms involve the testimony of Frank Scott.
Defendant asserts that the prosecution misrepresented the evidence by telling the jury
that DivCap and AAH Rem "had Frank Scott's money." (Docs. 1563, p. 121; 1723,
p. 160). According to Dohan, this argument was contrary to the evidence because
"Scott testified that Clarion had his $900,000, not DivCap or AAH Rem." (Doc.
1723, pp. 160-61). Similarly, defendant argues that Ms. Heldmyer misrepresented the
evidence when she stated that he was responsible for persuading Scott to accept a
$900,000 credit in Hammersmith in lieu of being repaid. (Docs. 1563, p. 122; 1723,
p. 161). Defendant contends that this argument was improper because the evidence
showed that "all Hammersmith agreements, correspondence, and communications
were always with Gilliland . . . ." (Doc. 1723, p. 161).

The totality of the evidence simply does not support defendant's assertions.
Scott testified that Gilliland and Dohan encouraged him repeatedly to invest his first
$300,000 in a trading program with European banks. (Doc. 1528, pp. 61-68). Scott

also stated that "they [Dohan and Gilliland] actually did put together [the] contracts to facilitate that structure." (Doc. 1528, p. 67). When the investment failed, Scott recalled, Gilliland and Dohan "gave various excuses and explanations" and encouraged him to invest again and "make up the prior losses by entering another [program]." (Doc. 1528, p. 68). Scott testified that he lost two additional investments of $300,000, at which point Dohan and Gilliland convinced him to invest with DivCap. (Doc. 1528, pp. 69-71). According to Scott, Dohan faxed him the necessary documentation. (Doc. 1528, pp. 71-72, 76). Subsequently, Scott asserted, Gilliland and Dohan persuaded him to sign onto Hammersmith with the promise that they would give him a $900,000 "credit" for the money he had lost and by telling him that they expected returns of "anywhere from [forty] percent to a hundred percent a week." (Doc. 1528, pp. 83-86). Given this testimony, the prosecution did not stray impermissibly from the evidence by stating that Dohan convinced Scott to accept a $900,000 credit in Hammersmith in lieu of being repaid. Further, the details regarding the entity that actually had Frank Scott's $900,000 were not significant, as Scott testified that Dohan and Gilliland, in concert, were directly responsible for convincing him to invest his money in a "structure" "they" had "facilitated" and pursuant to a contract "they" had "put together." (Doc. 1528, p. 67).

Defendant's assignment of misconduct to the prosecution's closing-argument reference to Alexander Gilliland is misplaced for similar reasons. Defendant argues that Ms. Heldmyer misrepresented the evidence by asserting that Alexander Gilliland had no contact with David Gilliland, because the former conceded that he spoke with the latter on occasion. (Doc. 1723, p. 162). In focusing on this misstatement, however, defendant elides the significance of Alexander Gilliland's generally

incriminating testimony concerning Dohan's conduct in Australia. Alexander Gilliland testified, *inter alia*, that Dohan (1) claimed the investment in Treasury bills was "guaranteed," (2) gave a presentation to prospective investors, suggesting returns as great as ten percent per month and that profits were "guaranteed," and (3) was considered "the brains behind the outfit" and the "facilitator of the program." (Doc. 1540, pp. 49, 52-55, 60). That Alexander Gilliland may have also conversed with David Gilliland was largely immaterial.

Likewise, the prosecution's references to "programs" and "databases" were not improper. Ms. Heldmyer stated in rebuttal closing that Dohan used "programs" and "databases" to track money laundered by the conspiracy. (Doc. 1583, p. 180). Defendant claims this statement was "contrary to the evidence," which, he submits, "categorically shows that the database" he created "was never used." (Doc. 1723, p. 164). Defendant thus not only concedes he created the database, but also overlooks the testimony of Ray Hanson ("Hanson"), who worked as a business-plan developer for Bridgeport Alliance. (Doc. 1580, p. 114). Hanson testified that Dohan had come from London with a Microsoft disk containing the database. (Doc. 1580, pp. 134-35). According to Hanson, Dohan gave the disk to Gilliland's personal assistant, Jack Higgins, to set up a "tracking mechanism" for Hammersmith and Microfund investors. (Doc. 1580, p. 135). In a case hinging almost entirely on the defendant's intent, the distinction between Dohan personally using the database and creating the database for use by others in the conspiracy is one of semantics. Hanson's testimony provided a clear factual predicate for the prosecution's argument to this effect.

Defendant also asserts that Ms. Heldmyer misrepresented the evidence in arguing to the jury that when Dohan pitched the programs to investors like Mizrahi,

Alexander Gilliland, and Frederick Gilliland,[36] he did not reveal that the programs were not successful and had not made "millions of dollars." (Doc. 1723, pp. 167-68). Again, however, defendant splits hairs to make his point. Mizrahi testified Dohan told him that Microfund "was making money and that it was up and running." (Doc. 1528, pp. 153-54). When asked how much, Mizrahi replied Dohan had indicated that "[a] lot of money was being made." (Doc. 1528, p. 154). Conversely, Mizrahi affirmed, Dohan did not tell him "anything . . . negative or discouraging in any way about the prospects of this investment." (Doc. 1528, p. 156). Similarly, Frederick Gilliland testified Dohan represented that he was "happy" with Hammersmith, made no discouraging remarks about the program, and indicated that investors were making money and "things were working very well." (Doc. 1580, pp. 171, 173). Testifying to the details of Dohan's presentation in Australia, Alexander Gilliland echoed these assessments, recalling Dohan stated that returns could reach ten percent per month, never said anything negative about the programs, represented that the security of the investments was "guaranteed," claimed Microfund had "generated an enormous amount of funds" and "an awful lot of money," and was among those "extolling the virtues and the outcomes of the program . . . ." (Doc. 1558, pp. 54-66). Considering the testimony of these three investors, and the sheer quantum of money invested in the schemes of the conspiracy, Ms. Heldmyer's inference that Dohan had marketed these schemes as generative of "millions of dollars" was certainly grounded in the

---

[36] Frederick John Gilliland, who is of no relation to David or Alexander Gilliland, was a real estate agent living in St. Petersburg, Florida, and involved in building low income housing, which he then sold to investors. (Doc. 1528, pp. 154-55, 157). Frederick Gilliland was persuaded to invest with Hammersmith, and in connection with that investment pleaded guilty to charges of wire fraud and money laundering. (Doc. 1528, p. 154).

evidence adduced at trial. The thrust of Heldmyer's argument, moreover, was that Dohan had represented to investors that the programs had enjoyed considerable success, when in fact he knew them to be not only unsuccessful, but fraudulent. In this light, the distinction between "millions of dollars" and "a lot of money," "an enormous amount of funds," or "an awful lot of money," is not a material one.

In part because defense counsel countered and rebutted in his own closing argument several of the allegedly improper remarks, defendant has not shown that any of the subject comments prejudicially affected his substantive rights, or a reasonable probability that, but for the remarks, the outcome of the trial would have been different. *See Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). For instance, defendant assigns misconduct to Ms. Heldmyer's argument that "nobody else's money came back that went into Mr. Dohan's control," other than that of the Australian investors. (Doc. 1723, pp. 165-66). Defense counsel, however, refuted this argument on repeated occasion by highlighting evidence of record that showed Dohan had returned to investors no less than $8,200,000. (Doc. 1563, pp. 146-47, 149-50, 157, 163-65). In response to the prosecution's argument that Dohan was "the leader of the pack," which was also supported by the evidence and therefore not impermissible,[37] defense counsel argued with regularity that it was actually Gilliland and his accomplices in the United States who committed the fraud, while Dohan resided in Europe. (Doc.

---

[37] Alexander Gilliland testified that Muirhead always referred to Dohan with "deference," as "the brains behind the outfit," and as "the facilitator of the program." (Doc. 1558, p. 60).

1563, pp. 145, 148-55, 168, 171). Trial counsel also held up Gilliland and Dohan for comparison, arguing that the former "went the wrong way," whereas Dohan, faced with the same opportunities to defraud investors, "never took a penny." (Doc. 1563, pp. 172-73). Even assuming any of the prosecution's assertions were improper, counsel's actions in countering and refuting these assertions effectively mitigated any claimed prejudicial effect.

In pursuit of the same end, the trial judge cautioned the jury concerning any prejudice emanating from the extra-evidentiary remarks of either side to the case:

> [A]s I told you earlier, you must consider only the evidence that has been admitted into this case. The term "evidence" includes the testimony of the witnesses and the exhibits that have been admitted into the record. Remember, that anything the attorneys said is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the attorneys said is not binding upon you.

(Doc. 1563, pp. 183-84). The Eleventh Circuit has long held that "[a] prejudicial remark may be rendered harmless by a curative instruction." *See United States v. Iglesias*, 915 F.2d 1524, 1529 (11th Cir. 1990) (holding that "any prejudice was cured by the court's instruction to the jury that it should rely on its own recollection rather than the recollections of the attorneys"); *see also United States v. O'Keefe*, 461 F.3d 1338, 1350 (11th Cir. 2006) (concluding that "the district court's instructions remedied any likely prejudice caused by the improper comments," because the trial court instructed the jury, both before government's closing argument and after defendant objected to the government's comments, that arguments were not evidence and that the jury was to decide defendant's guilt based solely on the evidence); *United States v. Delgado*, 321 F.3d 1338, 1347 (11th Cir. 2003) ("[W]hen a district court

gives a curative instruction, the reviewing court will reverse only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition."); *United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992) ("[B]ecause the statements of counsel are not evidence, the district court may rectify improper prosecutorial statements by instructing the jury that only the evidence in the case is to be considered."). Here, none of the remarks in controversy were "so highly prejudicial as to be incurable by the trial court's admonition." *See Delgado*, 321 F.3d at 1347.

The preceding analysis of the allegedly improper closing arguments, which exposes the thin reed on which the corresponding allegations of prosecutorial misconduct were advanced, makes evident that defense counsel did not unreasonably withhold objection or motions for curative instruction or new trial, none of which were justified. As explained above, counsel does not render ineffective assistance for failing to raise objections or pursue motions of dubious merit. *See Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (holding that "[c]ounsel was not ineffective for failing to raise these issues because they clearly lack merit"); *Meeks v. Moore*, 216 F.3d 951, 968 (11th Cir. 2000) (affirming district court's assertion that counsel has no duty to bring forth non-meritorious motions); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (applying *Strickland* and holding that "a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client"); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (crediting as professionally reasonable counsel's decision not to file what he believed to be a meritless motion); *Ladd v. Jones*, 864 F.2d 108, 110 (11th Cir. 1989) ("[S]ince these claims were meritless, it was clearly not ineffective for counsel not to pursue them."). Most importantly, however, the prosecution's comments, to the extent they were impermissible, cannot

be viewed except in light of the totality of the evidence. *See United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006) ("When the record contains sufficient independent evidence of guilt, any error is harmless."); *United States v. Abraham*, 386 F.3d 1033, 1036 (11th Cir. 2004) (explaining that prosecutorial misconduct requires a reversal of a defendant's conviction only where defendant's substantial rights were prejudiced "in the context of the entire trial"); *United States v. Adams*, 74 F.3d 1093, 1097-98 (11th Cir. 1996) (determining that improper prosecutorial references did not raise a reasonable probability that, but for the remarks, the outcome would be different, "because the record contain[ed] sufficient independent evidence establishing guilt"); *Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir. 1994) ("[W]e determine whether a [prosecutor's] remark or a series of remarks, in the context of that trial, rendered the entire trial unfair."); *United States v. Harmas*, 974 F.2d 1262, 1269 (11th Cir. 1992) ("A prosecutor's comments [in closing argument] must be viewed in the context of the record as a whole, and will be the basis for reversal only if they result in prejudice affecting the substantial rights of the defendant."). Considering the government's allegedly improper statements in the context of the trial, the record of which establishes that the jury had sufficient evidence on which it could find that defendant did commit the offenses charged, the statements did not prejudice defendant's substantial rights. Because the record contains sufficient independent evidence of his guilt, defendant has not shown a reasonable probability that counsel's failure to object to the remarks at issue, or move for a curative instruction or new trial on the basis of those remarks, deprived defendant of a trial whose result is reliable. *See Fretwell*, 506 U.S. at 369 (requiring defendant waging

claim of ineffective assistance of counsel to show that "the result of the proceeding was fundamentally unfair or unreliable").

*Cumulative Error*

Finally, defendant alleges in ground two (x) that the cumulative effect of counsel's alleged errors so undermined the proper functioning of the adversarial process as to deny him a fair trial. (Doc. 1723, pp. 175, 179). Defendant emphasizes his belief that he was "tried in violation of his Sixth Amendment right to speedy trial, pursuant to an indictment obtained "via the knowing use of misrepresented facts and false evidence," and on a record "tragically distorted by the prosecution and Benjamin David Gilliland . . . ." (Doc. 1723, pp. 175-76).

The validity of cumulative error claims, as premised on the ineffective assistance of counsel, is not in question. *See Strickland*, 466 U.S. at 694-96 (expressing prejudice inquiry in aggregate terms of reasonable probability counsel's *errors* affected outcome of proceeding); *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1979) ("Where no single error or omission of counsel, standing alone, significantly impairs the defense, the district court may nonetheless find unfairness and thus, prejudice emanating from the totality of counsel's errors and omissions."). The fatal flaw in defendant's argument, however, is that he has identified only one supposed error of even passing significance–the failure to assert his rights under the Jencks Act–and certainly none that, taken on its own, so undermines confidence in the fairness of the trial or reliability of the outcome as to abrogate the right to counsel afforded by the Sixth Amendment. *See Porter v. McCollum*, 130 S. Ct. 447, 455-56 (2009) (requiring defendant alleging prejudice under *Strickland* to "establish 'a probability [of error] sufficient to undermine confidence in [the] outcome'" (*quoting*

*Strickland v. Washington*, 466 U.S. 668, 693-94 (1984))). Accordingly, these allegations taken together do not "cumulatively" become constitutional errors "merely because they occurred contemporaneously." *See United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir. 2004).

Even on any issues where the performance of counsel, hypothetically was *colorably* deficient, defendant has not approached the requisite showing of prejudice under *Strickland*. Nor does the aggregation of assumed prejudice "emanating from the totality of counsel's [alleged] errors and omissions" subtract in any constitutionally meaningful way from the fairness of the trial or the reliability of the verdict. "Effective assistance of counsel, such as will satisfy the requirements of the [S]ixth [A]mendment, is counsel 'reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances.'" *House v. Balcom*, 725 F.2d 608, 615 (11th Cir. 1984) (*quoting Washington v. Strickland*, 693 F.2d 1243, 1250 (5th Cir. Unit B 1982) (en banc), *cert. granted*, 462 U.S. 1105 (1983)). "In considering the totality of the circumstances, a court looks to the quality of counsel's assistance from the time of initial retention through the time of appeal." *Id*. Here, nothing in the record gives reason to doubt the constitutional adequacy of the assistance provided by defendant's attorneys. Notwithstanding his assertions to the contrary, defendant was not convicted because of the infirmity of his legal representation, but rather on the consistency and strength of the evidence adduced by the government. The trial and appeal underlying this post-conviction motion simply did not lead to a result that is objectively unreliable.

## CERTIFICATE OF APPEALABILITY

Section 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2255 11(b).

After review of the record, the court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.  That the motion to vacate, set aside, or correct sentence (doc. 1722) pursuant to 28 U.S.C. § 2255 be DENIED as to all grounds.[38]

2.  That all pending motions be DENIED, either as addressed in this Report and Recommendation, or as moot.

---

[38] In total, the parties to this post-conviction matter filed twenty-nine memoranda and notices of supplemental authority, comprising 609 pages of argument (not including hundreds of pages of exhibits or the pleadings related to the evidentiary hearing). The undersigned has reviewed each of these submissions with thorough care, considering each and every duly-presented theory and argument raised therein.

3. A certificate of appealability be DENIED.

At Pensacola, Florida, this 6th day of February, 2013.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).